Emalee R. Wagoner 428514, pro se
Goose Creek Correctional Center
22301 W. Alsop Rd.
Wasilla, AK
          99623



FEB 22 2023

CLERK, U.S. DISTRICT COURT
ANCHORAGE, AK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

EMALEE R. WAGONER,                )
                                  )
          PLAINTIFF,              )
                                  )
VS.                               )          PLAINTIFF'S MOTION
                                  )          FOR SUMMARY JUDGMENT
NANCY DAHLSTROM, et al.,          )
                                  )
          DEFENDANTS.             )
                                  )
_____)          Case No. 3:18-cv-00211-RRB

Comes now, the Plaintiff, EMALEE R. WAGONER (WAGONER) appearing

pro se and pursuant to her Federal rights of Due Process and Equal

Protection and Fed. R. Civ. P. 56(a) hereby MOVES this Court for

SUMMARY JUDGMENT on her single claim against Defendants: Nancy

Dahlstrom; Adam Rutherford; Robert Lawrence and Laura Brooks.

WAGONER contends that the Defendant's were responsible for the

care of Alaskan inmates, which included implementing policy to ensure

inmate access to constitutionally adequate health care; that the

Defendant's failed to implement any policies regarding the care of

inmates who are transgender and/or suffer from Gender Dysphoria, and

that as a result of this failure, WAGONER was denied care and when

she recieved care it was constitutionally inadequate and resulted in

actual harm to WAGONER, and all of which violated the Eighth Amend-

ment to the U.S. Constitution.

Because she is appearing pro se and remains, at best, a layperson

at the law, WAGONER asks that the Court liberally construe her

pleadings and notify her of any defects requiring correction.

## I.

## FACTS

WAGONER is a male-to-female transgender person and is also a sentenced Alaska prisoner. She has been housed at the Goose Creek Correctional Center (GCCC) in Wasilla, AK since 2012. WAGONER has experienced Gender Dysphoria (GD) throughout her lifetime.

GD refers to discomfort or distress that is caused by a discrepancy between a person's gender identity and their gender assigned at birth, and the associated gender roles and/or primary or secondary sex characteristics. Some people experience GD at such a level that the distress meets the criteria for a formal diagnosis under the DSM V which might be classified as a mental disorder.

As is common among transgender people whom experience GD, WAGONER's anxiety and distress has intensified as she has aged.

In August 2016 WAGONER used a razor blade to cut her penis tissue in an attempt at a self sex reassignment surgery. On 9/13/16 she was cited for an infraction of 22 AAC 05.400(d)(14), self mutilation, after she was heard discussing her first attempt at self surgery on the phone with her fiance by GCCC security staff. Dkt. 108 attachment # 5.

On 11/12/16 WAGONER requested to see a mental health psychologist, in response she was seen by Rodney Smith, who explained that the GCCC is not a theraputic environment and that the AKDOC does not accomodate outside psychological services for GD issues. Dkt. 108 attachment # 6.

On 11/23/16 WAGONER requested mental health treatment for her GD, Rodney Smith responded "I am willing to help you work on

2.

acceptance of your situation or develop coping methods, however MH does not address gender dysphoria issues, nor does medical as far as I know. Please let it go!" Dkt. 108 attachment # 7.

On 11/26/16 WAGONER requested treatment for her GD from GCCC medical, Angela Strommer responded, "Mr. Cancel, Alaska DOC does not offer medical treatment for this, continue to follow up and meet with mental health." Dkt. 108 attachment # 8.

On 12/1/16 WAGONER filed a grievance, GCC16-1272, requesting "to be treated, for Gender Dysphoria, by a qualified mental health specialist in accordance with the WPATH standards of care, No staff retaliation or discrimination." Dkt. 108 attachment # 9.

On 12/20/16 WAGONER was granted partial relief in GCC16-1272, which held "You will be seen by a professional for a proper diagnosis." Dkt. 108 attachment # 10.

On 12/20/16 WAGONER met with Christine Sawyer who informed her that due to her inexperience with GD she was not comfortable giving any diagnosis and that she would request that WAGONER be diagnosed by someone with more experience.

On 12/24/16 WAGONER filed an appeal of grievance GCC16-1272 and raised the continued lack of meaningful treatment. Dkt. 108 attachment # 11.

On 1/10/17 WAGONER was seen by Adam Rutherford, who informed her that he had reviewed her entire case file, that he was giving her a diagnosis of GD and that she would be recieving treatment in accordance with a DSM IV or V triadic treatment and that an appointment with an outside psychologist would be made.

On 1/16/17 Adam Rutherford responded to WAGONER's appeal of

3.

GCC16-1272, holding "Granted in the form of ongoing contact with mental health including evaluation by the psychiatrist to clarify your diagnosis and to address any symptoms you may be experiencing secondary to a possible gender dysphoria is clarified the Department will make an appointment for you to be assessed by an outside provider to aid in treatment planning. I would encourage you to continue to utilize the interventions provided by mental health and to reach out to mental health for any future needs." WAGONER was not served a copy of this until 1/8/18. Dkt. 108 attachment # 12.

On 1/25/17 WAGONER requested her diagnosis, an outside provider, and to begin Hormone Replacement Therapy (HRT) from Adam Rutherford in accordance with their 1/10/17 meeting. No response was ever recieved. Dkt. 108 attachment # 13.

On or around 5/8/17 WAGONER sent (3) additional requests for HRT to Rodney Smith. On 5/10/17 Rodney Smith informed WAGONER that she had been scheduled for an initial appointment with Michael Reed MS, LPA and reiterated that the AKDOC does not provide HRT.

On 5/17/17 WAGONER met with Michael Reed whom completed a mental health evaluation, diagnosed her with GD and recommended that: she engage in bi-monthly individual therapy sessions with either himself or another licensed mental health professional; that the AKDOC should consider allowing WAGONER to wear female clothing, make-up, etc. the same as what female inmates are allowed; that the AKDOC should con- sider encouraging its staff to refer to and address WAGONER using feminine pronouns; and that upon release WAGONER find a provider willing to prescribe her anti-androgen medications to assist with her transition. Dkt. 108 attachment # 14.

4.

On 6/14/17 WAGONER requested HRT in response to her diagnosis. This request was forwarded to mental health and responded to by Traci Tusha "Please continue w/Mr. Reed. This is still a work in progress for this treatment. Please be patient as we work through this." Dkt. 108 attachment # 15.

On 6/19/17 WAGONER was cited for an infraction of 22 AAC 05.400 (d)(14), self mutilation, for cutting her penis. She was taken to the Mat-Su Regional Hospital Emergency room. Dkt. 108 attachment # 16.

On 6/27/17 WAGONER requested HRT and sex reassignment surgery as treatment for her GD, this was forwarded to Adam Rutherford and he did not respond. Dkt. 108 attachment # 18.

On 7/7/17 WAGONER was started on Zoloft as a medication to treat her depression. Between August and September 2017 WAGONER repeatedly requested to have her follow up appointments with Michael Reed.

In September 2017 the AKDOC created a Gender Dysphoria Clinical Care Guide. Dkt. 108 attachment # 19.

On 10/5/17 WAGONER requested treatment for her GD in accordance with GCC16-1272 including bi-monthly visits with Michael Reed. Traci Tusha responded "Mental Health staff have done what we can and Mr. Smith will cont. to work with you." Ms. Tusha also forwarded this request to Adam Rutherford. Dkt. 108 attachment # 20.

On 10/26/17 WAGONER requested HRT as treatment for her GD. Kyle Sullivan responded "such services are not provided at DOC. You may seek these services after your release." Dkt. 108 attachment # 21.

On 10/27/17 WAGONER filed a grievance, GCC17-900, asserting that she was not recieving treatment for her GD. This was screened and Earl Houser upheld the screening. Dkt. 108 attachments # 22, 23, 24.

5.

On 11/5/17 WAGONER wrote to Michael Reed inquiring as to why she had not recieved her follow up bi-monthly visits with him. Dkt. 108 attachment # 25. Also on 11/5/17 WAGONER wrote a letter to the AKDOC Director of Institutions explaining that her requests and grievances were not working to get her adequate treatment for her GD as promised in GCC16-1272. Dkt. 108 attachment # 26.

On 11/7/17 WAGONER was informed that AKDOC was trying to find a new specialist, other than Michael Reed, who could meet with her in person. On 11/9/17 WAGONER's name was legally changed from Emmanuel Gancel to Emalee Rain Wagoner.

On 11/18/17 WAGONER recieved a letter from Michael Reed stating that: he had diagnosed her with GD and that this diagnosis was sent to Adam Rutherford, Traci Tusha, and Rodney Smith; he had recieved documentation that the AKDOC had given the same diagnosis; he had emailed AKDOC (5) times inquiring as to his next session with her, but had recieved no responses; and that he had not been compensated for his initial evaluation nor the planned follow up sessions. Dkt. 108 attachment # 27.

On 12/1/17 WAGONER sent a request to Traci Tusha and Adam Rutherford about her GD issues continuing to be left untreated and ignored, she attached a copy of Michael Reed's letter. Dkt. 108 attachment # 28.

On 12/5/17 the AKDOC Director of Institutions, Jeremy Hough, responded to WAGONER's letter, stating "Your letter is being returned unanswered due to: Referred back to institution for response/resolution Failure to follow the Classification, Disciplinary or Grievance appeal process." Dkt. 108 attachment # 29.

On 12/6/17 WAGONER met with Traci Tusha regarding her 12/1/17

6.

request, who informed her that Michael Reed was not telling her the truth and that she had done all she could for WAGONER, that it was Adam Rutherford's fault that she isn't recieving HRT and that the AKDOC would only ever offer counseling and never will provide HRT or sex reassignment surgery.

On 12/29/17 WAGONER requested to see a urologist due to the pain and bleeding issues from her attempts at self surgery. Dkt. 108 attachment # 30.

On 1/3/18 WAGONER was seen by Louis Smith who did an exam and prescribed antibiotics for an infection in her genitals, he also submitted a referral to a urologist.

On 1/11/18 WAGONER requested the triad of care from the WPATH Standards of Care, this was responded to by Kyle Sullivan stating that the AKDOC does not provide HRT. Dkt. 108 attachment # 32.

On 1/19/18 WAGONER filed a grievance, GCC18-072, asserting that she was not recieving the treatment she had been granted in GCC16-1272. This was screened. Dkt. 108 attachment # 35, 36.

On 2/13/18 WAGONER met with Adam Rutherford and Robert Lawrence to discuss her treatment plan, they informed her that: there would be no  outside specialist for her GD; there would be no HRT nor any surgery; that they would provide coping skills workbooks with Rodney Smith and Traci Tusha. Adam Rutherford claimed he would return to review all the requests he hadn't responded to.

On 2/28/18 WAGONER recieved a HARS communication from Robert Lawrence informing her that the (3) most common causes of death in transgender people are suicide, drug overdose and cardiovascular disease, and he offered that AKDOC will help with any cardio-

7.

vascular disease issues. Dkt. 108 attachment # 39.

On 3/1/18 WAGONER filed a grievance, GCC18-226, asserting staff misconduct against Adam Rutherford and that she was not recieving the outside specialist she was awarded in GCC16-1272. This was screened and Earl Houser upheld the screening. Dkt. 108 attachment # 46, 47, 48.

On 3/16/18 WAGONER engaged in self harm to her testicles, they were bruised and discolored from the injury.

On 4/12/18 WAGONER was informed by Rodney Smith that per her request he had contacted Adam Rutherford to clarify her care plan and he reiterated that they would only be providing coping skills.

On 5/3/18 WAGONER engaged in self harm to her genitals, they were bruised and discolored from the injury.

On 9/18/18 WAGONER filed the instant federal civil rights action pursuant to 42 USC § 1983.

On 9/28/18 WAGONER met with her new primary provider and discussed her untreated GD, showed her the damage to her penis and tesicles.

On 11/8/18 WAGONER recieved a HARS communication stating that she is recieving treatment prescribed for her current diagnosis. Dkt. 108 attachment # 51.

On 11/29/18 WAGONER engaged in self harm to her genitals, cutting to test a self sex reassignment surgery.

On 12/11/18 WAGONER requested HRT consistent with her diagnosis of GD by both Adam Rutherford and Michael Reed, Traci Tusha responded "I can not prescibe HRT. I will forward this to Mr. Rutherford." Dkt. 108 attachment # 52.

On 12/24/18 WAGONER was provided underwear pad to address the

8.

bleeding, discharge and leaking from damaged penis and urethra. Dkt. 108 attachment # 53. Also on 12/24/18 WAGONER was treated for a serious urinary tract infection requiring emergency antibiotics. Dkt. 108 attachment # 54.

On 1/5/19 WAGONER was medically issued daily extra bedding rolls due to the bleeding, discharge and leaking from her damaged penis and urethra. Dkt. 108 attachment # 55.

On 1/16/19 Rodney Smith informed WAGONER that the AKDOC MAC will be conducting a new evaluation of her case.

On 1/31/19 WAGONER was seen by Tanya Villers who informed her that the AKDOC MAC had denied her request that WAGONER recieve the Depo Prevara shot and she also performed an extensive physical exam and referred WAGONER to see a urologist.

On 2/27/19 WAGONER was seen by Louis Smith and Eric Nimmo who informed her that the Depo Prevara shot was out of the question and that the AKDOC will not treat her transgender issues unless and until they become life threatening.

On 3/13/19 WAGONER was seen by Adam Rutherford and Robert Lawrence. Rutherford claimed to have never recieved any of her requests that had been forwarded. Lawrence asked if WAGONER would consent to a penile reconstruction surgery. On 3/14/19 Rodney Smith informed WAGONER that Rutherford had tasked him with developing a new treatment plant for her.

On 3/18/19 WAGONER filed a grievance, GCC18-198, requesting to see a urologist qualified to treat patients with GD regarding her severely damaged penis and urethra. This was denied, appealed and upheld. Dkt. 108 attachment # 64, 65, 66, 67.

9.

On 7/27/19 WAGONER requested an update about the AKDOC MAC's review of her most recent request for HRT. Traci Tusha forwarded this request to Adam Rutherford. Dkt. 108 attachment # 69.

On 1/30/20 WAGONER was seen by Christine Sawyer whom discussed her requests for GD treatment going back to 2016, she advised WAGONER to write to Adam Rutherford.

On 4/9/20 WAGONER recieved a HARS communication informing her that her most recent request for HRT had been forwarded to the AKDOC MAC for evaluation. Dkt. 108 attachement # 71.

On 5/8/20 WAGONER recieved a HARS communication informing her that her request for HRT had been submitted to the multidisciplinary committee for GD managment; that her case had not been before the committee before; and that Christine Sawyer would address all GD i. issues rather than AKDOC medical. Dkt. 108 attachment # 72.

On 8/12/20 WAGONER filed a grievance, GCC20-430, requesting proper medication in accordance with the WPATH Standards of Care because the meds she was on did not address her issues and had side effects that impacted her GD. This was denied, appealed and upheld. Dkt. 108 attachment # 73, 74.

On 12/4/21 WAGONER recieved a HARS communication informing her that her most recent request for HRT was being forwarded to the multidisciplinary committee for GD managment. Dkt. 108 attachment # 78.

On 7/5/22 the acting AKDOC Commissioner, Jen Winkleman, enacted AKDOC Policy 807.23 Treatment and Managment of Gender Dysphoria.

On 7/24/22 WAGONER was seen by Dr. Rachel Samuelson at the Anchorage Neighborhood Health Center who completed an exam and

10.

prescribed WAGONER HRT to treat her severe GD, initiating treatment immediately.

On 8/22/22 the AKDOC MAC issued a decision authorizing the treatment prescribed by Dr. Samuelson, HRT, to treat WAGONER's GD Dkt. 108 attachment # 82.

AKDOC policies are available online for public viewing on the State of Alaska website.

AKDOC policy 807.01 outlines Health Care Organization and Administration, including the Medical Advisory Committee (MAC). The MAC includes the Health Care Administrator, Chief Medical Officer and the Chief Mental Health Officer.

Defendant Laura Brooks is and/or was at all time relevent to this matter the Health Care Administrator for the AKDOC. Defendant Adam Rutherford is and/or was at all time relevent to this matter the Chief Mental Health Officer for the AKDOC. Defendant Robert Lawrence is and/or was at all times relevent to this matter the Chief Medical Officer for the AKDOC.

Pursuant to AKDOC policy 807.01 the Health Care Administrator (HCA) and Chief Medical Officer (CMO) are responsible, among other things, for developing and maintaining Medical Operating Procedures that will guide decision making of health practitioners and standardize the delivery of care across the system. The MAC, among other things, reviews all prisoner health care grievance appeals, and also reviews health care policies and procedures, clinical guidelines, and medical operating procedures.

Defendant Nancy Dahlstrom was at all times relevent to this matter the Commissioner of the AKDOC and pursuant to Alaska

11.

Statute 33.30.011 she was responsible to maintain and operate all correctional facilities suitable for the custody and care of persons convicted of offenses against the state or held under authority of state law; and to provide necessary medical services for prisoners housed in correctional facilities. Pursuant to 22 AAC 05.155 she was responsible to establish policies and procedures to interpret and implement relevant sections of the Alaska Statutes and 22 AAC.

The World Professional Association for Transgender Health (WPATH) is a professional association dedicated to understanding and treating gender dysphoria. WPATH has established Standards of Care for Transgender individuals. See World Professional Ass'n For Transgender, & Gender Nonconforming People (7th Version 2011), available online at https://www.wpath.org.

12.

## II.

## ARGUMENT

WAGONER asserts that the Defendant's failed to have policy in place to ensure that inmates suffering from Gender Dysphoria (GD) would recieve necessary health care, or in other words, the Defendants maintained a policy of inaction in regards to inmates who suffer from GD. She further asserts that as a result of this she was both denied care and recieved inadequate care, which resulted in actual, significant, harm to her.

## WAGONER'S RIGHT TO CARE

Over 40 years ago the U.S. Supreme Court delcared that the government has an "obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Estelle v. Gamble, 429 U.S. 97, 103 (1976).

This obligation does not disappear if the inmate is trangender and/or suffering from Gender Dysphoria. See Norsworthy v. Beard, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015)(holding that discrimination based on transgender status independently qualifies as a suspect classification under the Equal Protection Clause.") citing United States v. Windsor, 570 U.S. 744 (2013). See also Schwenk v. Hartford, 204 F.3d 1187, 1201-02 (9th Cir. 2000)(discrimination on the basis of transgender status is also gender discrimination);

Thus at all times relevant to this action WAGONER has had a clearly established right to adequate health care to treat her GD.

13.

## DEFENDANT'S LIABILITY

To plead a §1983 violation, a plaintiff must allege facts from which it may be inferred (1) he was deprived of a federal right, and (2) a person who committed the alleged violation acted under color of state law. West v. Atkins, 487 U.S. 42, 58 (1988); and Williams v. Gorton, 529 F.2d 668, 670 (9th Cir. 1976). In addition, a plaintiff must allege he suffered a specific injury, and show a causal relationship between the defendant's conduct and the injury suffered by the plaintiff. See Rizzo v. Goode, 423 U.S. 362, 371-72 (1976); Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978). (a person deprives another of a federal right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made.").

There is no vicarious liability in §1983 lawsuits. Ashcroft v. Igbal, 556 U.S. 662, 676 (2009) citing inter alia, Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Hence, a government official - whether subordinate or supervisor - may be held liable under §1983 only when his or her own actions have caused a con-stitutional deprivation. OSU Student Alliance v. Ray, 699 F.3d 1053, 1069 (9th Cir. 2012) cert. denied 134 S. Ct. 70 (2013).

"A showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the involvement - and the liability - of that supervisor." Starr v. Baca, 652 F.3d 1202, 1206-07 (9th Cir. 2011). The supervisor need not be personally involved in the same way as are the individual medical providers on

14.

the scene inflicting constitutional injury. Id. at 1205. The supervisor's participation could include his own action or inaction in the training, supervison, or control or his subordinates, his acquiescence in the constituttional deprivations or conduct that showed a reckless or callous indifference to serious medical needs. Id. at 12-05-06.

Supervisory liability may also exist without any personal participation if the official implemented "a policy so deficient that the policy itself is a repudiation of the constitutional rights and is the moving force of the constitutional violation." Redman v. Cty. of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991), abrogated on other grounds by Farmer v. Brennan, 511 U.S. 825 (1970).

Supervisor liability under §1983 is a form of direct liability. Munoz v. Kolender, 208 F. Supp. 2d 1125, 1149 (S.D.Cal. 2002). Under direct liability, plaintiff must show that defendant breached a duty to him which was the proximate cause of his injury. Id. "The requisite causal connection can be established...by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Id. quoting Johnson, supra at 743-744. However, "where the applicable constitutional standard is deliberate indifference, a plaintiff may state a claim for supervisory liability based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by others." Starr, supra at 1196.

In the instant matter, WAGONER has alleged that Defendant Nancy Dahlstrom is liable as a supervisor, and that Defendants Adam Rutherford, Laura Brooks and Robert Lawrence are liable both as

15.

supervisors and for their own conduct.

## DENIAL OF HRT

At the time when WAGONER's requests for GD treatment, including and specifically HRT, were being responded to with:

"MH does not address gender dysphoria issues, nor does medical as far as I know. Please let it go!" (2016);

"Mr. Cancel, Alaska DOC does not offer medical treatment for this, continue to follow up with mental health." (2016);

"Such services are not provided at DOC. You may seek these services after your release." (2017); and

"AKDOC does not provide HRT." (2018)

Dkt. 108 attachments # 7, 8, 21, 32; the Ninth Circuit had already ruled that such blanket denials of HRT to treat GD amounted to deliberate indifference and were therefore unconstitutional. See Rosati v. Igbinoso, 791 F. 3d 1037, 1039 (9th Cir. 2015) citing Colwell v. Bannister, 763 F.3d 1060, 1063 (9th Cir. 2014).

A reasonably competent public official should know the law which governs his or her conduct. Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982). Here it is more than reasonable to expect that the Defendant's knew, or should have known, that it was unconstitutional to maintain a policy regarding medical care for inmates which failed to ensure transgender inmates suffering from GD would have access to essential medical care and services, such as HRT, in 2016, 2017 and 2018. Especially considering that as far back as 2000 it was clearly established that discrimination based on transgender status is also considered sex based discrimination. How then did the Defendant's justify denying transgender inmates suffering from GD any treatment at all?

16.

Indeed, the denial of treatment, including the blanket denial of HRT, is directly attributable to the Defendant's failure to create and implement policy and procedure to ensure that transgender inmates suffering from GD would receive essential health care. We know this because within (60) days of the new acting AKDOC Commissioner enacting such a policy 807.23, the Defendant's approved WAGONER for HRT and began her treatment. Dkt. 108 attachment # 82.

The Defendant's were clearly aware of WAGONER's transgender status and that her GD was severe, to the point of self attempted sex reassignment surgery, through their review of WAGONER's grievance appeals as AKDOC MAC members, Michael Reed's letter, and the multiple instances where subordinates forwarded WAGONER's pleas for help to Defendant and AKDOC MAC member Adam Rutherford. Dkt. 108 attachment # 11, 22-24, 35, 36, 46-48, 27, 18, 20.

The denial of HRT continued for over (5) years, including more than (3) years after WAGONER filed the instant action. While the Defendant's may try to argue that there was no "blanket ban" on HRT, WAGONER would challenge them to produce documentation of even a single case wherein the AKDOC approved and provided HRT to treat a transgender inmate for their GD. And even if they could produce such documentation, this wouldn't cure the constitutional violation here, because then why in the absence of such a ban was WAGONER, a transgender inmate with such severe GD that she was attempting to castrate herself, denied HRT? If any other inmate could have met the criteria for this treatment, WAGONER certainly would have to.

Even if the denial of HRT, or any treatment for GD, was not part of a "blanket ban" on such treatments, and instead was a

17.

series of distinct individualized denials, this still would not pass constitutional muster. The denials were never based on a medical determination that WAGONER did not need the treatment, but instead were based solely on the state actor's claim that AKDOC does not treat GD nor offer HRT. What most clearly exposes that these denials were improper is that later, in 2022, after a policy was created to ensure that inmates, such as WAGONER, who are transgender and suffer from GD recieve essential health care, the exact same state actors (GCCC medical department) began treating WAGONER with the exact treatment to address the exact same medical need she had had all along.

Defendant Nancy Dahlstrom was personally responsible to create and implement policies and procedures to ensure that inmate's recieve necessary health care in accordance with her duties under A.S. 33.30.011 and 22 AAC 05.155. Her failure to do so proximately caused WAGONER to be denied HRT, or any treatment for GD, and WAGONER suffered further injury as a result, evidenced by her continued attempts at self sex reassignment surgery (Dkt. 108 attachment #16), multiple instances of self harm and exacerbated depression, anxiety and distress.

Defendants Adam Rutherford, Laura Brooks and Robert Lawrence were personally responsible for creating and implementing medical operating procedures to ensure inmates recieved essential health care, and for overseeing all AKDOC health care staff. Their failure to do so proximately caused WAGONER to be denied HRT, and any treatment for GD, and WAGONER suffered further injury as a result, evidenced by her continued attempts at self sex reassignment surgery (Dkt. 108

18.

attachment #16), multiple instances of self harm and exacerbated depression, anxiety and distress.

Indeed, the policy and procedures which the Defendant's did create and implement were so deficient that they themselves were a repudiation of WAGONER's Eighth Amendment rights and were the moving force behind her being denied HRT, or any GD treatment, for <u>years</u>. The policy or custom was to deny treatment as shown in Dkt. 108 attachment # 7, 8, 21, 32, 52, 69, 71, 78. Again, these denials were attributable to the Defendant's because they were the policy makers.

INADEQUACY OF HEALTH CARE

Despite making dozens of requests for appropriate essential health care to treat her GD, and filing (9) grievances, the only treatment that WAGONER recieved for GD was a series of coping skills workbooks which was implemented by Defendant Adam Rutherford in February 2018. Dkt. 108 attachment # 9, 11, 22-24, 35, 36, 40-42, 46-48, 56-58, 64-67, 73, 74, 75-77.

Offering coping skills workbooks, and no other treatment, to a patient who is self harming, attempting self castration and sex reassignment surgery, clincially depressed and suffering from severe GD, is so clearly inadequate that WAGONER will not argue the point. This was tantamount to no treatment at all.

The Defendant's implemented a treatment plan for WAGONER to engage in the coping skills workbooks with Rodney Smith. Mr. Smith was a Mental Health Clinician with no experience in treating patients with GD nor any specialized training.

19.

Access to medical staff has no meaning if the medical staff is not competent to deal with the prisoner's problems. Hoptowit v. Ray, 682 F. 2d 1237, 1252-53 (9th Cir. 1982) abrogated on other grounds by Sandin v. Conner, 515 U.S. 472 (1995).

If the need for specialized expertise would have been obvious to a lay person, then the obdurate refusal to engage specialists permits an inference that a medical provider was deliberately indifferent to an inmate's condition. See Rosati, supra at 1040, citing Pyles v. Fahim, 771 F.3d 403, 412 (7th Cir. 2014).

As soon as the Defendant's were aware that WAGONER had GD, it was obvious that she needed a specialist. She was attempting to perform self surgeries with razor blades! It doesn't get more obvious than that. After WAGONER filed her first grievance, GCC16-1272, requesting treatment from a qualified specialist, WAGONER was sent to Christine Sawyer for a proper diagnosis. Christine Sawyer herself chose not to diagnose WAGONER due to her inexperience with GD. This alerted the MAC Defendant's that a specialist was needed.

Following Ms. Sawyer's refusal to act in place of a specialist WAGONER was sent to Dr. Michael Reed, who did diagnose her with GD and made a series of recommendations. The MAC Defendants disregarded all of Dr. Reed's recommendations and instead offered WAGONER coping skills workbooks with Rodney Smith.

Prison officials are deliberately indifferent to a prisoner's serious medical need when they "deny, delay or intentionally interfere with medical treatment." Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988). Here because the offering of coping skills workbooks was tantamount to a denial, the Defendant's were deliberately

20.

indifferent to WAGONER's serious medical need.

Defendant Nancy Dahlstrom was personally responsible to create and  implement policies and procedures to ensure that inmate's recieve necessary health care in accordance with her duties under A.S. 33.30.011 and 22 AAC 05.155. Her failure to do so proximately caused WAGONER to be denied specialized treatment for her GD and WAGONER suffered further injury as a result, evidenced by her continued attempts at self sex reassignment surgery (Dkt. 108 attachment #16), multiple instances of self harm and exacerbated depression, anxiety and distress.

Defendants Adam Rutherford, Laura Brooks and Robert Lawrence were personally responsible for creating and implementing medical operating procedures to ensure inmates recieved essential health care, and for overseeing all AKDOC health care staff. Their failure to do so proximately caused WAGONER to be denied specialized treatment for her GD and WAGONER suffered further injury as a result, evidenced by her continued attempts at self sex reassignment surgery (Dkt. 108 attachment #16), multiple instances of self harm and exacerbated depression, anxiety and distress.

21.

## III.

### CONCLUSION

WAGONER asserts that based on the evidence in the record and the Affidavit & Declaration she has attached to this motion, there is no genuine dispute as to any material facts necessary to state her claim and she is entitled to judgment as a matter of law.

The material facts are:

1. The Defendant's failed to implement any policy ensuring that inmate's suffering from GD would recieve essential health care;

2. WAGONER, a transgender inmate suffering from GD, had no access to essential health care;

3. The Defendant's became aware of WAGONER's serious medical need, GD, after her first attempt at sex reassignment surgery and her grievance GCC16-1272;

4. WAGONER was repeatedly denied care for her GD; and when care offered it was meaningless;

5. WAGONER's condition worsened and she sustained further injury as a result of the denial of care;

6. The Defendant's enacted AKDOC policy 807.23 Treatment and Management of Gender Dysphoria;

7. WAGONER was sent to Anchorage Neighborhood Health Center and was immediately prescribed HRT to treat her GD.

These facts are outlined above with citations to materials in the record and are attested to in WAGONER's Affidavit & Declaration.

WAGONER asks that this Court enter an order GRANTING this motion for summary judgment and set the matter for trial on damages.

RESPECTFULLY SUBMITTED THIS 20th DAY OF FEBRUARY 2023.

Emalee R. Wagoner, pro se      2/20/2023

22.

R. Wasonai 42854
Creek Correctional Center
West Alsop Road
, Alaska 99623

United States District Court
District of Alaska
Att: Clerk of Court
Federal Building, U.S. Courthouse
222 West 7th Avenue # 4
Anchorage, Alaska 99513-7564

