1            IN THE UNITED STATES DISTRICT COURT
2                FOR THE DISTRICT OF ALASKA
3
4      EMALEE WAGONER,                )
              Plaintiff,              )
5                                     )
                                      )  Case No.
6      vs.                            )  3:18-cv-00211-MMS
                                      )
7      NANCY DAHLSTROM, et al.,       )
              Defendants.             )
8      ------------------------------
9

10     _____

           VIDEO DEPOSITION VIA VIDEOCONFERENCE OF
11
                      GREG LUND, M.D.
12     _____
13
                      March 27, 2025
14                2:00 p.m. Alaska Time
15
16     Taken via Zoom videoconference originating at:
17                2490 South Woodworth Loop
                   Palmer, Alaska  99645
18
19
20
21
22
23
24     Reported by:
              Sandra M. Mierop, FAPR, CRR, CCP, CBC
25

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 1 of 82
Exhibit 1
Page 1 of 82

1                    A P P E A R A N C E S
2
3       FOR THE PLAINTIFF:
4       LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
        120 Wall Street, 19th Floor
5       New York City, New York 10005
6       By:   Sonja Kerr
              skerr@lambdalegal.org
7             (646) 307-7394
                    -and-
8             Morgan Walker
              mwalker@lambdalegal.org
9                 -and-
              Richard Saenz
10            rsaenz@lambdalegal.org
11
        FOR THE DEFENDANTS:
12
        BIRCH, HORTON BITTNER & CHEROT
13      510 L Street, Suite 700
        Anchorage, Alaska 99501
14
        By:   David K. Gross
15            dgross@bhb.com
              907-802-2998
16                -and-
              Mara Michaletz
17
18      FOR DR. LUND AND DR. SIMERVILLE:
19      FARLEY & GRAVES
        807 G Street, Suite 250
20      Anchorage, Alaska 99501
21      By:   Jim Wilkson
              jwilkson@farleygraves.com
22            907-274-5100
23
        VIDEOGRAPHER:
24
        Arielle Friedman
25

```
 1                        INDEX
 2     GREG LUND, M.D.                     March 27, 2025
 3                                              Page
 4     By Ms. Kerr                               5
 5     By Mr. Gross                              50
 6     By Ms. Kerr                               56
 7
 8                    EXHIBIT INDEX
 9     Number          Description          First Reference
                                              Page/Line
10
       Exhibit 44  Deposition Notice            17/24
11
       Exhibit 45  Amended Expert List          25/22
12
       Exhibit 46  Alaska Urology Notes         36/23
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 3 of 82    Exhibit 1
Page 3 of 82

```
 1                    PROCEEDINGS
 2                    THE VIDEOGRAPHER:  Good
 3      afternoon.  We are going on the record on
 4      Thursday, March 27, 2025, at 2:17, AKDT.
 5                    Please note this deposition is
 6      being conducted virtually.  The quality of the
 7      recording depends on the quality of the camera
 8      and Internet connection of participants.  What
 9      is seen from the witness and heard on screen is
10      what will be recorded.  Audio and video
11      recording will continue to take place unless
12      all parties agree to go off the record.
13                    This is Media Unit 1 of the
14      remote video-recorded deposition of Dr. Greg
15      Lund, in the matter of Emalee Wagoner versus
16      Nancy Dahlstrom, et al., filed in the United
17      States District Court for the District of
18      Alaska, Case 3:18-cv-02 -- 00211.
19                    My name is Arielle Friedman, your
20      legal videographer.  Your court reporter is
21      Sandy Mierop.  We are with Veritext Legal
22      Solutions.
23                    I am not related to any parties
24      in the action, nor am I financially interested
25      in the outcome.
```

1    All counsel will be stated on the
2    stenographic record.  After the witness is
3    sworn in, we will proceed.
4                    GREG LUND, M.D.
5        being duly sworn, testified as follows:
6                    EXAMINATION
7        Q.   (BY MS. KERR)  Good afternoon,
8    Dr. Lund.  I'm Sonja Kerr from Lambda Legal.  I
9    represent Emalee Wagoner.  And with me is
10   Morgan Walker, another counsel from Lambda
11   Legal.  And Richard Saenz, also.
12                    MS. KERR:  Do other counsel want
13   to note their appearances on the record?
14                    MR. GROSS:  This is David Gross.
15   I've got Mara Michaletz with me, as well,
16   representing the Defendants.
17                    MR. WILKSON:  Jim Wilkson here
18   for Dr. Lund.
19                    MS. KERR:  Thank you.
20       Q.   (BY MS. KERR)  Dr. Lund, thank you for
21   appearing today.  I'm sorry to interrupt your
22   world by asking you to come to this deposition.
23   I do appreciate your time.
24                    Could you please state and spell
25   your first name for the record?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 5 of 82
Exhibit 1
Page 5 of 82

1          A.     G-R-E-G.

2          Q.     And do you go by Dr. Lund?

3          A.     In certain circles.

4          Q.     Is this one of those circles?

5          A.     I'm Dr. Lund.

6          Q.     Okay.  And you and I have never had

7     the pleasure of meeting, have we?

8          A.     No.

9          Q.     Do you have an attorney here?

10         A.     Yeah, I do.

11                MR. WILKSON:  Yes, myself.

12         A.     I've asked Jim Wilkson just to be

13    present for my own benefit, yes.

14         Q.     (BY MS. KERR)  Okay.  And have you had

15    your deposition taken before?

16         A.     On this matter?

17         Q.     In any matter?

18         A.     Yes.

19         Q.     And have you had it taken more than

20    once?

21         A.     Yes.

22         Q.     And have you testified in court?

23         A.     Yes.

24         Q.     Have you testified in any matter

25    relating to Emalee Wagoner?

1        A.      No.

2        Q.      So when you've testified before, what

3   types of proceedings were those?

4        A.      Expert witness.

5        Q.      In what types of cases?

6        A.      The only court appearance I had was an

7   expert witness regarding chronic pain following

8   a vasectomy.

9        Q.      Okay.  And about how many times do you

10  think you've testified in depositions, but not

11  in court?

12       A.      Five or six, I would guess, over the

13  years.

14       Q.      Okay.  When was the last time?

15       A.      I'd say a couple of years ago.  It was

16  a matter -- I was at a -- I was a hospital

17  board member that -- a medical executive

18  committee member.  There was a matter regarding

19  credentialing.

20       Q.      So since you've been through a

21  deposition process before, you're somewhat

22  familiar with it, yes?

23       A.      Yes.

24       Q.      Can we agree that when I ask you a

25  question, you'll give an audible answer for the

1      court reporter?

2          A.     Yes.

3          Q.     Okay.  And let -- can we agree to try

4      and not talk over each other?

5          A.     Yes.

6          Q.     You understand that you're under oath

7      today just as if you were in court?

8          A.     Yes.  I just took my oath.

9          Q.     Okay.  And just as a reminder, this is

10     not a marathon.  So if you need a break, please

11     just ask me.  If we're in the middle of a

12     question, I just ask that you answer the

13     question first.

14                 Is -- is that acceptable?

15         A.     I suppose.  We'll see.  I hope this is

16     not a marathon.

17         Q.     I'm hoping it isn't either.

18                 Is there any reason, such as any

19     medication or illness, that would interfere

20     with your ability to answer questions today

21     truthfully and fully?

22         A.     No.

23         Q.     Okay.  I appreciate that.

24                 And if I ask you a question and

25     you answer, can we agree that you understood

1    the question?

2        A.    If I don't, I'll ask for

3    clarification.

4        Q.    Okay.  So you'll tell me if you don't

5    understand the question, right?

6        A.    I will.

7        Q.    Okay.  Have you treated a patient by

8    the name of Emmanuel Cancel?

9        A.    I -- I don't know.  I don't recall --

10   name sounds familiar.

11       Q.    All right.  Have you treated a patient

12   named Emalee Wagoner?

13       A.    Yes.

14       Q.    Okay.  And you remember treating

15   Emalee Wagoner?

16       A.    Well, I remember the visit, as I have

17   seen -- looked at those medical records.

18       Q.    Okay.  Well, we'll talk about that in

19   a minute.

20             Can we agree that Emmanuel Cancel

21   and Emalee Wagoner are the same person?

22       A.    I don't have that knowledge.

23       Q.    All right.

24             So if the rec- -- the medical

25   records of Emalee Wagoner earlier name her as

1       Emmanuel Cancel, you don't know that?

2           A.    No, but that's -- I can accept that.

3           Q.    You don't dispute that?

4           A.    No dispute -- no, I do not dispute

5       that.

6           Q.    Okay.  And do you understand you're

7       here today in connection with a lawsuit between

8       Emalee Wagoner and the Alaska Department of

9       Corrections?

10          A.    Yes.

11          Q.    And you're not a party to that

12      lawsuit, right?

13          A.    Correct.

14          Q.    Are you being paid for your time

15      today?

16          A.    No.

17          Q.    Dr. Lund, I understand you're a

18      licensed doctor in the state of Alaska,

19      correct?

20          A.    Correct.

21          Q.    Are you retired at this time?

22          A.    Partially.

23          Q.    Okay.  Can you explain that?

24          A.    I'm working one week a month.

25          Q.    Okay.  So no one is actually paying

1      for your time today, as far as you know?

2          A.    No.  I would know.

3                MR. WILKSON:  And that would be a

4      surprise to me, as well.

5                THE WITNESS:  But if anybody was,

6      it would be you.  I don't think you're paying

7      me anything.  There's been no discussion about

8      any reimbursement, which means I'm not an

9      expert witness, I'm a treating physician, if I

10     understand this correctly.

11         Q.    (BY MS. KERR)  True.  And going back to

12     your experience as a licensed doctor in Alaska,

13     how long were you -- how long have you been

14     a -- a doctor?

15         A.    I got my medical degree in 1987.

16         Q.    Okay.  That was a very good year.

17     Same year I got my law license.

18                So, where did you go to medical

19     school?

20         A.    University of Utah.

21         Q.    Okay.  And did you do any special

22     residencies?

23         A.    I did a urology residency and

24     Fellowship for seven years at the University of

25     Iowa.

1      Q.    Okay.  Well, and -- after you
2    completed your residency, how long after that
3    did you prac- -- did you practice?  Right away?
4      A.    Immediately following my residency and
5    my Fellowship, I moved to Alaska and have been
6    in private practice ever since then, in 1994.
7      Q.    All right.  So from 1994, you've been
8    continuously in private practice in Alaska?
9      A.    Correct.
10     Q.    Okay.  Thank you.
11           Now, you have specialty training
12    in urology, correct?
13     A.    Correct.
14     Q.    Did you have any other specialty
15    training, such as other areas, like, surgery,
16    or psychiatry or heart issues?
17     A.    Urology is a surgical specialty, but
18    it's all under urology and urological surgery.
19    And then I did a Fellowship in minimally
20    invasive surgery and laparoscopy.
21     Q.    Okay.  And what was the last world?
22    Can you spell it for me?
23     A.    Laparoscopy.  Laparoscopic,
24    L-A-P-A-R-O-S-C-O-P-I-C.
25     Q.    Okay.  What does that mean?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-1     Filed 03/28/25     Page 12 of 82
Exhibit 1
Page 12 of 82

1      A.     Looking in the abdominal cavity with a
2   scope.
3      Q.     Okay.
4      A.     With a telescope instead of a big
5   incision.
6      Q.     Okay.  And for the time frame that
7   you've been a urologist in Alaska, were you
8   always affiliated with Alaska Urology?
9      A.     No.
10     Q.     Okay.  How long were you with Alaska
11  Urology?
12     A.     There have been several -- I started
13  as a -- as a sole proprietor as Greg O. Lund,
14  M.D., treating urology and uro- -- and -- as a
15  urologist.  And then probably -- I'm guessing
16  about 12 years ago -- that's a guess, I don't
17  know the exact date -- I was affiliated with a
18  group called Alaska South Central Urology
19  Specialists.
20              And, ultimately, that name was
21  changed -- we still may be -- we may just be a
22  DBA as Alaska Urology, but it's -- it's kind of
23  changed complexions a bit.  But more than
24  ten years, for sure.
25     Q.     All right.  Perfect.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-1     Filed 03/28/25     Page 13 of 82
Exhibit 1
Page 13 of 82

 1                And in the course of your work at
 2     Alaska Urology, did you treat incarcerated
 3     individuals?
 4          A.    Yes.
 5          Q.    Can you estimate what percentage of
 6     your practice?
 7          A.    One percent.
 8          Q.    Okay.  So not very many?
 9          A.    No, not in the scheme of things, but,
10     you know.
11          Q.    Okay.  Would you say that you have any
12     specialty in treating incarcerated individuals?
13          A.    No.
14          Q.    Can you --
15          A.    I would say -- I would say I have
16     expertise in treating urological problems,
17     which is where my training is.  And I'm not
18     sure the incarceration pertains.  If somebody
19     has got an enlarged prostate and can't void,
20     the -- that's material, I think.
21          Q.    Being incarcerated doesn't matter?
22          A.    No.
23          Q.    Okay.  Thank you.
24                Have you heard the term "gender
25     dysphoria"?

1    A.    Yes, I've heard of it.

2    Q.    And can you tell me what that is?

3    A.    I think -- I -- my -- my understanding

4    is that this is where someone's not comfortable

5    with their birth gender and -- yeah, I would

6    say that's about it.  They're uncomfortable

7    with their birth gender.

8    Q.    Okay.  In any of your training in

9    medical school or your -- your residencies, did

10   you receive any specific instruction on gender

11   dysphoria or gender identity disorder?

12   A.    No.

13   Q.    Did you have any experience in

14   treating individuals with gender dysphoria or

15   gender identity disorder while in medical

16   school?

17   A.    No.

18   Q.    Do you have any experience treating

19   patients who are seeking gender-affirming

20   surgical treatment?

21   A.    No.

22   Q.    All right.  Do you know what the term

23   "gender-affirming care" is?

24   A.    Just what it sounds like.

25   Q.    Do you have any particular experience

1    providing gender-affirming care?

2        A.    No.

3        Q.    Are you aware that Ms. Wagoner has

4    identified as having gender dysphoria?

5        A.    I'm aware from my note that that --

6    that that was recorded in the note, yes.

7        Q.    Okay.  And have you treated anyone

8    other than Ms. Wagoner who you were aware was

9    carrying a diagnosis of gender dysphoria?

10       A.    No, not specifically the diagnose --

11   that diagnosis.

12       Q.    Okay.  Have you ever performed any

13   gender-affirming surgery for any person?

14       A.    No.

15       Q.    Okay.  Do you hold yourself out today

16   as an expert in gender dysphoria?

17       A.    I do not.

18       Q.    And -- and why is that?

19       A.    It's -- I think we all pick what we

20   practice, and that's beyond the scope of my

21   practice.  It would be an alternative practice

22   that I've not pursued.  My expertise is in

23   other areas of urology.

24       Q.    Okay.  Would you agree that there is

25   no one in the Alaska Urology group currently

1    that is an expert in gender dysphoria?

2    A.   I -- I would state that I'm not aware

3    of anyone being an expert.

4    Q.   Okay.  And but you -- and when you say

5    you're -- you -- you're not aware, you -- you

6    haven't done any formal survey or anything to

7    determine that?

8    A.   That's correct.

9    Q.   Okay.  Would you agree that there

10    simply isn't anyone in Alaska who can do

11    gender-affirming surgery?

12    A.   I don't know the answer to that

13    question.

14    Q.   Okay.  That's --

15    A.   I'm not aware -- I will say, I'm not

16    aware of anyone.

17    Q.   Okay.  But you -- again, you haven't

18    conducted any particular survey or asked

19    anybody to, you know, do that type of research?

20    A.   Correct, I have not.

21    Q.   Okay.  All right.  We're going to try

22    and look at an exhibit now, and it's -- it's

23    the -- it's the Deposition Notice, and I would

24    like to introduce it as Exhibit 44.

25              MS. KERR:  So have I done

1    everything I need to for the videographer and

2    court reporter?

3                    THE REPORTER:  Yes.

4                    MS. KERR:  Okay.

5        Q.   (BY MS. KERR)  Doctor, can you look at

6    this notice of deposition?  Can you see it?

7        A.    I cannot see it, no.

8        Q.    Okay.  I will share it.

9                    MR. WILKSON:  The exhibit is not

10   visible to me.

11                   MS. KERR:  Okay.  Can -- can

12   people see it now?

13                   THE WITNESS:  No.

14                   THE VIDEOGRAPHER:  Counsel, this

15   is the videographer.  There you go.  You've

16   just shared your screen, and it is loading now.

17                   MS. KERR:  All right.

18                   THE WITNESS:  I see it now.

19       Q.   (BY MS. KERR)  Doctor, I want you to

20   just take a minute and look at this -- and --

21   which we're marking as Exhibit 44, and tell me

22   if you've seen it before.

23       A.    I have seen it.

24       Q.    And once you received this, did you

25   understand why you were being asked to come to

1      this deposition?

2           A.    No.

3                     MR. WILKSON:  And I want to make

4      sure you're not asking for anything implicating

5      attorney-client privilege.

6           Q.   (BY MS. KERR)  Oh, sure.  Yeah,

7      don't -- don't share -- share anything that you

8      may have discussed with Mr. Wilkson.

9                     But did you -- did you personally

10     understand why you were being asked to come to

11     this deposition?

12          A.    I don't think anything was made to be

13     understood.  I -- I -- you know, I read all the

14     paperwork.  And so I understand that I was

15     being subpoenaed for deposition as a treating

16     physician, and there was another word -- kind

17     of a -- I can't remember the other word that

18     was used in another document, where you could

19     go either way.

20          Q.    Okay.  Did anyone -- I'm sorry, were

21     you done?

22          A.    Yeah, I'm done.

23          Q.    Okay.  Did you meet with anyone to

24     prepare for today?

25          A.    No.

1        Q.    And I don't want to know anything that
2    you may have discussed with Mr. Wilkson, but
3    did you meet with anyone?
4        A.    No.
5        Q.    Did you discuss this matter with
6    anyone else, such as your partner,
7    Dr. Simerville?
8        A.    Only to the degree that we -- that we
9    were both deposed and we thought the whole
10   process was a little unusual, but no real
11   specifics of the case.  It's been a while, and
12   I think both of our notes -- having read each
13   of our notes, we're kind of up on -- up on what
14   we have done and what's happened, so...
15       Q.    Okay.  Did you -- what do you -- what
16   do you mean that you thought the process was
17   unusual?
18       A.    Well, I get a subpoena with -- you
19   know, saying I've got to appear in two days
20   and, you know, it's all very threatening.  It's
21   not very -- you know, it's not a very collegial
22   sort of an approach to things, that I -- I just
23   think that -- I've never had a subpoena with a
24   gun to my head that I need to appear in -- you
25   know, in -- in 48 hours for a video deposition

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-1     Filed 03/28/25     Page 20 of 82
Exhibit 1
Page 20 of 82

1      and -- with no discussion, no -- no -- no
2      concern for my time.
3                     So that I -- I find that a little
4      unusual.  But, you know, I mean, generally,
5      I've been given, can we work a time that --
6      that suits everyone, which was a -- which was a
7      significant impetus to me talking to
8      Mr. Wilkson about this.
9          Q.    Okay.  Now, did you talk to any other
10     doctors, including Dr. Robert Lawrence, about
11     this situation of --
12         A.    No.
13         Q.    -- being subpoenaed?
14         A.    No.
15         Q.    Okay.  Do you know a Dr. Rachel
16     Samuelson?
17         A.    No.
18         Q.    Can you tell me what documents you
19     reviewed?
20         A.    My clinic note dated June 27th, 2022.
21                     And I -- and I reviewed
22     Dr. Simerville's clinic visit dated
23     February 7th, 2018.
24         Q.    Okay.  Now, you said earlier that you
25     are a urologist, correct?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-1     Filed 03/28/25     Page 21 of 82   Exhibit 1
                                                                        Page 21 of 82

1    A.    Correct.

2    Q.    Is that different from a general

3    surgeon?

4    A.    Yes.

5    Q.    Can you explain the difference for me?

6    A.    Urology is a -- is a surgical

7    specialty that deals with the urinary tract and

8    the male reproductive system.

9              Whereas, general surgery is

10   significantly less specific.  They're much more

11   specialized in conditions of the alimentary

12   tract, including, you know, the esophagus,

13   stomach, bowel, gallbladder, liver.

14             They may tend to specialize into

15   another areas, such as thoracic surgery,

16   vascular surgery, transplant surgery.

17   Q.    Okay.  Now, you did not -- you talked

18   earlier about treating doctor -- or treating

19   Ms. Wagoner and that you are aware that she is

20   carrying a diagnosis of gender dysphoria,

21   correct?

22   A.    Correct.

23   Q.    You did not give her that diagnosis,

24   correct?

25   A.    Correct.

1      Q.    Is giving a diagnosis of gender

2    dysphoria within your expertise as a urologist?

3      A.    No.

4      Q.    Are you familiar with certain types of

5    genital surgery, such as an orchiectomy?

6      A.    I'm -- I'm -- I'm aware of the

7    operation orchiectomy.

8      Q.    Okay.  Do you perform those types of

9    surgeries?

10     A.    I have performed many orchiectomies,

11   primarily for infection, non-function, and --

12   and/or cancer.

13     Q.    And are you familiar with a surgery

14   called vaginoplasty?

15     A.    I -- I am aware of its existence.

16     Q.    Have you ever completed one?

17     A.    I've never started or completed one.

18     Q.    Okay.  Did you -- sitting here today

19   for the representatives of the Alaska

20   Department of Corrections is David Gross and

21   Mara Michaletz -- I always murder that, I'm

22   sorry.

23            Did you talk to either of those

24   people before this deposition?

25     A.    No.

1    Q.    Okay.  Did you know that they existed?

2    A.    No.

3    Q.    Okay.  I mean, you -- I just -- you

4    know.  No worries.

5              So can we agree that you are not

6    holding yourself out as an expert concerning

7    people who experience gender dysphoria?

8    A.    That is correct.  I do not hold myself

9    out as an expert in that -- in gender

10   dysphoria.

11   Q.    Okay.  Okay.  We're going to try and

12   look at another exhibit here.  So give me a

13   moment.

14              Oops, clicked the wrong button.

15              MS. KERR:  Okay.  Does everyone

16   who is using share, can you see what is

17   currently marked as Exhibit 2, 2024 Docket 204

18   Amendment to Defendant's expert list?

19              MR. WILKSON:  I can see a link of

20   it.  I don't see the actual document.

21              MS. KERR:  Well, it should be in

22   the marked exhibits.  Are you at the marked

23   exhibits, David?  So then you should be able to

24   click exhibit share.

25              MR. GROSS:  That wasn't me

1      talking.

2                    MS. KERR:  Oh, sorry.

3                    MR. WILKSON:  Yes.  Can you

4      please open the exhibit?

5                    MS. KERR:  I think I'm opening

6      it.

7                    Okay.  I'm going to try to share

8      that.  Can people see the exhibit?

9                    MR. WILKSON:  Yeah, the -- it's

10     very tiny.

11                   I mean, the text is in about

12     6-point font.

13                   MS. KERR:  How is that?

14                   MR. WILKSON:  That's better.

15        Q.   (BY MS. KERR)  Okay.  Dr. Lund, can you

16     see the exhibit?

17                   Yes?

18        A.    Yes.

19        Q.    Okay.  Thank you.

20                   MS. KERR:  And this -- we would

21     be marking for the court reporter as

22     Exhibit 45.

23                   THE REPORTER:  Correct.

24                   MS. KERR:  And this is

25     Defendant's Amended Expert Witness Disclosure,

```
 1    Document 204.
 2         Q.    (BY MS. KERR)  Dr. Lund, have you ever
 3    seen this document before?
 4         A.    Well, I'm seeing just a very small
 5    window of it, and I'm not sure what it -- what
 6    it is.  I may have scanned through this, if it
 7    came.  I -- I don't know what I'm looking at,
 8    honestly.  I can't tell you.
 9         Q.    Okay.  Let me scroll through it to
10    the --
11         A.    Oh, you're not --
12         Q.    -- part that includes your name.
13    Okay?
14         A.    Yes, I -- I have -- I have seen this
15    document.
16         Q.    You have seen this.  When did you
17    first --
18         A.    I --
19         Q.    This document is dated --
20         A.    I saw it this morning.
21         Q.    You saw it this morning.  Was that the
22    first time you saw it, Dr. Lund?
23         A.    It may have been yesterday.  I don't
24    know.
25         Q.    Okay.  But it was yesterday or today?
```

```
 1        A.    Correct.

 2        Q.    Okay.  Where did you first see this

 3     document?

 4        A.    On my computer as an attachment in an

 5     e-mail.

 6        Q.    Okay.  And who did you -- who did you

 7     get the e-mail from?

 8        A.    Mr. Wilkson.

 9        Q.    Okay.  And I don't want you to talk

10     about anything you've discussed with

11     Mr. Wilkson, but when you received this

12     document and you read it, did you -- what did

13     you understand this document to be saying about

14     you?

15        A.    That I'm expected to testify as to

16     what my note says.

17        Q.    Okay.  Would you read -- would you

18     take a minute and just read all the way through

19     this section about --

20        A.    From the begin- -- from the beginning,

21     11/30 --

22        Q.    No, just from -- from the section that

23     says, Alaska Urology, do you see that section,

24     on Page 5 of the document?

25        A.    Yes, I don't have that one printed.
```

1       Okay.  So, yeah, I'll have to do it off the
2       screen.  So you'll have to go back.
3                       Do you want me to read it out
4       loud, or what are you asking me to do?
5           Q.    Oh, just -- just take a moment,
6       Doctor, and read Pages 5 and 6 to yourself.
7           A.    Okay.  I -- I don't have the option of
8       scrolling this like you do.
9                       MR. WILKSON:  And, Dr. Lund, I
10      can -- I can -- you know, I mean, I sent this
11      to you previously.  I can e-mail it to you
12      really quick, if you want -- if that's easier.
13                      THE WITNESS:  Well, I would have
14      to use my phone.  Let me see.  You probably
15      already have.  What was the name of it?
16                      MR. WILKSON:  It's --
17                      MR. GROSS:  Sonja, why don't --
18      why don't you just read him the portion that
19      you want to ask him questions about.  It will
20      move this along.
21                      MS. KERR:  That's fine.  That's a
22      good suggestion, actually, David.
23          Q.    (BY MS. KERR)  So this says it --
24      can -- we're looking at Exhibit 44 [sic], which
25      is Defendant's -- amendment -- Amended Expert

Veritext Legal Solutions
212-267-6868              www.veritext.com              516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 28 of 82    Exhibit 1
Page 28 of 82

1    Witness Disclosure.

2              And it states that providers at

3    Alaska Urology who have treated Plaintiff,

4    including yourself, Dr. Lund, are hybrid

5    witnesses who may be called to provide

6    testimony regarding the medical treatment

7    provided to Plaintiff and expert testimony

8    regarding the medical necessity of further

9    treatments.

10             Do you understand that the

11   Department of Corrections has indicated that's

12   what you are here to testify about?

13             MR. GROSS:  Sonja, I'm going

14   to -- I'm going to object to that.

15        A.    I can only read the document.

16             MR. GROSS:  Doctor --

17        A.    I see what the document says.  I don't

18   know --

19             MR. GROSS:  Doctor --

20        A.    -- who produced this document.  But,

21   yes, I -- I understand what is written there.

22             MR. GROSS:  I'm going to

23   interpose an objection in the sense that --

24   that this is just a mimic of the Plaintiff's

25   witness list that lists him as a trial witness.

1    This isn't any direction to the doctor to

2    testify one way or the another.

3                    MS. KERR:  Object to the speaking

4    objection.  Make your objection and no speaking

5    objection, please.

6                    MR. GROSS:  I just made it.

7    Q.   (BY MS. KERR)  Dr. Lund, getting back

8    on track, this document, which was submitted to

9    the Court, says -- and I -- on Page 5, that

10   Dr. Lund -- and Dr. Simerville, but we'll just

11   talk about you.

12                   Can you see what's on the screen

13   right now?

14                   It says:  Dr. Lund and Simerville

15   are also qualified to testify as to the

16   availability and appropriateness of medical

17   services available to treat gender dysphoria

18   through surgery in Alaska, outside of a

19   correctional setting.

20                   Do you see that?

21   A.   I see that.

22   Q.   Are you an expert about medical

23   services available to treat gender dysphoria

24   through surgery in Alaska?

25   A.   I am not.

1     Q.    Okay.  And did you know before

2    yesterday that anyone was suggesting you were

3    an expert on that?

4     A.    I've never -- no, I'm not aware of

5    anyone considering me an expert in that.

6     Q.    Are you aware of anyone suggesting you

7    were an expert in gender dysphoria in any way,

8    in Alaska or anywhere?

9     A.    Again, no.

10     Q.    Okay.  Did you know before yesterday,

11    when you received this document, that you were

12    going to be testifying about whether

13    Ms. Wagoner needs surgery at this time, in

14    2025?

15     A.    I was not made aware of any -- no, I

16    was not aware of any -- what I was going to

17    testify to.

18     Q.    Okay.  You would agree that while you

19    are an experienced urology, you're not

20    qualified to determine if a person needs

21    gender-affirming surgery; is that correct?

22     A.    Again, correct.

23     Q.    Would you agree as a doctor that an

24    individual's medical condition can change, you

25    know, medical conditions are not static?

Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 31 of 82
Exhibit 1
Page 31 of 82

 1        A.     I agree.
 2        Q.     Have you ever specifically assessed
 3     someone for the need for gender-affirming
 4     surgery?
 5        A.     No.
 6        Q.     Does that include Ms. Wagoner?
 7        A.     You said the word "routine."
 8        Q.     I'm sorry, I didn't -- maybe it wasn't
 9     clear.  I didn't use the -- that word.  But let
10     me restate the question so we're clear.
11                    You -- you had said that you
12     had -- had not assessed anyone for
13     gender-affirming surgery, and my question is:
14     Did you ever assess Ms. Wagoner for
15     gender-affirming surgery?
16        A.     No.
17        Q.     And why, as an experienced urologist,
18     did you not assess her for gender-affirming
19     surgery?
20        A.     It's outside the realm of my practice.
21        Q.     Are you familiar with what is called
22     the DSM-5?  Do you know what that book is?
23        A.     Yeah, psycholo- -- psycholo- --
24     psychiatric diagnoses.
25        Q.     Okay.  And do you --

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-1     Filed 03/28/25     Page 32 of 82
Exhibit 1
Page 32 of 82

1        A.    I knew of it in medical school.  I
2    haven't had -- I haven't touched a copy in
3    probably 35 years.
4        Q.    Okay.  So you don't use it?
5        A.    I do not.
6        Q.    Okay.  And a diagnosis of gender
7    dysphoria, in your view, would require a
8    psychiatrist or a psychologist?
9        A.    I wouldn't say that.
10       Q.    Okay.  Do you even know?
11       A.    I -- I -- I think it -- it requires
12   whoever's an expert in that area.
13       Q.    Okay.  And that isn't you?
14       A.    That's correct.
15       Q.    Okay.  Do you -- have you -- have you
16   heard of the World Professional Association for
17   Transgender Health Standards.  We call it
18   WPATH, W-P-A-T-H?
19             Have you heard of that?
20       A.    No, I have not heard of that.
21       Q.    Okay.  So is it fair to assume you've
22   not had any training in WPATH then in those --
23       A.    It's correct.  I have not had any
24   training.
25       Q.    Okay.  Do you have any general

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-1     Filed 03/28/25     Page 33 of 82
Exhibit 1
Page 33 of 82

1      understanding that WPATH sets particular

2      standards for how to care for people with

3      tran- -- who are transgender and have gender

4      dysphoria?

5           A.    If I've never heard of them, I

6      wouldn't know what they teach or -- of course,

7      the follow-up to that is no.

8           Q.    Okay.  All right.

9                      Have you ever read any documents

10     that describe what the standards of care are

11     for -- promoted by WPATH?

12          A.    No.

13          Q.    Have you -- with respect to

14     incarcerated people, did you work with

15     incarcerated people who live at Goose Creek

16     Correctional Center?

17          A.    I -- I have treated incarcerated

18     individuals from Goose Creek.

19          Q.    Okay.  And with respect to

20     Goose Creek, have you ever heard of a committee

21     called the MAC committee, Medical Advisory

22     Committee?

23          A.    No.

24          Q.    Okay.  Have you ever heard of the

25     National Commission of Correctional Healthcare?

1       A.    No.

2       Q.    Have you ever published or presented

3    on the topic of incarcerated transgender

4    people?

5       A.    No.

6       Q.    Have you ever written any articles on

7    incarcerated transgender people who have gender

8    dysphoria?

9       A.    No.

10      Q.    Do you have any expertise in

11   conducting primary research on the topic of

12   gender dysphoria or surgical care?

13      A.    No.

14      Q.    Have you ever published any

15   peer-reviewed pub -- publication at all?

16      A.    Yes.

17      Q.    And have you ever published on the

18   topic of gender dysphoria in a peer-reviewed

19   publication?

20      A.    No.

21      Q.    Have you ever published on the topic

22   of gender-affirming surgical care --

23      A.    No.

24      Q.    -- in a peer-reviewed publication?

25      A.    No.

Case 3:18-cv-00211-MMS   Document 249-1   Filed 03/28/25   Page 35 of 82

Exhibit 1
Page 35 of 82

1      Q.    Have you ever written any peer-review

2      articles, whether they were published or not,

3      on the care of gender -- on the care of

4      transgender persons?

5      A.    No.

6      Q.    You would agree that you have no

7      specialty in the medical care and treatment of

8      people with gender dysphoria, correct?

9                  MR. GROSS:  Asked and answered.

10     A.    I was going to say asked and answered

11     a handful of times.  No, I do not have any

12     expertise in that.

13                 MS. KERR:  Can I introduce

14     another document, which is -- we'll call it

15     Exhibit -- I think we're at 47.

16                 THE REPORTER:  Excuse me.  We're

17     at 46.

18                 MS. KERR:  Oh, I thought the last

19     one was 45.  I've introduced two exhibits.

20                 THE REPORTER:  Yes.

21                 MR. GROSS:  46 comes after 45.

22     So 44, 45.  This will be 46.

23                 MS. KERR:  I'm sorry, 46.  Thank

24     you.

25     Q.    (BY MS. KERR)  Doctor, do you need to

1      refresh your page?  Can you see the document?
2          A.    It's loading.  I see a document now.
3      Small.
4          Q.    Okay.
5                    Can you see the document?
6          A.    I see it.
7          Q.    It should say Alaska Urology at the
8      top.
9                    MS. KERR:  So we're marking this
10     as Exhibit 46.
11         Q.    (BY MS. KERR)  Can you see it,
12     Dr. Lund?
13                   MR. WILKSON:  The text is
14     still -- it's very small.  It -- it's --
15     it's --
16                   MS. KERR:  Sorry.
17                   MR. WILKSON:  -- simply
18     unreadable.
19                   MS. KERR:  Here you go.  Okay.
20         Q.    (BY MS. KERR)  Can you see it now,
21     Doctor?
22         A.    Yes.
23         Q.    You said that you thought that you
24     brought -- that you had received a copy of
25     this.  It's from your Alaska Urology notes?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 37 of 82
Exhibit 1
Page 37 of 82

1          A.     It's my office note.  This is my
2      office note, correct.
3          Q.     Okay.  If you want to use your copy to
4      look at, if that's easier for you, that's fine.
5      Otherwise, you can refresh the page, and you'll
6      be able to see this a little better.
7                     I just want you to be able to see
8      it as we talk about it.
9          A.     I see it.  I see it.  And I have a
10      printed copy.
11          Q.     Okay.  And you have a printed copy.
12      Okay.
13                     And so this is a document from --
14      from Alaska Urology that you created, correct?
15          A.     Correct.
16          Q.     Okay.  And the date is June 27, 2022;
17      is that right?
18          A.     Correct.
19          Q.     Sorry, you faded out a little.
20          A.     Correct.
21          Q.     Thank you.
22                     I just want to ask you a little
23      bit about this visit.
24                     First of all, do you see towards
25      the bottom of that first page, there's a

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-1     Filed 03/28/25     Page 38 of 82
Exhibit 1
Page 38 of 82

1     reference to past surgical history?

2        A.    Yes.

3        Q.    Okay.  And why does your note include

4     past surgical history?  Why does -- why does

5     that appear?  What's the reason for that?

6        A.    Because any good medical history

7     includes past medical history and past surgical

8     history.

9        Q.    So it's something you always do as a

10    doctor?

11        A.    I -- I would hope most of the time we

12    do it, as long as there is a -- a history.

13        Q.    And when -- when you sought -- you saw

14    Ms. Wagoner on this date in June of 2022,

15    right?

16        A.    The note would reflect that's the

17    case, yes.

18        Q.    Okay.  And at the time that you

19    visited with Ms. Wagoner on this date, did

20    you -- what did you think was the purpose of

21    her visit?  What was the reason she was

22    visiting you?

23        A.    I'm sorry, what's the question?

24        Q.    What was the reason that Ms. Wagoner

25    was visiting with you on this date, as far as

1    you recall?

2         A.    Well, I don't have any recollection

3    other than reading my note.  And my note says

4    that the patient presents with numerous

5    urological complaints.  She has gender identity

6    dysphoria and has attempted surgical male --

7    and then we go on with the history.  I could

8    read it, but what it says there is my

9    understanding of why the patient came to me.

10        Q.    Okay.  And you're saying that today,

11   in 2025, you don't have any recollection of

12   this visit?

13        A.    I have minimal recollection other than

14   trying to help the patient by giving some --

15   some potential resources as far as people with

16   expertise, which I was able to find on the

17   Internet.  That's the extent of my

18   recollection.

19        Q.    What do you understand --

20        A.    I see -- I see a lot of patients every

21   day.  And so, you know -- and I don't see a lot

22   of -- I -- I -- in fact, I -- I'm not aware of

23   patients seeking out gender dysphoria or

24   gender -- transgender surgery.  I am not aware

25   I've seen anybody else.

1           Because most of those that would
2    schedule for such, we already tell them that we
3    don't do that, and so they don't even make an
4    appointment with us.
5        Q.   Okay.  So tell me about that.  When
6    you say Alaska Urology, you're saying Alaska
7    Urology, we just don't do that?  Is that what
8    you're --
9        A.   My -- my office, when somebody calls
10   to see me, one of the questions is:  What are
11   we seeing you for?
12           And if it's to do with
13   transgender, which we have numerous calls every
14   year regarding that, we explain that I'm happy
15   to see them, but we don't perform that, they
16   might be better off seeking out a provider who
17   does.
18       Q.   Okay.  All right.  So somehow you
19   didn't -- somehow you still ended up with
20   Ms. Wagoner in your office asking about
21   transgender surgery.
22           Is that the gist of it?
23       A.   Well, I can't control what a patient
24   asks me when they're in the office.  It says --
25       Q.   Yeah.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 41 of 82
Exhibit 1
Page 41 of 82

 1      A.    -- we're here for consult regarding a
 2      penile injury and urinary incontinence, both of
 3      which I do treat.
 4      Q.    Okay.  So let's look at your note a
 5      minute.
 6                  On the -- on the -- on the third
 7      page -- I'm sorry, the fourth page -- and I'll
 8      get -- go to that.
 9                  On the fourth page, there's a --
10      a section, and it says "Assessment."
11                  Do you see that part?
12      A.    Yes.
13      Q.    Okay.  And this exhibit, which is your
14      note from the visit in 2022, describes
15      Ms. Wagoner's visit to you.  And then there is
16      a reference to your -- your discussion.
17                  You say there's a lengthy
18      discussion, right?
19      A.    It does say that.
20      Q.    Okay.  When you were having this
21      conversation with Ms. Wagoner, did you at the
22      time identify yourself as have -- as being an
23      expert in gender dysphoria?
24      A.    I feel like it's being argumentative
25      asking me that question so many times.  No.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 42 of 82    Exhibit 1
Page 42 of 82

1      Q.    And, in fact, on that -- on -- on that

2      page, do you ever make -- do you make a

3      recommendation as to what Ms. Wagoner should

4      do?

5      A.    I did not make a recommendation as --

6      as to what she should do.

7      Q.    Did you give her suggestions?

8      A.    I did not give suggestions.  I gave

9      some options.

10     Q.    Okay.  What did you -- what options

11     did you give her?

12     A.    To see someone who does this.

13     Q.    Okay.  There's some -- there's some

14     reference to referral sources that you gave to

15     Ms. Wagoner, correct?

16     A.    Correct.

17     Q.    And under the "Plan" on Page 4, it

18     says:  Instructions:  Recommend referral to

19     special -- specialty clinic for ongoing and

20     definitive care.

21                Do you see that?

22     A.    Yes.

23     Q.    And when you were making that

24     recommendation, were you -- what was -- what

25     was your expertise in making that

1    recommendation?
2         A.    That the patient was seeking something
3    that I didn't offer, and if that's what they
4    want to pursue, they should see a specialty
5    center.
6         Q.    Okay.  All right.  Now, on Page 4,
7    again, there's a reference to a call that you
8    received from Dr. Lawrence.
9                    Do you see that?
10        A.    Yes.
11        Q.    Do you recall getting a call from
12   Dr. Lawrence at the Department of Corrections?
13        A.    I don't recall.
14        Q.    Okay.  Your note reflects there was a
15   call, correct?
16        A.    Correct.
17        Q.    You don't have any reason to doubt
18   your note, do you?
19        A.    I do not.
20        Q.    Did you write this note?
21        A.    I dictated this note.
22        Q.    Okay.  Can you just clarify, at the
23   time you said -- you know, you're not qualified
24   to give an opinion is what you said in that
25   note.  I did emphasize I was not in a position

1      or ex- -- nor do I have expertise to make a

2      psychological recommendation.

3              What were you saying there?

4          A.    The note would -- my -- my answer here

5      would suggest Dr. Lawrence was trying to assess

6      the urgency of this matter, whether this was an

7      emergent versus an elective issue.  And I

8      explained that I wasn't in a position to make a

9      psychologic recommendation.  I don't know

10     because, again, it's not my area of expertise.

11             In my opinion, the lower surgery

12     is an elective procedure, which I think

13     everyone would have to agree it is.  It's an

14     elective surgery.

15         Q.    And that's the statement you made at

16     the time in 2022, right?

17         A.    I'm -- I'm kind of reading off my

18     note, yes.

19         Q.    And at the time you made that note,

20     you -- your expertise to render any

21     psychological recommendation is the same now as

22     it was in 2022, right?

23         A.    Yes.

24         Q.    And you haven't had any further

25     training on gender dysphoria?  We talked about

1    that, right?

2        A.    Right.

3        Q.    Okay.  And you haven't seen

4    Ms. Wagoner since this note; is that correct?

5        A.    Correct.

6        Q.    And you don't have any particular

7    knowledge, sitting here today, about her

8    condition today in March of 2025?

9        A.    No knowledge.

10        Q.    You have not reviewed any medical

11    notes or information about Ms. Wagoner since

12    her visit with you in 2022 that are after that

13    date; is that correct?

14        A.    That is correct.

15        Q.    Do you today, in March of 2025, stand

16    by your recommendation that she go to a full

17    care clinic, which is what you said in 2022?

18        A.    I don't want to be construed to be

19    saying that she should go.  That would be the

20    best option to pursue treatment, would be to go

21    to a tertiary care center that performs this.

22                    But I also emphasize that I

23    thought it was an elective situation for the

24    surgery.  But I'm not in a position to

25    determine if it's an elective psychologic

```
 1      situation.
 2                   So, yes, I would stand by the
 3      fact that I said -- by exactly what I said, is
 4      that if they -- if there is -- if this is to be
 5      pursued, it should be at a specialty center.
 6                   And I went and did some research
 7      on the Internet and I think I alluded to those,
 8      but I also handwrote those out.  And I've seen
 9      them on another document that's -- was a -- an
10      additional page to this, where I gave the
11      websites or the addresses or the phone numbers,
12      I don't remember which, for those centers that
13      I went and looked up.  And I also looked in
14      Alaska and found that there weren't any in
15      Alaska.
16                   There -- there it is, right
17      there.
18          Q.    What you looked -- that's what you
19      handwrote?
20          A.    That's my handwriting.  And --
21          Q.    Okay.  And your -- and your note, and
22      that's what you found on the Internet?
23          A.    Correct.
24          Q.    Okay.  Okay.
25          A.    And if I remember right -- but I -- I
```

1     wouldn't swear to this, but I believe the
2     patient asked who.  And I said, I can go look
3     up some things.  And this is what I came up
4     with at -- at the patient's request,
5     Ms. Gard- -- Miss -- Ms. Wagoner.
6          Q.    And did you give that page to
7     Ms. Wagoner, or do you remember?
8          A.    I doubt it.
9          Q.    Okay.
10         A.    I don't remember, but I doubt it.  I
11    give everything to the DOC, usually to the
12    accompanying guard.
13         Q.    Oh, okay.  So the guards were with --
14    so you just gave that paper -- that handwritten
15    note to the guards, you think?
16         A.    I -- I imagine.
17         Q.    Okay.
18                   THE VIDEOGRAPHER:  Excuse me,
19    Counsel.  This is the videographer.  If we
20    could take a break within the next ten minutes,
21    that would be great.  I didn't know if this was
22    a good time in between documents.  Whatever is
23    good for you.
24                   MS. KERR:  Actually, this is a
25    good -- a good spot to break.

Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 48 of 82
Exhibit 1
Page 48 of 82

1                    THE WITNESS:  It's a good time to
2      be done.
3                    MS. KERR:  Well, we're al- -- I
4      am almost done.  So I -- I appreciate the
5      break.  And what I'm going to do during the
6      break, Dr. Lund, is to see what, if anything,
7      else I still need to ask you.  Okay?
8                    MR. WILKSON:  Can we make it a --
9      like, a two-minute break so we can move this
10     along?
11                   THE WITNESS:  Yeah, because --
12                   MR. WILKSON:  Does that give the
13     videographer enough time to switch over, just a
14     two-minute break?
15                   THE VIDEOGRAPHER:  Let's just go
16     off -- let's go off the record first.
17                   The time is --
18                   MR. WILKSON:  I came straight
19     from a mediation to this.  So I need to --
20     speaking of urology, I need to take care of
21     some business really quick, but -- so maybe --
22     maybe three minutes.
23                   THE VIDEOGRAPHER:  Stand by.
24                   The time is 3:20 p.m.  This will
25     end Media Unit 1.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-1     Filed 03/28/25     Page 49 of 82
Exhibit 1
Page 49 of 82

1           MS. KERR:  We'll be back in about

2     five.

3                (Break.)

4           THE VIDEOGRAPHER:  The time is

5     3:27 p.m.  We are back on the record.  And this

6     will begin Media Unit 2.

7           MS. KERR:  Okay.  Dr. Lund, I

8     don't have any other questions of you.  I do

9     appreciate your time.  And I'm sorry to

10    inconvenience your day, but I do appreciate

11    your time and understanding about this process.

12    Thank you.

13           Now, other people might ask you

14    something.  So just don't run off yet.

15                EXAMINATION

16    Q.   (BY MR. GROSS)  Yeah, Doctor, very --

17    very quickly.  My name is David Gross.  I

18    represent the State of Alaska Department of

19    Corrections and the other Defendants.  Just a

20    couple quick questions for you, and then we'll

21    get you out of here.

22           First, I want to test your memory

23    a little bit.  I understood you said that you

24    did not remember Ms. Wagoner as a patient.  And

25    looking at some of the records, it looks like

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-1     Filed 03/28/25     Page 50 of 82
Exhibit 1
Page 50 of 82

1    on October of 2005, there was a circumcision,
2    not newborn done.
3                    Do you remember that procedure?
4         A.    I do not.
5         Q.    Okay.  And then about two months
6    later, there is a repair, incomplete
7    circumcision.  Now, I suspect you don't
8    remember that.
9                    But what would be some examples
10   of what a repair, incomplete circumcision would
11   be?
12        A.    Sometimes when a circumcision heals,
13   it will have redundant skin or adhesions or a
14   stricture.  And so sometimes we -- in both,
15   children and adults, have to sometimes revise
16   that, a relatively minor procedure.
17        Q.    Okay.  Not -- not uncommon?
18        A.    Not uncommon.
19        Q.    Okay.  I want to read something to you
20   that -- that comes in with DOC patients, and
21   it's a statement on -- on one of their top
22   sheets, and it says this.
23                    It says:  DOC will not perform or
24   authorize procedures which are elective or
25   nonessential.  All surgical recommendations not

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 51 of 82
Exhibit 1
Page 51 of 82

1       of an emergency nature must be approved by the
2       Medical Advisory Committee.
3                       In your mind and based on your
4       practice, what is an elective surgery to you?
5                       MS. KERR:  Objection, form and
6       beyond the scope of the witness' knowledge.
7           Q.   (BY MR. GROSS)  Go -- go ahead and
8       answer.
9           A.    Something that is -- I -- I would
10      consider an elective procedure something that
11      is not imminently necessary for long-term
12      health.
13          Q.    Okay.  Could you give me some examples
14      of what you would consider to be an elective
15      surgery?
16          A.    Breast augmentation, breast reduction,
17      facelift, blepharoplasty, would be some
18      examples that are clearly elective.
19          Q.    And what about -- what about the term
20      "nonessential," what does that mean to you?
21                      MS. KERR:  Objection, form and
22      beyond the scope of the permitted deposition.
23          A.    So I --
24          Q.   (BY MR. GROSS)  Go ahead.  You can
25      answer.

Veritext Legal Solutions
212-267-6868                www.veritext.com                              516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 52 of 82    Exhibit 1
Page 52 of 82

1      A.    Yeah, I mean, I -- I -- again, that's

2    not a term -- I'm not sure that that's a

3    medical term, but more of a committee term.   I

4    would consider that to be similar to elective,

5    something nonessential for ongoing health.

6      Q.    Got you, okay.

7              You were shown your visit with

8    Ms. Wagoner on June 27th, 2022.  We looked at

9    that a little bit.  And there is one -- there

10   is one entry that I want to read to you and

11   just get your feedback on what it means,

12   because I think there's -- there's some

13   language that I'm not quite clear what you're

14   trying to say.  So -- so this is what it says.

15              It says:  EM, which is the

16   patient, frequently refers to seeing me on

17   numerous occasions, but I do not have records

18   of those visits.  Regardless, the patient would

19   definitely benefit from referral to specialist

20   in transgender care.  She asked whether I would

21   be willing to perform prostate surgery or

22   orchiectomy or testerone [sic] blocker therapy.

23   And I think this would not do the patient

24   justice as full transgender care as indicated.

25              So it sort of got -- it got

1 bobbled at the end there.  What -- what was

2 the -- what was the nature of what you were

3 trying to communicate there?

4  A. Well, I think that the patient was

5 trying to ask for parts -- parts of the --

6 parts of the transgender surgery.  So removing

7 the testicles, removing the prostate, blocking

8 testosterone function and -- and I -- you know,

9 again, it's outside the realm of what I do.

10   And it -- you really -- for an

11 individual pursuing this really needs to go to

12 someone who -- it's -- it's -- the clinics

13 entail a full spectrum of care, whether it be

14 gynecology, urology, general surgery,

15 psychiatry.  I mean, there's just so many

16 facets to it and -- and, you know, to -- to sit

17 and pick out and say, Well, I'll just remove

18 your testicles, I wouldn't do that.  That's not

19 in the patient's interest.  I wouldn't do that.

20  Q. And -- and based on your -- oh, sorry,

21 did you finish?

22  A. I did.

23  Q. And based on your treatment and review

24 of this particular patient, you came to the

25 conclusion that those different treatments

1        would be elective?
2                    MS. KERR:  Objection, form.
3        A.    I do believe those to be elective.
4        Q.   (BY MR. GROSS)  Now, we talked a little
5    bit about the addendum that is listed there.
6    And it looks like the addendum is dated
7    July 26th, 2022.
8                    In this case, one of the -- one
9    of the Plaintiff's experts have suggested that
10   Dr. Lawrence called you and -- and sort of
11   bullied you into changing your -- your opinion
12   about the proper treatment.
13                   Now, you don't remember the call
14   from Dr. Lawrence, but would you allow
15   anyone --
16                    MS. KERR:  Objection.
17                    MR. GROSS:  Well, let me finish
18   my -- Sonja, let me finish my question first.
19       Q.   (BY MR. GROSS)  Doctor, would you let
20   anybody, including Dr. Lawrence, call you
21   and -- and convince you to change your opinion
22   on a patient?
23       A.    No.
24                    MS. KERR:  Objection, form,
25   free- -- and in addition, beyond the scope of

1     the Court's order concerning this deposition.

2          Q.    (BY MR. GROSS)   What was your answer,

3     Doctor?

4          A.     So, no, I would not.   And I think I --

5     I -- I made it very clear that I said that

6     the -- that Dr. Lawrence from DOC wanted

7     clarification.   And so I just tried to add to

8     my note to make it clear to him my position on

9     whether this was medically necessary versus

10    elective.

11                And I only could address it in

12    terms of the physical aspects of it as being

13    elective, but made no rec- -- no -- no

14    recommendations based on psychiatric issues.

15         Q.    Okay.

16                MR. GROSS:   Those are all the

17    questions I have.   Thank you, Doctor.

18                THE WITNESS:   Thank you.

19                FURTHER EXAMINATION

20         Q.    (BY MS. KERR)   Dr. Lund, I just have a

21    couple follow-up.

22                You testified earlier that you're

23    not an expert on gender dysphoria or its

24    treatment, and you were not an expert on that

25    in 2022, correct?

 1          A.    Oh, my word --
 2                    MR. GROSS:  Asked and answered.
 3     In fact, I -- he shouldn't have to answer that
 4     question, Sonja.  You asked him ten times.
 5                    THE WITNESS:  Thank you.
 6          Q.   (BY MS. KERR)  Are you declining to
 7     answer?
 8          A.    My answer is, no, I wasn't, and I am
 9     not an expert.
10          Q.    Okay.  And you testified that
11     Ms. Wagoner should go to a clinic for -- for
12     full care.
13          A.    I never said "should."
14          Q.    Okay.
15          A.    I said if -- if this is to be pursued,
16     that's where it should be pursued.  I'm not
17     testifying that it should happen.  And I
18     certainly don't have any expertise as to what
19     the DOC does or doesn't do for elective cases.
20                    And I would never be so
21     presumptuous as to tell them they must send
22     somebody or should send somebody for something
23     elective.
24          Q.    So when you wrote "elective," you
25     didn't mean that the patient didn't need the

Veritext Legal Solutions
212-267-6868              www.veritext.com              516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 57 of 82
Exhibit 1
Page 57 of 82

1      surgery?  You weren't taking a position on

2      that?

3                  MR. WILKSON:  And asked -- this

4      has been asked and answered numerous times.

5          Q.   (BY MS. KERR)  You can answer.

6          A.    No position.  No position.

7          Q.    No position.

8                  (Reporter seeks clarification)

9                  THE WITNESS:  No position.

10         Q.   (BY MS. KERR)  What did you understand

11     was the clarification that DOC wanted?

12         A.    To know whether there was an emergency

13     versus an elective situation.

14         Q.    So, just to clarify, the only kinds of

15     surgery are elective or emergency?

16         A.    No, there's lots of kinds of surgery.

17     There's semi-elective.  There's semi-emergent.

18     There's all -- it's a big spectrum, and I don't

19     know that there's a -- a list of right answers

20     as to what -- where something falls.

21         Q.    Okay.  And you -- you don't know where

22     this one specifically would fall as of 2022?

23         A.    Well, I -- I -- I think my note made

24     it pretty clear that my position is lower

25     surgery, in terms of physical well-being, is

1    elective.

2        Q.    And whether she needed

3    gender-affirming surgery today would require an

4    expertise you don't have, correct?

5                    MR. GROSS:  Asked and answered.

6        A.    Correct.

7                    MS. KERR:  All right.  I don't

8    have anything else.  I do appreciate your time.

9                    THE WITNESS:  Okay.  Thank you.

10                   MR. GROSS:  No questions.  Thank

11   you, Doctor.

12                   THE VIDEOGRAPHER:  Before you

13   sign out, I'm just going to close out the

14   record.  Please stand by.

15                   The time is 3:37 p.m.  This will

16   conclude today's testimony given by

17   Dr. Greg Lund.  The total number of media units

18   is two and will be retained by Veritext.

19            (Deposition adjourned at 3:37 p.m.)

20              (Signature not requested.)

21

22

23

24

25

1           CERTIFICATE OF DEPONENT

2

3           I have read the foregoing transcript of

4    my deposition and except for any corrections or

5    changes noted on the errata sheet, I hereby

6    subscribe to the transcript as an accurate record

7    of the statements made by me.

8

9

                    _____

10                       GREG LUND, M.D.

11

12           SUBSCRIBED AND SWORN before and to me

13   this ____ day of _____, 20___.

14

15

16                    _____

17                       NOTARY PUBLIC

18

19

20   My Commission expires:

21

22

23

24

25

```
1                          CERTIFICATE
2            I, SANDRA M. MIEROP, Certified Shorthand
3       Reporter, do hereby certify that the foregoing
4       proceedings were taken before me at the time and
5       place herein set forth; that the witness was sworn
6       to tell the truth; that the proceedings were
7       reported stenographically by me and later
8       transcribed by computer transcription; that the
9       foregoing is a true record of the proceedings
10      taken at that time; and that I am not a party to,
11      nor do I have any interest in, the outcome of the
12      action herein contained.
13            IN WITNESS WHEREOF, I have hereunto set
14      my hand on this the 28th day of March, 2025.
15
16
17
                       SANDRA M. MIEROP
18                     Notary Public, State of Alaska
                       My commission expires:  9/18/28
19
20
21
22
23
24
25
```

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Wagoner, Emalee v. Dahlstrom, Nancy, Et Al.
DATE OF DEPOSITION: 3/27/2025
WITNESSES' NAME: Greg Lund , M.D.

PAGE    LINE (S)         CHANGE                    REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

                                            _____
                                            Greg Lund , M.D.

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.


_____            _____
(NOTARY PUBLIC)                     MY COMMISSION EXPIRES:

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 62 of 82    Exhibit 1
Page 62 of 82

| & | | | |
|---|---|---|---|
| **&**   2:12,19 | **204**   24:17 26:1 | **48**   20:25 | **accept**   10:2 |
| **0** | **2490**   1:17 | **5** | **acceptable**   8:14 |
| **00211**   1:6 4:18 | **25/22**   3:11 | **5**   3:4 27:24 | **accompanying** |
| **02**   4:18 | **250**   2:19 | 28:6 30:9 | 48:12 |
| **1** | **26th**   55:7 | 32:22 | **accurate**   60:6 |
| **1**   4:13 49:25 | **27**   1:13 3:2 4:4 | **50**   3:5 | **action**   4:24 |
| **10005**   2:5 | 38:16 | **510**   2:13 | 61:12 |
| **11/30**   27:21 | **27th**   21:20 53:8 | **56**   3:6 | **actual**   24:20 |
| **12**   13:16 | **28th**   61:14 | **6** | **actually**   10:25 |
| **120**   2:4 | **2:00**   1:14 | **6**   25:12 28:6 | 28:22 48:24 |
| **17/24**   3:10 | **2:17**   4:4 | **646**   2:7 | **add**   56:7 |
| **1987**   11:15 | **3** | **7** | **addendum** |
| **1994**   12:6,7 | **3/27/2025**   62:3 | **700**   2:13 | 55:5,6 |
| **19th**   2:4 | **307-7394**   2:7 | **7th**   21:23 | **addition**   55:25 |
| **2** | **35**   33:3 | **8** | **additional** |
| **2**   24:17 50:6 | **36/23**   3:12 | **807**   2:19 | 47:10 |
| **20**   60:13 62:22 | **3:18**   1:6 4:18 | **9** | **address**   56:11 |
| **2005**   51:1 | **3:20**   49:24 | **9/18/28**   61:18 | **addresses** |
| **2018**   21:23 | **3:27**   50:5 | **907-274-5100** | 47:11 |
| **2022**   21:20 | **3:37**   59:15,19 | 2:22 | **adhesions** |
| 38:16 39:14 | **4** | **907-802-2998** | 51:13 |
| 42:14 45:16,22 | **4**   43:17 44:6 | 2:15 | **adjourned** |
| 46:12,17 53:8 | **44**   3:10 17:24 | **99501**   2:13,20 | 59:19 |
| 55:7 56:25 | 18:21 28:24 | **99645**   1:17 | **adults**   51:15 |
| 58:22 | 36:22 | **a** | **advisory**   34:21 |
| **2024**   24:17 | **45**   3:11 25:22 | **abdominal** | 52:2 |
| **2025**   1:13 3:2 | 36:19,21,22 | 13:1 | **affiliated**   13:8 |
| 4:4 31:14 | **46**   3:12 36:17 | **ability**   8:20 | 13:17 |
| 40:11 46:8,15 | 36:21,22,23 | **able**   24:23 38:6 | **affirming** |
| 61:14 | 37:10 | 38:7 40:16 | 15:19,23 16:1 |
| | **4642**   61:16 | | 16:13 17:11 |
| | **47**   36:15 | | 31:21 32:3,13 |
| | | | 32:15,18 35:22 |
| | | | 59:3 |

Veritext Legal Solutions
212-267-6868     www.veritext.com     516-608-2400
Case 3:18-cv-00211-MMS     Document 249-1     Filed 03/28/25     Page 63 of 82     Exhibit 1
Page 63 of 82

**afternoon** 4:3
5:7
**ago** 7:15 13:16
**agree** 4:12 7:24
8:3,25 9:20
16:24 17:9
24:5 31:18,23
32:1 36:6
45:13
**ahead** 52:7,24
**akdt** 4:4
**al** 1:7 4:16 49:3
62:2
**alaska** 1:2,14
1:17 2:13,20
3:12 4:18 10:8
10:18 11:12
12:5,8 13:7,8
13:10,18,22
14:2 16:25
17:10 23:19
27:23 29:3
30:18,24 31:8
37:7,25 38:14
41:6,6 47:14
47:15 50:18
61:18
**alimentary**
22:11
**allow** 55:14
**alluded** 47:7
**alternative**
16:21

**amended** 3:11
25:25 28:25
**amendment**
24:18 28:25
**anchorage** 2:13
2:20
**answer** 7:25
8:12,20,25
17:12 45:4
52:8,25 56:2
57:3,7,8 58:5
**answered** 36:9
36:10 57:2
58:4 59:5
**answers** 58:19
**anybody** 11:5
17:19 40:25
55:20
**appear** 20:19
20:24 39:5
**appearance** 7:6
**appearances**
5:13
**appearing** 5:21
**appointment**
41:4
**appreciate** 5:23
8:23 49:4 50:9
50:10 59:8
**approach**
20:22
**appropriaten...**
30:16

**approved** 52:1
**area** 33:12
45:10
**areas** 12:15
16:23 22:15
**argumentative**
42:24
**arielle** 2:24
4:19
**articles** 35:6
36:2
**asked** 6:12
17:18 18:25
19:10 36:9,10
48:2 53:20
57:2,4 58:3,4
59:5
**asking** 5:22
19:4 28:4
41:20 42:25
**asks** 41:24
**aspects** 56:12
**assess** 32:14,18
45:5
**assessed** 32:2
32:12
**assessment**
42:10
**association**
33:16
**assume** 33:21
**attachment**
27:4

**attempted** 40:6
**attorney** 6:9
19:5
**audible** 7:25
**audio** 4:10
**augmentation**
52:16
**authorize**
51:24
**availability**
30:16
**available** 30:17
30:23
**aware** 16:3,5,8
17:2,5,15,16
22:19 23:6,15
31:4,6,15,16
40:22,24

**b**

**back** 11:11
28:2 30:7 50:1
50:5
**based** 52:3
54:20,23 56:14
**beginning**
27:20
**believe** 48:1
55:3
**benefit** 6:13
53:19
**best** 46:20
**better** 25:14
38:6 41:16

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 64 of 82    Exhibit 1
Page 64 of 82

beyond 16:20
52:6,22 55:25
bhb.com 2:15
big 13:4 58:18
birch 2:12
birth 15:5,7
bit 13:23 38:23
50:23 53:9
55:5
bittner 2:12
blepharoplasty
52:17
blocker 53:22
blocking 54:7
board 7:17
bobbled 54:1
book 32:22
bottom 38:25
bowel 22:13
break 8:10
48:20,25 49:5
49:6,9,14 50:3
breast 52:16,16
brought 37:24
bullied 55:11
business 49:21
button 24:14

**c**

c 2:1 12:24,24
call 33:17
36:14 44:7,11
44:15 55:13,20

called 13:18
23:14 29:5
32:21 34:21
55:10
calls 41:9,13
camera 4:7
cancel 9:8,20
10:1
cancer 23:12
care 15:23 16:1
34:2,10 35:12
35:22 36:3,3,7
43:20 46:17,21
49:20 53:20,24
54:13 57:12
carrying 16:9
22:20
case 1:5 4:18
20:11 39:17
55:8 62:2
cases 7:5 57:19
cavity 13:1
cbc 1:24
ccp 1:24
center 34:16
44:5 46:21
47:5
centers 47:12
central 13:18
certain 6:3 23:4
certainly 57:18
certificate 60:1
61:1

certified 61:2
certify 61:3
change 31:24
55:21 62:5
changed 13:21
13:23
changes 60:5
changing 55:11
cherot 2:12
children 51:15
chronic 7:7
circles 6:3,4
circumcision
51:1,7,10,12
city 2:5
clarification
9:3 56:7 58:8
58:11
clarify 44:22
58:14
clear 32:9,10
53:13 56:5,8
58:24
clearly 52:18
click 24:24
clicked 24:14
client 19:5
clinic 21:20,22
43:19 46:17
57:11
clinics 54:12
close 59:13
collegial 20:21

come 5:22
18:25 19:10
comes 36:21
51:20
comfortable
15:4
commission
34:25 60:20
61:18 62:25
committee 7:18
34:20,21,22
52:2 53:3
communicate
54:3
complaints
40:5
completed 12:2
23:16,17
complexions
13:23
computer 27:4
61:8
concern 21:2
concerning
24:6 56:1
conclude 59:16
conclusion
54:25
condition 31:24
46:8
conditions
22:11 31:25
conducted 4:6
17:18

| conducting | | **d** | 50:18 |

**conducting**
35:11
**connection** 4:8
10:7
**consider** 52:10
52:14 53:4
**considering**
31:5
**construed**
46:18
**consult** 42:1
**contained**
61:12
**continue** 4:11
**continuously**
12:8
**control** 41:23
**conversation**
42:21
**convince** 55:21
**copy** 33:2
37:24 38:3,10
38:11
**correct** 10:13
10:19,20 12:9
12:12,13 17:8
17:20 21:25
22:1,21,22,24
22:25 24:8
25:23 27:1
31:21,22 33:14
33:23 36:8
38:2,14,15,18
38:20 43:15,16

44:15,16 46:4
46:5,13,14
47:23 56:25
59:4,6
**correctional**
30:19 34:16,25
**corrections**
10:9 23:20
29:11 44:12
50:19 60:4
**correctly** 11:10
**counsel** 5:1,10
5:12 18:14
48:19
**couple** 7:15
50:20 56:21
**course** 14:1
34:6
**court** 1:1 4:17
4:20 6:22 7:6
7:11 8:1,7 18:2
25:21 30:9
**court's** 56:1
**created** 38:14
**credentialing**
7:19
**creek** 34:15,18
34:20
**crr** 1:24
**currently** 16:25
24:17
**cv** 1:6 4:18

**d**
**dahlstrom** 1:7
4:16 62:2
**date** 13:17
38:16 39:14,19
39:25 46:13
62:3
**dated** 21:20,22
26:19 55:6
**david** 2:14 5:14
23:20 24:23
28:22 50:17
**day** 40:21
50:10 60:13
61:14 62:22
**days** 20:19
**dba** 13:22
**deals** 22:7
**declining** 57:6
**defendant's**
24:18 25:25
28:25
**defendants** 1:7
2:11 5:16
50:19
**defense** 2:4
**definitely** 53:19
**definitive** 43:20
**degree** 11:15
20:8
**department**
10:8 23:20
29:11 44:12

50:18
**depends** 4:7
**deponent** 60:1
**deposed** 20:9
**deposition** 1:10
3:10 4:5,14
5:22 6:15 7:21
17:23 18:6
19:1,11,15
20:25 23:24
52:22 56:1
59:19 60:4
62:3
**depositions**
7:10
**describe** 34:10
**describes** 42:14
**description** 3:9
**determine** 17:7
31:20 46:25
**dgross** 2:15
**diagnose** 16:10
**diagnoses**
32:24
**diagnosis** 16:9
16:11 22:20,23
23:1 33:6
**dictated** 44:21
**difference** 22:5
**different** 22:2
54:25
**direction** 30:1
**disclosure**
25:25 29:1

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400
Case 3:18-cv-00211-MMS Document 249-1 Filed 03/28/25 Page 66 of 82
Exhibit 1
Page 66 of 82

**discuss** 20:5
**discussed** 19:8
  20:2 27:10
**discussion** 11:7
  21:1 42:16,18
**disorder** 15:11
  15:15
**dispute** 10:3,4
  10:4
**district** 1:1,2
  4:17,17
**doc** 48:11
  51:20,23 56:6
  57:19 58:11
**docket** 24:17
**doctor** 10:18
  11:12,14 18:5
  18:19 22:18
  28:6 29:16,19
  30:1 31:23
  36:25 37:21
  39:10 50:16
  55:19 56:3,17
  59:11
**doctors** 21:10
**document**
  19:18 24:20
  26:1,3,15,19
  27:3,12,13,24
  29:15,17,20
  30:8 31:11
  36:14 37:1,2,5
  38:13 47:9

**documents**
  21:18 34:9
  48:22
**doubt** 44:17
  48:8,10
**dr** 2:18,18 4:14
  5:8,18,20 6:2,5
  10:17 20:7
  21:10,15,22
  25:15 26:2,22
  28:9 29:4 30:7
  30:10,10,14
  37:12 44:8,12
  45:5 49:6 50:7
  55:10,14,20
  56:6,20 59:17
**dsm** 32:22
**duly** 5:5
**dysphoria**
  14:25 15:11,14
  16:4,9,16 17:1
  22:20 23:2
  24:7,10 30:17
  30:23 31:7
  33:7 34:4 35:8
  35:12,18 36:8
  40:6,23 42:23
  45:25 56:23

### e

**e** 2:1,1 6:1 27:5
  27:7 28:11
**earlier** 9:25
  21:24 22:18

  56:22
**easier** 28:12
  38:4
**education** 2:4
**either** 8:17
  19:19 23:23
**elective** 45:7,12
  45:14 46:23,25
  51:24 52:4,10
  52:14,18 53:4
  55:1,3 56:10
  56:13 57:19,23
  57:24 58:13,15
  58:17 59:1
**em** 53:15
**emalee** 1:4 4:15
  5:9 6:25 9:12
  9:15,21,25
  10:8 62:2
**emergency**
  52:1 58:12,15
**emergent** 45:7
  58:17
**emmanuel** 9:8
  9:20 10:1
**emphasize**
  44:25 46:22
**ended** 41:19
**enlarged** 14:19
**entail** 54:13
**entry** 53:10
**errata** 60:5
  62:1

**esophagus**
  22:12
**estimate** 14:5
**et** 1:7 4:16 62:2
**ex** 45:1
**exact** 13:17
**exactly** 47:3
**examination**
  5:6 50:15
  56:19
**examples** 51:9
  52:13,18
**except** 60:4
**excuse** 36:16
  48:18
**executive** 7:17
**exhibit** 3:8,10
  3:11,12 17:22
  17:24 18:9,21
  24:12,17,24
  25:4,8,16,22
  28:24 36:15
  37:10 42:13
**exhibits** 24:22
  24:23 36:19
**existed** 24:1
**existence** 23:15
**expected** 27:15
**experience**
  11:12 15:13,18
  15:25 24:7
**experienced**
  31:19 32:17

Veritext Legal Solutions
212-267-6868     www.veritext.com     516-608-2400
Case 3:18-cv-00211-MMS     Document 249-1     Filed 03/28/25     Page 67 of 82   Exhibit 1
Page 67 of 82

**expert** 3:11 7:4
7:7 11:9 16:16
17:1,3 24:6,9
24:18 25:25
28:25 29:7
30:22 31:3,5,7
33:12 42:23
56:23,24 57:9
**expertise** 14:16
16:22 23:2
35:10 36:12
40:16 43:25
45:1,10,20
57:18 59:4
**experts** 55:9
**expires** 60:20
61:18 62:25
**explain** 10:23
22:5 41:14
**explained** 45:8
**extent** 40:17

**f**

**facelift** 52:17
**facets** 54:16
**fact** 40:22 43:1
47:3 57:3
**faded** 38:19
**fair** 33:21
**fall** 58:22
**falls** 58:20
**familiar** 7:22
9:10 23:4,13
32:21

**fapr** 1:24
**far** 11:1 39:25
40:15
**farley** 2:19
**farleygraves....**
2:21
**february** 21:23
**feedback** 53:11
**feel** 42:24
**fellowship**
11:24 12:5,19
**filed** 4:16
**financially** 4:24
**find** 21:3 40:16
**fine** 28:21 38:4
**finish** 54:21
55:17,18
**first** 3:9 5:25
8:13 26:17,22
27:2 38:24,25
49:16 50:22
55:18
**five** 7:12 50:2
**floor** 2:4
**follow** 34:7
56:21
**following** 7:7
12:4
**follows** 5:5
**font** 25:12
**foregoing** 60:3
61:3,9
**form** 52:5,21
55:2,24

**formal** 17:6
**forth** 61:5
**found** 47:14,22
**fourth** 42:7,9
**frame** 13:6
**free** 55:25
**frequently**
53:16
**friedman** 2:24
4:19
**full** 46:16 53:24
54:13 57:12
**fully** 8:21
**function** 23:11
54:8
**fund** 2:4
**further** 29:8
45:24 56:19

**g**

**g** 2:19 6:1,1
**gallbladder**
22:13
**gard** 48:5
**gender** 14:24
15:5,7,10,11,14
15:15,19,23
16:1,4,9,13,16
17:1,11 22:20
23:1 24:7,9
30:17,23 31:7
31:21 32:3,13
32:15,18 33:6
34:3 35:7,12

35:18,22 36:3
36:8 40:5,23
40:24 42:23
45:25 56:23
59:3
**general** 22:2,9
33:25 54:14
**generally** 21:4
**genital** 23:5
**getting** 30:7
44:11
**gist** 41:22
**give** 7:25 22:23
24:12 43:7,8
43:11 44:24
48:6,11 49:12
52:13
**given** 21:5
59:16
**giving** 23:1
40:14
**go** 4:12 6:2
11:18 18:15
19:19 28:2
37:19 40:7
42:8 46:16,19
46:20 48:2
49:15,16 52:7
52:7,24 54:11
57:11
**going** 4:3 11:11
17:21 24:11
25:7 29:13,14
29:22 31:12,16

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400
Case 3:18-cv-00211-MMS Document 249-1 Filed 03/28/25 Page 68 of 82 Exhibit 1
Page 68 of 82

36:10 49:5
59:13
**good** 4:2 5:7
11:16 28:22
39:6 48:22,23
48:25,25 49:1
**goose** 34:15,18
34:20
**graves** 2:19
**great** 48:21
**greg** 1:11 3:2
4:14 5:4 13:13
59:17 60:10
62:3,21
**gross** 2:14 3:5
5:14,14 23:20
24:25 28:17
29:13,16,19,22
30:6 36:9,21
50:16,17 52:7
52:24 55:4,17
55:19 56:2,16
57:2 59:5,10
**group** 13:18
16:25
**guard** 48:12
**guards** 48:13
48:15
**guess** 7:12
13:16
**guessing** 13:15
**gun** 20:24
**gynecology**
54:14

**h**

**h** 33:18
**hand** 61:14
**handful** 36:11
**handwriting**
47:20
**handwritten**
48:14
**handwrote**
47:8,19
**happen** 57:17
**happened**
20:14
**happy** 41:14
**head** 20:24
**heals** 51:12
**health** 33:17
52:12 53:5
**healthcare**
34:25
**heard** 4:9 14:24
15:1 33:16,19
33:20 34:5,20
34:24
**heart** 12:16
**help** 40:14
**hereunto** 61:13
**history** 39:1,4,6
39:7,8,12 40:7
**hold** 16:15 24:8
**holding** 24:6
**honestly** 26:8

**hope** 8:15
39:11
**hoping** 8:17
**horton** 2:12
**hospital** 7:16
**hours** 20:25
**hybrid** 29:4

**i**

**identified** 16:4
**identify** 42:22
**identity** 15:11
15:15 40:5
**illness** 8:19
**imagine** 48:16
**immediately**
12:4
**imminently**
52:11
**impetus** 21:7
**implicating**
19:4
**incarcerated**
14:2,12,21
34:14,15,17
35:3,7
**incarceration**
14:18
**incision** 13:5
**include** 32:6
39:3
**includes** 26:12
39:7

**including** 21:10
22:12 29:4
55:20
**incomplete**
51:6,10
**incontinence**
42:2
**inconvenience**
50:10
**index** 3:1,8
**indicated** 29:11
53:24
**individual**
54:11
**individual's**
31:24
**individuals**
14:3,12 15:14
34:18
**infection** 23:11
**information**
46:11
**injury** 42:2
**instruction**
15:10
**instructions**
43:18
**interest** 54:19
61:11
**interested** 4:24
**interfere** 8:19
**internet** 4:8
40:17 47:7,22

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 69 of 82
Exhibit 1
Page 69 of 82

interpose  29:23
interrupt  5:21
introduce
  17:24 36:13
introduced
  36:19
invasive  12:20
iowa  11:25
issue  45:7
issues  12:16
  56:14

**j**

jim  2:21 5:17
  6:12
july  55:7
june  21:20
  38:16 39:14
  53:8
justice  53:24
jwilkson  2:21

**k**

k  2:14
kerr  2:6 3:4,6
  5:7,8,12,19,20
  6:14 11:11
  17:25 18:4,5
  18:11,17,19
  19:6 24:15,21
  25:2,5,13,15,20
  25:24 26:2
  28:21,23 30:3
  30:7 36:13,18
  36:23,25 37:9

37:11,16,19,20
48:24 49:3
50:1,7 52:5,21
55:2,16,24
56:20 57:6
58:5,10 59:7
kind  13:22
  19:16 20:13
  45:17
kinds  58:14,16
knew  33:1
know  9:9 10:1
  11:1,2 13:17
  14:10 15:22
  17:12,19 19:13
  20:1,19,20,21
  20:25 21:4,15
  22:12 24:1,4
  26:7,24 28:10
  29:18 31:1,10
  31:25 32:22
  33:10 34:6
  40:21 44:23
  45:9 48:21
  54:8,16 58:12
  58:19,21
knowledge
  9:22 46:7,9
  52:6

**l**

l  2:13 12:24
lambda  2:4 5:8
  5:10

lambdalegal....
  2:6,8,10
language  53:13
laparoscopic
  12:23
laparoscopy
  12:20,23
law  11:17
lawrence  21:10
  44:8,12 45:5
  55:10,14,20
  56:6
lawsuit  10:7,12
legal  2:4 4:20
  4:21 5:8,11
lengthy  42:17
license  11:17
licensed  10:18
  11:12
line  3:9 62:5
link  24:19
list  3:11 24:18
  29:25 58:19
listed  55:5
lists  29:25
little  20:10 21:3
  38:6,19,22
  50:23 53:9
  55:4
live  34:15
liver  22:13
llc  62:1
loading  18:16
  37:2

long  11:13,13
  12:2 13:10
  39:12 52:11
look  17:22 18:5
  18:20 24:12
  38:4 42:4 48:2
looked  9:17
  47:13,13,18
  53:8
looking  13:1
  26:7 28:24
  50:25
looks  50:25
  55:6
loop  1:17
lot  40:20,21
lots  58:16
loud  28:4
lower  45:11
  58:24
lund  1:11 2:18
  3:2 4:15 5:4,8
  5:18,20 6:2,5
  10:17 13:13
  25:15 26:2,22
  28:9 29:4 30:7
  30:10,14 37:12
  49:6 50:7
  56:20 59:17
  60:10 62:3,21

**m**

m  1:24 61:2,17

**m.d.** 1:11 3:2
5:4 13:14
60:10 62:3,21
**mac** 34:21
**made** 19:12
30:6 31:15
45:15,19 56:5
56:13 58:23
60:7
**mail** 27:5,7
28:11
**make** 19:3 30:4
41:3 43:2,2,5
45:1,8 49:8
56:8
**making** 43:23
43:25
**male** 22:8 40:6
**mara** 2:16 5:15
23:21
**marathon** 8:10
8:16
**march** 1:13 3:2
4:4 46:8,15
61:14
**marked** 24:17
24:22,22
**marking** 18:21
25:21 37:9
**material** 14:20
**matter** 4:15
6:16,17,24
7:16,18 14:21
20:5 45:6

**mean** 12:25
20:16 21:4
24:3 25:11
28:10 52:20
53:1 54:15
57:25
**means** 11:8
53:11
**media** 4:13
49:25 50:6
59:17
**mediation**
49:19
**medical** 7:17
9:17,24 11:15
11:18 15:9,15
29:6,8 30:16
30:22 31:24,25
33:1 34:21
36:7 39:6,7
46:10 52:2
53:3
**medically** 56:9
**medication**
8:19
**meet** 19:23
20:3
**meeting** 6:7
**member** 7:17
7:18
**memory** 50:22
**michaletz** 2:16
5:15 23:21

**middle** 8:11
**mierop** 1:24
4:21 61:2,17
**mimic** 29:24
**mind** 52:3
**minimal** 40:13
**minimally**
12:19
**minor** 51:16
**minute** 9:19
18:20 27:18
42:5 49:9,14
**minutes** 48:20
49:22
**mms** 1:6
**moment** 24:13
28:5
**month** 10:24
**months** 51:5
**morgan** 2:8
5:10
**morning** 26:20
26:21
**move** 28:20
49:9
**moved** 12:5
**murder** 23:21
**mwalker** 2:8

**n**

**n** 2:1
**name** 4:19 5:25
9:8,10,25
13:20 26:12

28:15 50:17
62:2,3
**named** 9:12
**nancy** 1:7 4:16
62:2
**national** 34:25
**nature** 52:1
54:2
**necessary**
52:11 56:9
**necessity** 29:8
**need** 8:10 18:1
20:24 32:3
36:25 49:7,19
49:20 57:25
**needed** 59:2
**needs** 31:13,20
54:11
**never** 6:6 20:23
23:17 31:4
34:5 57:13,20
**new** 2:5,5 62:1
**newborn** 51:2
**non** 23:11
**nonessential**
51:25 52:20
53:5
**notary** 60:17
61:18 62:25
**note** 4:5 5:13
16:5,6 21:20
27:16 38:1,2
39:3,16 40:3,3
42:4,14 44:14

Case 3:18-cv-00211-MMS Document 249-1 Filed 03/28/25 Page 71 of 82 Exhibit 1
Page 71 of 82

44:18,20,21,25
45:4,18,19
46:4 47:21
48:15 56:8
58:23
**noted** 60:5
**notes** 3:12
20:12,13 37:25
46:11
**notice** 3:10
17:23 18:6
**number** 3:9
59:17
**numbers** 47:11
**numerous** 40:4
41:13 53:17
58:4

**o**

**o** 12:24,24
13:13
**oath** 8:6,8
**object** 29:14
30:3
**objection** 29:23
30:4,4,5 52:5
52:21 55:2,16
55:24
**occasions** 53:17
**october** 51:1
**offer** 44:3
**office** 38:1,2
41:9,20,24

**oh** 19:6 25:2
26:11 28:5
36:18 48:13
54:20 57:1
**okay** 6:6,14 7:9
7:14 8:3,9,23
9:4,7,14,18
10:6,23,25
11:16,21 12:1
12:10,21,25
13:3,6,10 14:8
14:11,23 15:8
16:7,12,15,24
17:4,9,14,17,21
18:4,8,11
19:20,23 20:15
21:9,15,24
22:17 23:8,18
24:1,3,11,11,15
25:7,15,19
26:9,13,25
27:2,6,9,17
28:1,7 31:1,10
31:18 32:25
33:4,6,10,13,15
33:21,25 34:8
34:19,24 37:4
37:19 38:3,11
38:12,16 39:3
39:18 40:10
41:5,18 42:4
42:13,20 43:10
43:13 44:6,14
44:22 46:3

47:21,24,24
48:9,13,17
49:7 50:7 51:5
51:17,19 52:13
53:6 56:15
57:10,14 58:21
59:9
**once** 6:20 18:24
**ongoing** 43:19
53:5
**oops** 24:14
**open** 25:4
**opening** 25:5
**operation** 23:7
**opinion** 44:24
45:11 55:11,21
**option** 28:7
46:20
**options** 43:9,10
**orchiectomies**
23:10
**orchiectomy**
23:5,7 53:22
**order** 56:1
**originating**
1:16
**outcome** 4:25
61:11
**outside** 30:18
32:20 54:9
**own** 6:13

**p**

**p** 2:1,1 12:24
12:24 33:18
**p.m.** 1:14 49:24
50:5 59:15,19
**page** 3:3,9
27:24 30:9
37:1 38:5,25
42:7,7,9 43:2
43:17 44:6
47:10 48:6
62:5
**pages** 28:6
**paid** 10:14
**pain** 7:7
**palmer** 1:17
**paper** 48:14
**paperwork**
19:14
**part** 26:12
42:11
**partially** 10:22
**participants**
4:8
**particular**
15:25 17:18
34:1 46:6
54:24
**parties** 4:12,23
**partner** 20:6
**parts** 54:5,5,6
**party** 10:11
61:10

| | | | |
|---|---|---|---|
| **past** 39:1,4,7,7 | **permitted** | **practice** 12:3,6 | **produced** |
| **patient** 9:7,11 | 52:22 | 12:8 14:6 | 29:20 |
| 40:4,9,14 | **person** 9:21 | 16:20,21,21 | **professional** |
| 41:23 44:2 | 16:13 31:20 | 32:20 52:4 | 33:16 |
| 48:2 50:24 | **personally** 19:9 | **prepare** 19:24 | **promoted** |
| 53:16,18,23 | **persons** 36:4 | **present** 6:13 | 34:11 |
| 54:4,24 55:22 | **pertains** 14:18 | **presented** 35:2 | **proper** 55:12 |
| 57:25 | **phone** 28:14 | **presents** 40:4 | **proprietor** |
| **patient's** 48:4 | 47:11 | **presumptuous** | 13:13 |
| 54:19 | **physical** 56:12 | 57:21 | **prostate** 14:19 |
| **patients** 15:19 | 58:25 | **pretty** 58:24 | 53:21 54:7 |
| 40:20,23 51:20 | **physician** 11:9 | **previously** | **provide** 29:5 |
| **paying** 10:25 | 19:16 | 28:11 | **provided** 29:7 |
| 11:6 | **pick** 16:19 | **primarily** | **provider** 41:16 |
| **peer** 35:15,18 | 54:17 | 23:11 | **providers** 29:2 |
| 35:24 36:1 | **place** 4:11 61:5 | **primary** 35:11 | **providing** 16:1 |
| **penile** 42:2 | **plaintiff** 1:4 2:3 | **printed** 27:25 | **psychiatric** |
| **people** 18:12 | 29:3,7 | 38:10,11 | 32:24 56:14 |
| 23:24 24:7 | **plaintiff's** | **private** 12:6,8 | **psychiatrist** |
| 25:8 34:2,14 | 29:24 55:9 | **privilege** 19:5 | 33:8 |
| 34:15 35:4,7 | **plan** 43:17 | **probably** 13:15 | **psychiatry** |
| 36:8 40:15 | **please** 4:5 5:24 | 28:14 33:3 | 12:16 54:15 |
| 50:13 | 8:10 25:4 30:5 | **problems** 14:16 | **psycholo** 32:23 |
| **percent** 14:7 | 59:14 | **procedure** | 32:23 |
| **percentage** | **pleasure** 6:7 | 45:12 51:3,16 | **psychologic** |
| 14:5 | **point** 25:12 | 52:10 | 45:9 46:25 |
| **perfect** 13:25 | **portion** 28:18 | **procedures** | **psychological** |
| **perform** 23:8 | **position** 44:25 | 51:24 | 45:2,21 |
| 41:15 51:23 | 45:8 46:24 | **proceed** 5:3 | **psychologist** |
| 53:21 | 56:8 58:1,6,6,7 | **proceedings** | 33:8 |
| **performed** | 58:9,24 | 4:1 7:3 61:4,6 | **pub** 35:15 |
| 16:12 23:10 | **potential** 40:15 | 61:9 | **public** 60:17 |
| **performs** 46:21 | **prac** 12:3 | **process** 7:21 | 61:18 62:25 |
| | | 20:10,16 50:11 | |

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Case 3:18-cv-00211-MMS     Document 249-1     Filed 03/28/25     Page 73 of 82   Exhibit 1
Page 73 of 82

**publication** 35:15,19,24
35:14,17,21
36:2
**published** 35:2
35:14,17,21
36:2
**purpose** 39:20
**pursue** 44:4
46:20
**pursued** 16:22
47:5 57:15,16
**pursuing** 54:11

**q**

**qualified** 30:15
31:20 44:23
**quality** 4:6,7
**question** 7:25
8:12,13,24 9:1
9:5 17:13
32:10,13 39:23
42:25 55:18
57:4
**questions** 8:20
28:19 41:10
50:8,20 56:17
59:10
**quick** 28:12
49:21 50:20
**quickly** 50:17
**quite** 53:13

**r**

**r** 2:1 6:1 12:24
**rachel** 21:15

**read** 19:13
20:12 27:12,17
27:18 28:3,6
28:18 29:15
34:9 40:8
51:19 53:10
60:3
**reading** 40:3
45:17
**real** 20:10
**really** 28:12
49:21 54:10,11
**realm** 32:20
54:9
**reason** 8:18
39:5,21,24
44:17 62:5
**rec** 9:24 56:13
**recall** 9:9 40:1
44:11,13
**receive** 15:10
**received** 18:24
27:11 31:11
37:24 44:8
**recollection**
40:2,11,13,18
**recommend**
43:18
**recommendat...**
43:3,5,24 44:1
45:2,9,21
46:16
**recommendat...**
51:25 56:14

**record** 4:3,12
5:2,13,25
49:16 50:5
59:14 60:6
61:9
**recorded** 4:10
4:14 16:6
**recording** 4:7
4:11
**records** 9:17,25
50:25 53:17
**reduction**
52:16
**redundant**
51:13
**reference** 3:9
39:1 42:16
43:14 44:7
**referral** 43:14
43:18 53:19
**refers** 53:16
**reflect** 39:16
**reflects** 44:14
**refresh** 37:1
38:5
**regarding** 7:7
7:18 29:6,8
41:14 42:1
**regardless**
53:18
**reimbursement**
11:8
**related** 4:23

**relating** 6:25
**relatively** 51:16
**remember** 9:14
9:16 19:17
47:12,25 48:7
48:10 50:24
51:3,8 55:13
**reminder** 8:9
**remote** 4:14
**remove** 54:17
**removing** 54:6
54:7
**render** 45:20
**repair** 51:6,10
**reported** 1:24
61:7
**reporter** 4:20
8:1 18:2,3
25:21,23 36:16
36:20 58:8
61:3
**reporting** 62:1
**represent** 5:9
50:18
**representatives**
23:19
**representing**
5:16
**reproductive**
22:8
**request** 48:4
**requested**
59:20

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 74 of 82
Exhibit 1
Page 74 of 82

**require** 33:7
59:3
**requires** 33:11
**research** 17:19
35:11 47:6
**residencies**
11:22 15:9
**residency**
11:23 12:2,4
**resources**
40:15
**respect** 34:13
34:19
**restate** 32:10
**retained** 59:18
**retired** 10:21
**review** 36:1
54:23
**reviewed** 21:19
21:21 35:15,18
35:24 46:10
**revise** 51:15
**richard** 2:9
5:11
**right** 9:5,11,23
10:12 12:3,7
13:25 15:22
17:21 18:17
30:13 34:8
38:17 39:15
41:18 42:18
44:6 45:16,22
46:1,2 47:16
47:25 58:19

59:7
**robert** 21:10
**routine** 32:7
**rsaenz** 2:10
**run** 50:14

**s**

**s** 2:1 12:24 62:5
**saenz** 2:9 5:11
**samuelson**
21:16
**sandra** 1:24
61:2,17
**sandy** 4:21
**saw** 26:20,21
26:22 39:13
**saying** 20:19
27:13 40:10
41:6 45:3
46:19
**says** 27:16,23
28:23 29:17
30:9,14 40:3,8
41:24 42:10
43:18 51:22,23
53:14,15
**scanned** 26:6
**schedule** 41:2
**scheme** 14:9
**school** 11:19
15:9,16 33:1
**scope** 13:2
16:20 52:6,22
55:25

**screen** 4:9
18:16 28:2
30:12
**scroll** 26:9
**scrolling** 28:8
**section** 27:19
27:22,23 42:10
**see** 8:15 18:6,7
18:12,18 24:16
24:19,20 25:8
25:16 27:2,23
28:14 29:17
30:12,20,21
37:1,2,5,6,11
37:20 38:6,7,9
38:9,24 40:20
40:20,21 41:10
41:15 42:11
43:12,21 44:4
44:9 49:6
**seeing** 26:4
41:11 53:16
**seeking** 15:19
40:23 41:16
44:2
**seeks** 58:8
**seen** 4:9 9:17
18:22,23 26:3
26:14,16 40:25
46:3 47:8
**semi** 58:17,17
**send** 57:21,22
**sense** 29:23

**sent** 28:10
**services** 30:17
30:23
**set** 61:5,13
**sets** 34:1
**setting** 30:19
**seven** 11:24
**several** 13:12
**share** 18:8 19:7
19:7 24:16,24
25:7
**shared** 18:16
**sheet** 60:5 62:1
**sheets** 51:22
**shorthand** 61:2
**shown** 53:7
**sic** 28:24 53:22
**sign** 59:13
**signature** 59:20
61:16
**significant** 21:7
**significantly**
22:10
**simerville** 2:18
20:7 30:10,14
**simerville's**
21:22
**similar** 53:4
**simply** 17:10
37:17
**sit** 54:16
**sitting** 23:18
46:7

| | | | |
|---|---|---|---|
| **situation** 21:11 | **speaking** 30:3,4 | **state** 5:24 | **suggestions** |
| 46:23 47:1 | 49:20 | 10:18 17:2 | 43:7,8 |
| 58:13 | **special** 11:21 | 50:18 61:18 | **suite** 2:13,19 |
| **six** 7:12 | 43:19 | **stated** 5:1 | **suits** 21:6 |
| **skerr** 2:6 | **specialist** 53:19 | **statement** | **suppose** 8:15 |
| **skin** 51:13 | **specialists** | 45:15 51:21 | **sure** 13:24 |
| **small** 26:4 37:3 | 13:19 | **statements** | 14:18 19:4,6 |
| 37:14 | **specialize** | 60:7 | 26:5 53:2 |
| **sole** 13:13 | 22:14 | **states** 1:1 4:17 | **surgeon** 22:3 |
| **solutions** 4:22 | **specialized** | 29:2 | **surgeries** 23:9 |
| **somebody** | 22:11 | **static** 31:25 | **surgery** 12:15 |
| 14:18 41:9 | **specialty** 12:11 | **stenographic** | 12:18,20 16:13 |
| 57:22,22 | 12:14,17 14:12 | 5:2 | 17:11 22:9,15 |
| **someone's** 15:4 | 22:7 36:7 | **stenographic...** | 22:16,16 23:5 |
| **somewhat** 7:21 | 43:19 44:4 | 61:7 | 23:13 30:18,24 |
| **sonja** 2:6 5:8 | 47:5 | **stomach** 22:13 | 31:13,21 32:4 |
| 28:17 29:13 | **specific** 15:10 | **straight** 49:18 | 32:13,15,19 |
| 55:18 57:4 | 22:10 | **street** 2:4,13,19 | 40:24 41:21 |
| **sorry** 5:21 | **specifically** | **stricture** 51:14 | 45:11,14 46:24 |
| 19:20 23:22 | 16:10 32:2 | **submitted** 30:8 | 52:4,15 53:21 |
| 25:2 32:8 | 58:22 | **subpoena** | 54:6,14 58:1 |
| 36:23 37:16 | **specifics** 20:11 | 20:18,23 | 58:15,16,25 |
| 38:19 39:23 | **spectrum** 54:13 | **subpoenaed** | 59:3 |
| 42:7 50:9 | 58:18 | 19:15 21:13 | **surgical** 12:17 |
| 54:20 | **spell** 5:24 12:22 | **subscribe** 60:6 | 15:20 22:6 |
| **sort** 20:22 | **spot** 48:25 | **subscribed** | 35:12,22 39:1 |
| 53:25 55:10 | **stand** 46:15 | 60:12 62:22 | 39:4,7 40:6 |
| **sought** 39:13 | 47:2 49:23 | **suggest** 45:5 | 51:25 |
| **sounds** 9:10 | 59:14 | **suggested** 55:9 | **surprise** 11:4 |
| 15:24 | **standards** | **suggesting** 31:2 | **survey** 17:6,18 |
| **sources** 43:14 | 33:17 34:2,10 | 31:6 | **suspect** 51:7 |
| **south** 1:17 | **started** 13:12 | **suggestion** | **swear** 48:1 |
| 13:18 | 23:17 | 28:22 | **switch** 49:13 |

**sworn** 5:3,5
  60:12 61:5
  62:22
**system** 22:8

**t**

**t** 33:18
**take** 4:11 18:20
  27:18 28:5
  48:20 49:20
**taken** 1:16 6:15
  6:19 61:4,10
**talk** 8:4 9:18
  21:9 23:23
  27:9 30:11
  38:8
**talked** 22:17
  45:25 55:4
**talking** 21:7
  25:1
**teach** 34:6
**telescope** 13:4
**tell** 9:4 15:2
  18:21 21:18
  26:8 41:2,5
  57:21 61:6
**ten** 13:24 48:20
  57:4
**tend** 22:14
**term** 14:24
  15:22 52:11,19
  53:2,3,3
**terms** 56:12
  58:25

**tertiary** 46:21
**test** 50:22
**testerone** 53:22
**testicles** 54:7
  54:18
**testified** 5:5
  6:22,24 7:2,10
  56:22 57:10
**testify** 27:15
  29:12 30:2,15
  31:17
**testifying** 31:12
  57:17
**testimony** 29:6
  29:7 59:16
**testosterone**
  54:8
**text** 25:11
  37:13
**thank** 5:19,20
  12:10 14:23
  25:19 36:23
  38:21 50:12
  56:17,18 57:5
  59:9,10
**therapy** 53:22
**things** 14:9
  20:22 48:3
**think** 7:10 11:6
  14:20 15:3
  16:19 19:12
  20:12,23 25:5
  33:11 36:15
  39:20 45:12

  47:7 48:15
  53:12,23 54:4
  56:4 58:23
**third** 42:6
**thoracic** 22:15
**thought** 20:9
  20:16 36:18
  37:23 46:23
**threatening**
  20:20
**three** 49:22
**thursday** 4:4
**time** 1:14 5:23
  7:14 10:14,21
  11:1 13:6 21:2
  21:5 26:22
  31:13 39:11,18
  42:22 44:23
  45:16,19 48:22
  49:1,13,17,24
  50:4,9,11 59:8
  59:15 61:4,10
**times** 7:9 36:11
  42:25 57:4
  58:4
**tiny** 25:10
**today** 5:21 8:7
  8:20 10:7,15
  11:1 16:15
  19:24 23:18
  26:25 40:10
  46:7,8,15 59:3
**today's** 59:16

**took** 8:8
**top** 37:8 51:21
**topic** 35:3,11
  35:18,21
**total** 59:17
**touched** 33:2
**towards** 38:24
**track** 30:8
**tract** 22:7,12
**training** 12:11
  12:15 14:17
  15:8 33:22,24
  45:25
**tran** 34:3
**transcribed**
  61:8
**transcript** 60:3
  60:6
**transcription**
  61:8
**transgender**
  33:17 34:3
  35:3,7 36:4
  40:24 41:13,21
  53:20,24 54:6
**transplant**
  22:16
**treat** 14:2
  30:17,23 42:3
**treated** 9:7,11
  16:7 29:3
  34:17
**treating** 9:14
  11:9 13:14

212-267-6868
Veritext Legal Solutions
www.veritext.com
516-608-2400

Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 77 of 82
Exhibit 1
Page 77 of 82

14:12,16 15:14
15:18 19:15
22:18,18
**treatment**
15:20 29:6
36:7 46:20
54:23 55:12
56:24
**treatments**
29:9 54:25
**trial** 29:25
**tried** 56:7
**true** 11:11 61:9
**truth** 61:6
**truthfully** 8:21
**try** 8:3 17:21
24:11 25:7
**trying** 40:14
45:5 53:14
54:3,5
**two** 20:19
36:19 49:9,14
51:5 59:18
**type** 17:19
**types** 7:3,5 23:4
23:8

**u**

**ultimately**
13:20
**uncomfortable**
15:6
**uncommon**
51:17,18

**under** 8:6
12:18 43:17
**understand** 8:6
9:5 10:6,17
11:10 18:25
19:10,14 27:13
29:10,21 40:19
58:10
**understanding**
15:3 34:1 40:9
50:11
**understood**
8:25 19:13
50:23
**unit** 4:13 49:25
50:6
**united** 1:1 4:16
**units** 59:17
**university**
11:20,24
**unreadable**
37:18
**unusual** 20:10
20:17 21:4
**urgency** 45:6
**urinary** 22:7
42:2
**uro** 13:14
**urological**
12:18 14:16
40:5
**urologist** 13:7
13:15 21:25
23:2 32:17

**urology** 3:12
11:23 12:12,17
12:18 13:8,11
13:14,18,22
14:2 16:23,25
22:6 27:23
29:3 31:19
37:7,25 38:14
41:6,7 49:20
54:14
**use** 28:14 32:9
33:4 38:3
**used** 19:18
**using** 24:16
**usually** 48:11
**utah** 11:20

**v**

**v** 62:2
**vaginoplasty**
23:14
**vascular** 22:16
**vasectomy** 7:8
**veritext** 4:21
59:18 62:1
**versus** 4:15
45:7 56:9
58:13
**video** 1:10 4:10
4:14 20:25
**videoconfere...**
1:10,16
**videographer**
2:23 4:2,20

18:1,14,15
48:18,19 49:13
49:15,23 50:4
59:12
**view** 33:7
**virtually** 4:6
**visible** 18:10
**visit** 9:16 21:22
38:23 39:21
40:12 42:14,15
46:12 53:7
**visited** 39:19
**visiting** 39:22
39:25
**visits** 53:18
**void** 14:19
**vs** 1:6

**w**

**w** 33:18
**wagoner** 1:4
4:15 5:9 6:25
9:12,15,21,25
10:8 16:3,8
22:19 31:13
32:6,14 39:14
39:19,24 41:20
42:21 43:3,15
46:4,11 48:5,7
50:24 53:8
57:11 62:2
**wagoner's**
42:15

212-267-6868
Veritext Legal Solutions
www.veritext.com
516-608-2400

Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 78 of 82
Exhibit 1
Page 78 of 82

**walker**   2:8 5:10
**wall**   2:4
**want**   5:12
   18:19 19:3
   20:1 27:9 28:3
   28:12,19 38:3
   38:7,22 44:4
   46:18 50:22
   51:19 53:10
**wanted**   56:6
   58:11
**way**   19:19
   27:18 30:2
   31:7
**websites**   47:11
**week**   10:24
**went**   47:6,13
**whereof**   61:13
**whoever's**
   33:12
**wilkson**   2:21
   5:17,17 6:11
   6:12 11:3 18:9
   19:3,8 20:2
   21:8 24:19
   25:3,9,14 27:8
   27:11 28:9,16
   37:13,17 49:8
   49:12,18 58:3
**willing**   53:21
**window**   26:5
**witness**   4:9 5:2
   7:4,7 11:5,9
   18:13,18 25:25

   28:13 29:1,25
   29:25 49:1,11
   52:6 56:18
   57:5 58:9 59:9
   61:5,13
**witnesses**   29:5
**witnesses'**   62:3
**woodworth**
   1:17
**word**   19:16,17
   32:7,9 57:1
**work**   14:1 21:5
   34:14
**working**   10:24
**world**   5:22
   12:21 33:16
**worries**   24:4
**wpath**   33:18,22
   34:1,11
**write**   44:20
**written**   29:21
   35:6 36:1
**wrong**   24:14
**wrote**   57:24

**y**

**yeah**   6:10 15:5
   19:6,22 25:9
   28:1 32:23
   41:25 49:11
   50:16 53:1
**year**   11:16,17
   41:14

**years**   7:13,15
   11:24 13:16,24
   33:3
**yesterday**
   26:23,25 31:2
   31:10
**york**   2:5,5 62:1

**z**

**zoom**   1:16

Veritext Legal Solutions
212-267-6868                 www.veritext.com                 516-608-2400
Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 79 of 82
Exhibit 1
Page 79 of 82

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

Case 3:18-cv-00211-MMS    Document 249-1    Filed 03/28/25    Page 81 of 82    Exhibit 1
Page 81 of 82

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.