1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF ALASKA
3
4        EMALEE WAGONER,                  )
              Plaintiff,                  )
5                                         )
                                          )  Case No.
6        vs.                              )  3:18-cv-00211-MMS
                                          )
7        NANCY DAHLSTROM, et al.,         )
              Defendants.                 )
8        ----------------------------
9

10       _____

            VIDEO DEPOSITION VIA VIDEOCONFERENCE OF
11

                      JEFF SIMERVILLE, M.D.
12       _____
13

                        March 27, 2025
14                  4:00 p.m. Alaska Time
15

16       Taken via Zoom videoconference originating at:
17                 2490 South Woodworth Loop
                    Palmer, Alaska  99645
18
19
20
21
22
23
24       Reported by:
              Sandra M. Mierop, FAPR, CRR, CCP, CBC
25

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 1 of 84  Exhibit 2
Page 1 of 84

```
 1                A P P E A R A N C E S
 2
 3      FOR THE PLAINTIFF:
 4      LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
        120 Wall Street, 19th Floor
 5      New York City, New York 10005
 6      By:  Sonja Kerr
             skerr@lambdalegal.org
 7           (646) 307-7394
                  -and-
 8           Morgan Walker
             mwalker@lambdalegal.org
 9              -and-
             Richard Saenz
10           rsaenz@lambdalegal.org
11
        FOR THE DEFENDANTS:
12
        BIRCH, HORTON BITTNER & CHEROT
13      510 L Street, Suite 700
        Anchorage, Alaska 99501
14
        By:  David K. Gross
15           dgross@bhb.com
             907-802-2998
16              -and-
             Mara Michaletz
17
18      FOR DR. LUND AND DR. SIMERVILLE:
19      FARLEY & GRAVES
        807 G Street, Suite 250
20      Anchorage, Alaska 99501
21      By:  Jim Wilkson
             jwilkson@farleygraves.com
22           907-274-5100
23
        VIDEOGRAPHER:
24
        Arielle Friedman
25
```

```
 1                          INDEX
 2      JEFF SIMERVILLE, M.D.              March 27, 2025
 3                                         Page
 4      By Ms. Walker                       5
 5      By Mr. Gross                       54
 6      By Ms. Walker                      58
 7
 8
 9                      EXHIBIT INDEX
10      Number          Description        First Reference
                                           Page/Line
11
        Exhibit 44  Deposition Notice            --
12
        Exhibit 45  Amended Expert List        09/18
13
        Exhibit 46  Alaska Urology Notes         --
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    PROCEEDINGS

2                    THE VIDEOGRAPHER:  The time is

3      4:17 p.m. AKDT on Thursday, March 27th, 2025.

4                    Please note this deposition is

5      being conducted virtually.  Quality of the

6      recording depends on the quality of the camera

7      and Internet connection of participants.  What

8      is seen from the witness and heard on screen is

9      what will be recorded.

10                    Audio and video recording will

11      continue to take place unless all parties agree

12      to go off the record.

13                    This is Media Unit 1 of the

14      remote video-recorded deposition Dr. Jeffrey

15      Simerville in the matter of Emalee Wagoner

16      versus Nancy Dahlstrom, et al., filed in the

17      United States District Court for the District

18      of Alaska, Case 3:18-cv-00211.

19                    My name is Arielle Friedman, your

20      legal videographer.  Your court reporter is

21      Sandra Mierop.  We are with Veritext Legal

22      Solutions.

23                    I am not related to any party in

24      the action, nor am I financially interested in

25      the outcome.

Veritext Legal Solutions
212-267-6868           www.veritext.com           516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 4 of 84    Exhibit 2
Page 4 of 84

1          All counsel will be stated on the
2    stenographic record.  After the witness is
3    sworn in, we will proceed.
4                    JEFF SIMERVILLE, M.D.
5         being duly sworn, testified as follows:
6                    EXAMINATION
7         Q.   (BY MS. WALKER)  Okay.  Very good.
8              Dr. Simerville, hello.  My name
9    is Morgan Walker.  I'm an attorney for the
10   Plaintiffs in this action.
11             Can you hear me okay?
12        A.   I can hear you fine.
13        Q.   Fantastic.
14             You and I have never met each
15   other, right?
16        A.   That is correct.
17        Q.   Okay.  Have you ever taken -- or had
18   your deposition taken before?
19        A.   Never before.
20        Q.   Never before.
21             Have you ever testified in court?
22        A.   Nope.
23        Q.   Okay.  Fantastic.  I'm just going to
24   just give a very brief kind of summary of the
25   rules.  Let me know if you have any questions.

1          So you've just taken an oath to
2     tell the truth, the whole truth, nothing but
3     the truth.  This is -- that oath really has the
4     same legal importance as it would in trial.  So
5     even though there's no jury here, there's no
6     judge here, you really need to listen to the
7     questions and respond to the best of your
8     ability, consistent with your oath.
9          Does that make sense to you?
10    A.    That makes sense.
11    Q.    Okay.  Can we agree that if I ask a
12    question, you -- you'll always give an audible
13    answer.  So, like, for example, like, so don't
14    just shake your head or nod, that kind of
15    thing?
16    A.    (Witness nods head.)
17    Q.    You've already figured this whole
18    thing out.
19          Okay.  So this is not a marathon.
20    If you need a break, just ask and -- and please
21    just answer the question first, if you need to
22    take a break.  I do understand you've got to be
23    somewhere soon.  So we will move as
24    expeditiously as possible.
25          Is there any reason, such as

1   medication or illness, that would interfere

2   would your ability to answer questions

3   truthfully and fully today?

4       A.    No.

5       Q.    Okay.  And will you please let me know

6   if you don't understand a question?

7       A.    Yes, I will.

8       Q.    Okay.  Have you ever treated a patient

9   by the name of Emmanuel Cancel?

10      A.    Not that I know of --

11      Q.    Okay.  And --

12      A.    -- from my records.

13      Q.    Okay.  Fair enough.

14            Do you recognize a patient

15  named -- by the name of Emalee Wagoner?

16      A.    Yes, I'm familiar with that.  I think

17  you've sent me documents concerning that.

18      Q.    Okay.  Do you think that I sent you

19  those, or did someone else send you those?

20      A.    I don't know who sent them to me.

21      Q.    Okay.  Fair enough.

22            So, Dr. Simerville, one of the

23  things that -- one of the most important rules

24  here is I'm going to ask questions.  I

25  definitely need you not to speculate or speak

1      informally.  So if you're not sure who did

2      something, like, please don't -- please don't

3      say that I did it, unless -- unless I'm the

4      person who did it.

5          A.    I did receive a lot of e-mails with

6      her name on it, and I've reviewed my records

7      that I wrote on her some seven years ago.

8          Q.    Okay.  Fair enough.

9                    And, also, if I ask questions

10     about who you've communicated with, I'm not

11     asking you to talk about your communications

12     with your attorney, who's -- who's here

13     remotely.

14                    Does that make sense to you?

15         A.    No.  Can you say that again?

16         Q.    Yeah.  So you have what's called

17     attorney-client privilege.  That means I'm not

18     going to ask you questions that you need to

19     answer that have to do with your communications

20     with your lawyer.

21         A.    Okay.

22         Q.    Dos that make sense?

23         A.    Sure.

24         Q.    Okay.  Got it.

25                    Okay.  So -- so fair to say you

1      didn't have a recollection until you reviewed

2      some documents that you got recently?

3          A.    That's correct.

4          Q.    Okay.  Do you -- do you know why

5      you're here today?

6          A.    No.

7          Q.    Okay.  Is anyone paying you for your

8      time today?

9          A.    No.  But I know everybody else is

10     getting paid today.

11         Q.    Fair enough.

12               Have you received a document

13     which is marked at the bottom as Document 204,

14     which is a legal document that has the caption

15     in all black, bold, and underlined, Defendant's

16     Amended Expert Witness Disclosure?

17               It's what we've been referring to

18     as doc- -- excuse me, Exhibit 45.  Do you have

19     that document?

20               MR. WILKSON:  Can I do a screen

21     share?

22               THE WITNESS:  I -- I think you

23     just gave it to me.  Let's see.  I don't see

24     any attachments, though, on it.

25         Q.   (BY MS. WALKER)  Okay.  I'll -- I'll

1      represent to you, Dr. Simerville, that I

2      e-mailed this document to your attorney a few

3      minutes ago.  It's a seven-page document.

4                      MR. WILKSON:  I'm going to do a

5      screen share so he can see it.  Okay.

6                      Can you see that, Dr. Simerville?

7                      THE WITNESS:  Let me pinch out

8      here.  Yeah, I can see it.

9                      MS. WALKER:  Okay.  Great.

10                     So, we have a situation here

11     where witness' cancel -- counsel is controlling

12     the exhibit.  That's fine.  In general, I'll

13     just ask you to do your best to keep up.  If we

14     could look at the top of the screen, please, of

15     Page 1.

16        Q.   (BY MS. WALKER)  So, Dr. Simerville, do

17     you see --

18                     MR. WILKSON:  Just one moment.

19     I'm trying to --

20                     MS. WALKER:  Counsel, if you're

21     having trouble, I can just e-mail it directly

22     to your client if you're comfortable with that.

23                     MR. WILKSON:  Well, I -- he -- he

24     e-mailed to me, and then I had to, like, log in

25     and get some sort of --

1                    THE WITNESS:  Yeah, I got a -- it
2        was just a link, and it doesn't let me open the
3        thing directly.
4                    MS. WALKER:  Right.  I could -- I
5        could just send it to anyone who needs it as a
6        PDF right now.  Is there anyone who objects to
7        that happening?
8                    Okay.  Hearing no objection,
9        Counsel, do you mind me e-mailing it directly
10       to your client?  I'll cc you, of course.
11                    Jim, can you hear me?
12                    MR. WILKSON:  Yeah, that's fine.
13       I'm just --
14                    MS. WALKER:  Okay.  Great.
15          Q.   (BY MS. WALKER)  Dr. Simerville, can I
16       have your e-mail address, please?
17          A.    It's -- it's jsimervill, without the
18       E, @yahoo.con.
19          Q.    And is that one L or two?
20          A.    There's two Ls.  And there's -- you
21       don't put an E on the end of it.
22          Q.    Okay.  So that's going to be
23       j-s-i-m-m-e-r-v-i-l-l @yahoo.com?
24          A.    Only one M.
25          Q.    Only one M, sorry.

```
 1                    MR. WILKSON:  I have it -- I have
 2      it up.  If we can just do a screen share, I
 3      have it up on my computer to expedite this.
 4                    Can you -- do you see it?
 5                    THE WITNESS:  I see it.
 6                    MS. WALKER:  Okay.  So -- okay.
 7      Great.  Witness can see it.
 8                    Okay.  If we can go to the top of
 9      Page 1, please.
10                    Okay.  That's not the top.
11                    Great.
12          Q.   (BY MS. WALKER)  Okay.  So,
13      Dr. Simerville, do you see that this is a legal
14      document?
15          A.   Sure, it looks like one.
16          Q.   Okay.  And I'm going to point you to
17      the text that's kind of in the middle of
18      Page 1.
19                    MS. WALKER:  Jim, if you don't
20      mind scrolling down just a bit.
21          Q.   (BY MS. WALKER)  Do you see where --
22                    MS. WALKER:  Oh, a little bit up.
23      A little bit up.  A little bit up.
24                    Okay, right there.
25          Q.   (BY MS. WALKER)  Do you see where it
```

1    says:  In the U.S. District Court for the

2    District of Alaska, and it has a bunch of names

3    there on the left?

4        A.    I do see that.

5        Q.    Okay.  Do you recognize any of those

6    names?

7        A.    Well, Emalee Wagoner --

8        Q.    Uh-huh.

9        A.    -- I've already established as a name

10   I might know.

11       Q.    Uh-huh.

12       A.    Nancy Dahlstrom is one I've heard of.

13       Q.    Okay.

14       A.    But I don't know them.  I don't know

15   Laura Brooks.  I don't know Adam Rutherford.

16   And I don't know Robert Lawrence.

17       Q.    Okay.  Have you ever -- have you ever

18   spoken with lawyers for those people?

19       A.    No.

20       Q.    Okay.  I'm going to direct your

21   attention down to Page 5 of this exhibit.

22                MS. WALKER:  Jim, you're just

23   going to scroll on down.  Thanks very much.

24       Q.    (BY MS. WALKER)  Dr. Simerville, do you

25   see there where it says, 4, Alaska Urology?

1    A.    I see that.

2    Q.    Do you see that?

3    A.    Yeah.  4, Alaska Urology, and our

4    address.

5    Q.    Yeah.  Have you ever seen this

6    document before, before this time I'm talking

7    to you about it right now?

8    A.    I'm unsure if I've seen this one or

9    not.  I've been seeing a lot of documents

10   lately.

11   Q.    Okay.  I do need you to take a moment

12   and just do your best to figure out if -- if

13   you've ever seen this document before.  So just

14   take as long as you need to read it.  And if

15   you need your attorney to scroll it down for

16   you, you're welcome to do that.

17   A.    It doesn't ring any bells.

18   Q.    Okay.  It doesn't look like something

19   you've seen before?

20   A.    No.

21   Q.    Okay.  I'm going to ask you to read

22   that first paragraph to yourself.

23              MS. WALKER:  Jim, if you don't

24   mind scrolling up just -- okay.

25   Q.    (BY MS. WALKER)  Mister --

```
1        Dr. Simerville, you see that paragraph that
2        says:   Providers at Alaska Urology?
3            A.    I do.
4            Q.    Just go ahead and read -- read that
5        first paragraph, and let me know when you're
6        ready to talk about it.
7            A.    (Reviewing document).
8                     Okay.
9            Q.    Okay.  Are -- are you -- are you
10       familiar with the term "hybrid witness"?
11           A.    I am not.
12           Q.    Okay.  Do you -- do you know who
13       created this document?
14           A.    I do not.
15           Q.    Does it surprise you to see yourself
16       described as a hybrid witness?
17           A.    I -- I'm -- I'm -- I'm shocked by this
18       whole thing.  I don't know why I'm here or why
19       we're take -- why it's taking so long, to be
20       quite honest.
21           Q.    Okay.  So you're surprised to see
22       yourself described as a hybrid witness?
23           A.    I don't know what a hybrid witness is.
24       I think I just said that.
25           Q.    Yeah, it sounds like it's surprising.
```

 1                  Okay.  Do you mind taking a look
 2      at the next paragraph, and just read that to
 3      yourself?  And let me know when you're ready to
 4      talk about it.
 5          A.    (Reviewing document).
 6          Q.    Sorry, is that a yes, are you ready to
 7      talk about it?
 8          A.    No, because my picture is in the way,
 9      I can't read it all.  I got rid of it.
10                  (Reviewing document).
11                  Okay.
12          Q.    So have you ever read that paragraph
13      before?
14          A.    I do not believe so.
15          Q.    Okay.  Directing your attention to the
16      second -- the second sentence there that says:
17      These include their observations and treatment
18      of Plaintiffs, so on and so forth.
19          A.    I'm there.
20          Q.    Okay.  Do you -- do you know what that
21      is talking about?
22          A.    I mean, I've read my notes.  So I was
23      treating her for some gross hematuria at the
24      time.
25          Q.    Okay.  And when you say "her," do you

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 16 of 84   Exhibit 2
                                                                    Page 16 of 84

1    mean Emalee Wagoner?

2       A.    That's correct.  That's who we're

3    talking about, correct?

4       Q.    That -- that is who I'm talking about.

5    And I -- I -- it's who you're talking about,

6    right?

7       A.    I don't know who else it would be.

8    That's why we're here.

9       Q.    Okay.  Okay.  Fair enough.

10           So are -- are you -- are you

11    familiar with a -- a fellow by the name of

12    Dr. Greg Lund?

13       A.    Yeah, he's my partner.

14       Q.    Like, your business partner and

15    medical partner at Alaska Urology?

16       A.    That's correct.

17       Q.    Would you be surprised if he were to

18    testify that no one in the practice at Alaska

19    Urology is an expert in the field of gender

20    dysphoria?

21       A.    Would that surprise me that he said

22    that?

23       Q.    Yeah, would that surprise you?

24       A.    No.

25       Q.    Okay.  Do you agree that no one at

1    your practice, Alaska Urology, is an expert in

2    gender dysphoria?

3       A.    We are urologists.  So that's not our

4    scope of practice.

5       Q.    Okay.  So you -- and so I -- I -- I'm

6    hoping just to kind of ask this once and just

7    get the clearest answer I possibly can.  Then

8    we won't have to repeat it, and we'll all get

9    out of here sooner.

10           Dr. Simerville, you are not an

11    expert in gender dysphoria, are you?

12       A.    I am not an expert in gender

13    dysphoria.

14       Q.    Okay.  So you are not an expert in

15    diagnosing gender dysphoria?

16       A.    That is also correct.

17       Q.    You're not an expert in identifying

18    the symptoms of gender dysphoria, correct?

19       A.    That is correct.

20       Q.    And you're not an expert in collecting

21    the medical or mental health history of a

22    patient regarding gender dysphoria, right?

23       A.    I think you're repeating yourself, but

24    yes.

25       Q.    Okay.  Well, I have to ask each --

1      each discrete thing so I can -- I can make sure

2      that everyone understands your position

3      regarding this paragraph.

4                  Do you have any expertise in

5      understanding the relationship between gender

6      dysphoria and self-inflicted injuries?

7          A.    Nope.

8          Q.    Okay.  And you're also not an expert

9      in understanding the relationship between

10     gender dysphoria and self-inflicted injuries,

11     right?

12         A.    Right.

13         Q.    And you're not an expert in the area

14     of the self-reported symptoms regarding gender

15     dysphoria, right?

16         A.    Again, I think we've already covered

17     this; but if you want me to say it again, sure.

18         Q.    Yep.  And -- and you can -- you can

19     see the --

20         A.    Every time you say gender dysphoria,

21     I'm going to say I'm not an expert in that.  So

22     if you put that in the sentence, I will say no.

23         Q.    Fantastic.  I -- I think we understand

24     each other.  I'm going to try to ask these

25     questions exactly as you describe them and just

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 19 of 84    Exhibit 2
Page 19 of 84

1     get through this as quickly as possible.  Okay?

2              All right.  So you're not an

3     expert regarding self-reported symptoms and

4     statements regarding gender dysphoria, right?

5        A.    You already asked me that, and I said

6     yes.

7        Q.    Yes, you are not an expert, right?

8        A.    Correct.

9        Q.    I just want to make sure we're not

10    getting -- getting any yes/no confusion here.

11             Okay.  Next clause.

12             Dr. Simer- -- Simerville, you are

13    not an expert in the ability to follow

14    aftercare instructions when it comes to any

15    sort of treatment for gender dysphoria, right?

16       A.    If -- if you're going to throw in

17    gender dysphoria, sure.  I mean, do I have

18    patients that need aftercare and need to assess

19    how they're going to take care of themselves in

20    their home, where -- wherever they're located,

21    well, sure, that's kind of just a general

22    medicine thing.

23       Q.    And I -- I appreciate you -- you

24    drawing a distinction there between, like, a

25    general medicine thing, as you said, versus

```
 1      gender dysphoria.  This is -- this is really a
 2      question about gender dysphoria.
 3                      So you would agree with me that
 4      you are not an expert when it comes to anything
 5      to do about following aftercare instructions
 6      when it comes to a physical procedure done to
 7      treat gender dysphoria, right?
 8                      Like, that -- that's -- that's
 9      not a particular expertise that you have?
10      A.    Are you asking me -- that's an unclear
11      question to me.  Can you clarify?
12      Q.    Yeah.  Okay.
13                      Do you see how your attorney has
14      highlighted, like, that text there?
15      A.    Yes.
16      Q.    Okay.  Do you see the first five words
17      that are highlighted, ability to follow
18      aftercare instructions?
19      A.    That doesn't mention gender
20      dysphoria --
21      Q.    No, no, no.  No.  No, you're right.
22      The document doesn't have those records, but my
23      question does.
24                      So I'm -- I'm asking you to focus
25      on ability to follow aftercare instructions.
```

Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 21 of 84    Exhibit 2
Page 21 of 84

1      Do you see what I'm saying -- seeing right

2      there?

3           A.     I see what you're saying.

4           Q.     Okay.  So, Dr. Simer- --

5      Dr. Simerville, what -- what I'm going to ask

6      you to do is I want you to put yourself in a

7      hypothetical scenario of being at a -- a big

8      convention full of urologists, like a whole lot

9      of your -- your professional colleagues.  Okay?

10                 Can you -- can you kind of

11     imagine that scenario?

12          A.     Sure.

13          Q.     Let's imagine you're having a casual

14     conversation, and -- and one of your colleagues

15     says to you:  Hey, by the way, obviously,

16     you're a urologist.  Obviously, you can deal

17     with the things that urologists deal with, but,

18     Dr. Simerville, let me just ask you, are -- are

19     you in particular an expert regarding a

20     patient's ability to follow aftercare

21     instructions when it comes to treatment for

22     gender dysphoria?

23                 What would you say?

24          A.     Well, that's a very loaded question.

25     I mean, sure, not an expert in that.

1      Q.    Okay.  That's --

2      A.    But --

3      Q.    That's act- -- that's actually --

4      A.    But -- but --

5      Q.    Wait, wait.  Wait, hang on.

6      A.    I can just say, you -- you can just

7  put me down for a no, I'm not an expert in

8  that.

9      Q.    Okay.  No, and I appreciate that.

10              Doctor -- and, Dr. Simerville,

11  I -- I super-duper appreciate you trying to

12  elaborate, but I -- one of the things we're

13  doing here is -- if you can answer with a yes

14  or no, please do.  I don't need you to

15  elaborate.

16              And as we said earlier, the

17  faster you can give a yes or no, if you can,

18  please do, and we'll move on.

19              MR. GROSS:  I disagree -- I

20  disagree with that instruction.  He -- he can

21  answer the question however he wants to answer

22  the question.

23              MS. WALKER:  I'm sorry, Counsel.

24  Are you instructing the witness how to answer

25  the question?

Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 23 of 84  Exhibit 2
Page 23 of 84

1           MR. GROSS:  No, I'm saying that

2     your instruction to him was improper.  You need

3     to both let him answer the question how he

4     wants to answer the question and -- and -- and

5     let him -- let him answer how he wants to.

6               That's -- that's not an

7     instruction.  That's just me communicating to

8     you that you can't tell him how he can and

9     cannot answer the question.

10          MS. WALKER:  Okay.  I appreciate

11    you, Counsel.

12      Q.   (BY MS. WALKER)  And, Dr. Simerville,

13    what -- what -- the instruction I'm going to

14    give you is you have to answer giving the

15    truth, the whole truth, and nothing but the

16    truth.

17              So if the whole truth, the truth,

18    and nothing but the truth is a yes or no, I'll

19    ask you just to give a yes or not.  But -- but

20    if the truth, the whole truth, and nothing but

21    the truth is beyond yes or no, then of course

22    you're free to elaborate.

23              Does that instruction make --

24    make sense to you?

25      A.    Yeah, that's what I was trying to do.

1     Q.    Okay, great.  So I think we've --
2     we've beaten the dead horse about that clause
3     enough.  We'll move on.
4               Okay.  Right -- let's move on to
5     the next clause.  Opinions and medical advice
6     given to Plaintiff.  I'm going to represent to
7     you that the Plaintiff is Emalee Wagoner.  So
8     that's the same person you referred to earlier
9     as being the person that you're talking about.
10              Does that make sense to you?
11    A.    Yeah.
12    Q.    Okay.  So did you -- did you give any
13    opinions to Emalee Wagoner regarding gender
14    dysphoria?
15    A.    Well, I saw her for her evaluation,
16    which she didn't come to me for that.  She came
17    to me with some blood in her urine, I believe.
18    And she also was requesting some bottom surgery
19    at the time, and I informed her that that
20    service is not available up here.
21    Q.    Okay.  Let's -- let's take one -- one
22    quick second.  Okay.  So let's start with just
23    kind of the question itself.
24              So as -- the question that I
25    asked was:  Did you give Emalee Wagoner any

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 25 of 84    Exhibit 2
Page 25 of 84

1    opinions about gender dysphoria?  And it sounds

2    like -- it sounds like you're saying the

3    opinion you gave her is that that's not a

4    service --

5         A.    I didn't give her an opinion.  So the

6    answer to your question is no.

7         Q.    Okay.

8         A.    I didn't give her any opinions.

9         Q.    Okay, terrific.  And -- and we'll come

10   back to what you said a minute ago.  But,

11   first, I just need to get all the way through

12   this document.

13                You didn't give Emalee Wagoner

14   any medical advice regarding gender dysphoria,

15   did you?  Or did you?

16        A.    It depends how you want to phrase

17   that.  I can give you -- say exactly what I

18   just told you before.  She asked about bottom

19   surgery.  I said that service is not available

20   here.

21        Q.    Okay.  So other than telling Emalee

22   Wagner that bottom surgery is not available

23   here, did you give any -- did you give Emalee

24   Wagoner any other medical advice regarding

25   gender dysphoria?

1      A.    I didn't.  No.

2      Q.    Okay, terrific.

3            When you said "bottom surgery" a

4   minute ago, what were you referring to?

5      A.    She wanted her testicles taken off.

6      Q.    Okay.  And what's the term for that?

7      A.    Are you asking me, like, you don't

8   know?

9      Q.    Well, you know, the -- the way it

10  works in a deposition is I don't get to

11  testify, I can only ask questions.

12     A.    Bi- -- bilateral orchiectomy.  That's

13  what --

14     Q.    Bilateral means both of them, right,

15  left and right?

16     A.    That's correct.

17     Q.    Okay.  So was Emalee Wagoner able to

18  tell you that she wanted an orchiectomy?  Was

19  she able to use that vocabulary?

20     A.    No, not that I recall.  This was,

21  again, seven, eight years ago, but I don't

22  think she asked for that.

23     Q.    Okay.  What -- so -- so when you said

24  "bottom surgery," did you mean only orchi- --

25  orchiectomy or anything else?

```
 1        A.    I believe that's what she was asking
 2     for.  But, again, it was seven years ago.  I
 3     don't remember.
 4        Q.    Okay.  Okay.  So fair enough that
 5     you -- you just don't remember what she was
 6     asking for, other -- other than the bilateral
 7     orchiectomy?
 8        A.    That's what I recall.
 9        Q.    Okay.  Is bilateral orchiectomy a
10     service that providers provide at
11     Alaska Urology?
12        A.    Nope.
13        Q.    Okay.  Does Dr. Lund provide bilateral
14     orchiectomy?
15        A.    Nope.
16        Q.    Okay.  And -- and, Dr. Simerville, I'm
17     not in a position to -- to give you
18     information, but I'm just going to ask.
19                If Dr. Lund were to testify that
20     he had performed many orchiectomies, would that
21     surprise you?
22        A.    Oh, we performed orchiectomies.  Those
23     are for not bilaterally.
24        Q.    Oh, I'm sorry.  Okay.  I apologize, I
25     don't understand.
```

1                So to be clear, Alaska Urology

2      does perform orchiectomies, right?

3          A.    For tumors, yes.

4          Q.    Okay.  So -- so it performs the

5      procedure for orchiectomy, just not bilateral

6      orchiectomy?

7          A.    Correct.  Many years ago, we used to

8      treat prostate cancer with bilateral

9      orchiectomy, but we don't do that anymore.

10         Q.    Okay.  Fair enough.  So -- and I want

11     to make sure I understand your testimony

12     correctly, and please forgive me if it sounds

13     like -- like asked or answered, but I just want

14     to clarify.

15                So when you told Emalee Wagoner

16     that bottom surgery was not available, you were

17     specifically referring to bilateral orchiectomy

18     for the treatment of gender dysphoria; is

19     that --

20         A.    That is correct.

21         Q.    Okay.  Got it.

22                And -- and -- and I think you

23     answered this before, but now that we've

24     clarified this other aspect, I'm going to come

25     back and just touch on it.

1               So you used the term "bottom

2    surgery" before I asked another question.  And

3    I asked you to define it, and you said

4    orchiectomy.

5               Now -- now that it's clear --

6    A.   Well --

7    Q.   Go ahead.

8    A.   I think it could be a lot more than

9    just orchiectomy, but it's --

10    Q.   Okay.  Let's talk -- let's -- let's

11    talk about that.  What -- what else is bottom

12    surgery?

13    A.   Well, you can have a vaginoplasty, I

14    suppose, or --

15    Q.   Okay.

16    A.   -- phalloplasty.  You can have all

17    sorts of things down there.

18    Q.   Okay.  And when you say "down there,"

19    are you referring to, like, the colloquial way

20    of talking about, like, a person's genitals or

21    do you mean, like, the lower 48 or what are you

22    talking about?

23    A.   I think we're talking about bottom

24    surgery here.

25    Q.   Okay.  Fair enough.  So -- so when you

1    said it's -- when you told Emalee Wagoner that

2    bottom surgery is not available, what -- did

3    you mean, like, not available at

4    Alaska Urology, not available in Alaska, not

5    available from you?  What did you mean?

6        A.    I -- I think there's not any

7    urologists up here that -- there's no one up

8    here providing that service.  None of the

9    urologists I know, no -- no general surgeon I

10   know, no plastic surgeon I know.  So I am not

11   aware of that being performed up here at all.

12       Q.    Okay.  And just -- just so we're

13   totally clear, Dr. Simerville, when you say

14   "that," you're referring to bilateral

15   orchiectomy for the purpose of gender dysphoria

16   treatment, right?

17       A.    That's correct.  Or whatever else you

18   want.  And I don't know -- I don't remember

19   what she wanted.  I know --

20       Q.    Okay.  Okay.  And -- and as -- as far

21   as you know, just so we're totally clear, there

22   are no medical providers in Alaska providing

23   vaginoplasty or phalloplasty for the purposes

24   of gender dysphoria?

25       A.    That is correct, as far as --

1     Q.    Did you con- -- oh, sorry, go ahead.

2     A.    That is correct, far as I'm aware.

3     Q.    Okay.  Do you consider yourself an

4 expert regarding what medical services are or

5 are not available to treat gender dysphoria in

6 Alaska?

7     A.    I'm aware of the procedures that are

8 done here as part of the medical community, and

9 that is not one that is done, as far as I'm

10 aware.

11     Q.    Okay.  Fair enough.

12              All right.  Let's -- let's really

13 quickly go back to -- okay.  Actually, let --

14 let me direct your attention to this last

15 sentence here.  Your -- your attorney still has

16 it highlighted.

17              Do you see where it says,

18 essentially:  Dr. Simerville is qualified to

19 testify as to the availability and

20 appropriateness of medical services available

21 to treat gender dysphoria through surgery in

22 Alaska, outside of a correctional setting.

23              Is that a true statement or a

24 false statement?  Or are parts of it true,

25 parts of it false, if you know?

1      A.    Well, I mean, through the surgery in
2      Alaska, so I -- I think we're -- my next -- I
3      think -- I know that there's no -- nobody
4      that's doing it up here.  So I think I would
5      have heard about it.  So availability, I can
6      certainly testify to.
7      Q.    Okay.  What about -- what about
8      appropriateness of medical services available
9      to treat gender dysphoria through surgery in
10     Alaska, is that something that you're qualified
11     to testify about at trial in Federal Court?
12     A.    Appropriateness?  Well, I told you I'm
13     not an expert in gender dysphoria.
14     Q.    So what's the answer to the question?
15     A.    I can tell you that I'm not -- that
16     it's not available, and I can tell you I think
17     it takes a lot -- a team of medical providers
18     that is not available up here.  So --
19     Q.    Yeah, and cert- -- certainly not --
20     certainly not in your practice, right?
21     A.    And the appropriateness would be
22     determined by the team.  So I would refer to
23     someone who would think they were -- it was
24     appropriate, but...
25     Q.    Okay.  So, Dr. Simerville -- and --

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 33 of 84    Exhibit 2
Page 33 of 84

1    and, again, I know -- I know you've expressed
2    the desire to do this as quickly as possible.
3    I'll definitely do my best to accommodate that,
4    but I -- I just need to ask a very direct
5    question.
6                Okay.  I'm just going to read the
7    words to you on the page, and I'm going to ask
8    you:  Is this a true statement or a false
9    statement?  Okay?  Here we go.
10               The statement is:  Dr. Simerville
11   is qualified to testify as to the, quote,
12   appropriateness of medical services available
13   to treat gender dysphoria through surgery in
14   Alaska, outside of a correctional setting,
15   unquote.
16               Is that a true statement, a false
17   statement, or something else?
18       A.    I think it's true because it says "in
19   Alaska."
20       Q.    Okay.  So could you explain how -- how
21   are you qualified to testify as to the
22   appropriateness of medical services available
23   to treat gender dysphoria?
24       A.    Well, because there's not services to
25   treat gender dysphoria through surgery in

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-2     Filed 03/28/25     Page 34 of 84     Exhibit 2
Page 34 of 84

1    Alaska.

2        Q.    Okay.  Fair enough.  So you -- so

3    you -- it sounds like, if I understand you

4    correctly, what you're saying is there are no

5    appropriate providers of medical services

6    available to treat gender dysphoria through

7    surgery in Alaska.

8                    Is that a true statement?

9        A.    True.

10       Q.    Okay.  So -- and just so we're totally

11   clear, like, you didn't do a survey or any

12   particular research of Alaska doctors in

13   preparation to answer this question, right?

14       A.    It -- it's a -- no.  So if something

15   has popped up since the last seven years when I

16   saw Emalee, then -- then maybe that's not

17   accurate.  But seven years ago, it was

18   certainly accurate.

19       Q.    Right.  And you certainly haven't done

20   any research between now and when you saw this

21   patient to, like, figure out what the -- what

22   the scope is of gender dysphoria surgery

23   treatment in Alaska, right?  Like, that's

24   not -- that's not a thing you spend your time

25   doing, right?

1      A.    I'm -- I'm part of the community up

2    here and would be -- likely be aware if it was

3    happening.

4      Q.    Got it.  You'd likely be aware, but

5    it's not something you seek out to learn,

6    right?

7      A.    I don't seek out to learn about it.

8      Q.    Okay.  Fair enough.

9                So let's -- I really want to dig

10   down on this concept of appropriateness of

11   medical services.  Okay?  So you've made it

12   very, very clear, Dr. Simerville -- and I

13   appreciate your brevity in answering these

14   questions, but you made it very, very clear

15   that you are not an expert in treating gender

16   dysphoria.

17                So really digging down on this

18   concept of appropriateness of -- of medical

19   services to treat gender dysphoria through

20   surgery in Alaska, here -- here's the question:

21                If -- if a patient came to you

22   and said, Hey, Dr. Simerville, I have gender

23   dysphoria, I need surgery, I need you to tell

24   me what services are -- are appropriate here in

25   Alaska for me to get surgery to treat gender

1    dysphoria.

2         A.    Here's where you're missing the thing.

3         Q.    Okay.

4         A.    You still put in Alaska, which means

5    there isn't.

6         Q.    Okay.

7         A.    It certainly wasn't in 2017, when I

8    saw the patient.

9         Q.    Okay.  And -- and so just to be clear,

10   like -- like, this particular statement -- and

11   we'll take a break here in just a moment.  I

12   really want to --

13        A.    I don't want breaks.  Got to keep

14   going.

15        Q.    Sorry, say again?

16        A.    I don't want to take a break.

17        Q.    Okay.  No, I totally appreciate that.

18   We'll go ahead and remain on record, and -- and

19   I'll -- I'll take a quick break, and that's

20   fine.  But you're -- you're welcome to stay

21   there.

22               If you want to take a break and

23   talk to your lawyer, you can or do whatever

24   else.  It will not -- it will not take long,

25   Dr. Simerville, I promise.

1                    MR. GROSS:  But we've only --
2        we've only been going, like, 40 minutes,
3        though.  And I -- and I think there's people
4        that need to be places.  Can -- can -- what do
5        you need a break for?
6                    MS. WALKER:  Yeah, David, if you
7        could, I'll just keep asking questions, and
8        we'll get this done as quickly as we can.  I do
9        appreciate your patience, David.
10          Q.   (BY MS. WALKER)  So, Dr. Simerville,
11       so -- so the concept of appropriateness, you
12       know, I -- I'll -- I'll just represent to you
13       this is a document written by lawyers.  Okay?
14       It's not written by doctors.  Okay?  So the --
15       what I'm really hoping you can talk about is
16       this notion of appropriateness.  Okay?
17                   So if you were talking about the
18       appropriateness of medical services available
19       to treat gender dysphoria through surgery in
20       Alaska, would you be able to give any advice
21       other than, You should go see a specialist?
22          A.    I don't know why you're not getting
23       this, but the statement says "in Alaska."
24          Q.    It does.  That's right.  It does.
25       That's right.

1      A.     So there was no specialist for this at
2      the time I was seeing Emalee.
3      Q.     And -- and not now either, as far as
4      you know?
5      A.     As far as I know, there's not now
6      either.
7      Q.     Okay.  And, Dr. Simerville, because
8      you're not an expert in gender dysphoria, you
9      would not deign, you would not venture to opine
10     on the appropriateness of any medical services
11     for treating gender dysphoria through surgery,
12     right?
13     A.     No.
14     Q.     So -- so, no, you wouldn't give an
15     opinion; or no, that's not right?
16     A.     Well, you told me to answer yes or no,
17     but --
18     Q.     Okay.  Well --
19     A.     So --
20     Q.     -- let's pause for a second just --
21     just to clarify the instruction.
22                MR. WILKSON:  No, he's still --
23     he's still talking.
24     Q.     (BY MS. WALKER)  No, I -- no, I know,
25     but I -- I'm going to pause and make sure,

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 39 of 84
Exhibit 2
Page 39 of 84

1    Dr. Simerville, that you understand the

2    instruction.  You are to answer with the truth,

3    the whole truth, and nothing but the truth.

4    If --

5         A.    I understand.

6         Q.    Okay.  Go ahead, then.

7         A.    So, yes, it takes an expert team, I

8    believe -- and I think I even wrote this in my

9    note, that it takes a whole team to treat

10   gender dysphoria, psychiatrist.  Shouldn't just

11   take them to a surgeon and have them to do

12   bottom surgery on them.

13                I believe it takes a team.  So

14   that service is not available in Alaska.  So

15   the "appropriateness" word is -- is

16   meaningless.  What really matters is

17   availability.

18        Q.    Yeah.  And just -- and just so we're

19   totally clear -- got it, okay.  Very good.

20                So -- and, you know, seven years

21   ago you talked about referring Ms. Wagoner to

22   an expert.  If -- if any patient came to you

23   now, you would -- you would refer them to a

24   specialist in gender dysphoria, right?

25        A.    Yeah, I would not treat that patient.

1    Q.    Okay.  And that's because you've had

2    no specialized education in gender dysphoria,

3    right?

4    A.    I believe we cleared that up already.

5    Q.    Okay.  I know -- okay.  And that means

6    you've never performed a surgery to treat

7    gender dysphoria?

8    A.    Nope.

9    Q.    Okay.  And -- and are you the director

10   of surgery at Mat-Su Regional Hospital?

11   A.    Not any -- no, I was the chief of

12   medical staff there for a while, but I'm not

13   anymore.

14   Q.    Okay.  And in your capacity there, you

15   never oversaw people doing surgery for

16   gender-affirming care, obviously?

17   A.    No.

18   Q.    Okay.  Do you have a specialization in

19   treating incarcerated people?

20   A.    I don't have a specialization in it.

21   Q.    What percentage of your practice

22   involves treating people who are incarcerated?

23   A.    We see a lot.  I couldn't give you a

24   number.

25   Q.    Okay.  Do you provide different

1    treatment to people in custody than you do who
2    are out of custody?
3         A.    No.
4         Q.    Why is that?
5         A.    Because they're people.
6         Q.    Give me one second, please.
7               So when you say that they're
8    people, I mean, I -- I hear you as a person,
9    Dr. Simerville, and I -- I feel the warmth and
10   sincerity of your answer, but I do need to ask
11   you to elaborate a -- a little bit.
12              So is the significance of them
13   being people that they're entitled to the same
14   medical care as people who are out of custody?
15        A.    Everybody gets the same excellent care
16   that comes through my office door.
17        Q.    Okay.  So the same clinical guidelines
18   would apply to someone in custody versus out of
19   custody?
20        A.    I believe we've established that.
21        Q.    Okay.  And that -- and that's a yes?
22        A.    Yes.
23        Q.    Okay.  Do you know what WPATH is?
24        A.    I do not.
25        Q.    Okay.  If I told you that it's -- that

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 42 of 84    Exhibit 2
Page 42 of 84

1    that's an acronym standing for the World

2    Professional Association for Transgender

3    Health, would that ring a bell or is this maybe

4    the first time you're hearing about this?

5        A.    I may have heard of it before.

6        Q.    Okay.  So you haven't -- but you

7    haven't had any special training with WPATH,

8    right?

9        A.    No.

10       Q.    Okay.  And you've never rendered an --

11   an opinion about whether any particular

12   medical -- medical care is or is not consistent

13   with WPATH medical guidelines, right?

14       A.    I don't know what WPATH medical

15   guidelines are.

16       Q.    Okay.  Just give me one moment,

17   please.

18                    THE VIDEOGRAPHER:  This is the

19   videographer.  Excuse me for a moment.

20                    Doctor, can you push the iPad

21   back a little bit since?  It's cutting off the

22   entire top of your head.

23                    I appreciate that.  Thank you so

24   much.

25                    THE WITNESS:  I had to read the

1      documents.  So...

2                     THE VIDEOGRAPHER:  Not a problem.

3                     MS. WALKER:  Just give me one

4      moment, please, while I look at my notes.

5          Q.   (BY MS. WALKER)  So in -- so in

6      particular, because you are not an expert in

7      gender-affirming surgery, you -- you would also

8      not be in a position to give an expert opinion

9      as to whether any particular patient has given

10     informed consent for gender-affirming surgery,

11     right?

12         A.    Would I know if someone's given --

13     that sounds like a very circular question to

14     me.  A person can give informed consent to

15     anything, and I can understand that.

16         Q.    Okay.  But in terms of, like, for

17     example a person understanding the risks and

18     benefits of a bilateral orchiectomy, like

19     you -- you would not be in a position to make

20     sure they understand all those risks and

21     benefits to give informed consent, right?

22         A.    I would -- I would not be the one

23     going over that with them.

24         Q.    Yeah, because you're just not

25     qualified to do that, right?

```
 1                    MR. GROSS:  Objection.  He gave
 2       the testimony.
 3                    MS. WALKER:  Well, I'm -- I'm
 4       asking a different question.
 5          Q.   (BY MS. WALKER)  So, Dr. Simerville,
 6       the reason you are not the person who would go
 7       over costs, benefits, risks of gender-affirming
 8       surgery, the reason you would not be that
 9       person is because you are not a surgeon who
10       specializes in that field, right?
11          A.   Generally, the person who does the
12       surgery does the informed consent.
13          Q.   Right.  And since you don't do the
14       surgeries, you're not going to do the informed
15       consent, right?
16          A.   Makes sense.
17          Q.   Okay.  Okay.
18                    Have you ever had any
19       conversation with Mr. Gross, who is an attorney
20       for the Defendants in this case?
21          A.   Not that I recall.
22          Q.   Okay.  Any conversations with
23       Ms. Michaletz, Mara Michaletz, who's also
24       defense counsel?
25          A.   I don't know.  There was somebody I
```

1    reached out to when I first got your summons
2    and saying, Why am I being called here for
3    this?
4                    And they said they were going to
5    try and get me off this thing so I wouldn't
6    have to do a deposition.  I did talk to
7    somebody.  I don't know who that was.
8         Q.    Okay.  And just to be clear, that --
9    that wasn't -- so when you called somebody,
10   that wasn't, like, a lawyer representing you,
11   correct?
12        A.    No, I was calling the teams, going,
13   Why -- Why is this happening to me?
14        Q.    Sorry, just to clarify, you were
15   calling the teams?
16        A.    I was calling whatever -- I think I
17   called your office or your lawyers and said,
18   What the heck's going on?  And I think I called
19   the -- the Defendant's office, as well.
20        Q.    Okay, got it.  And your goal was to
21   try to find a way to not testify?
22        A.    To find out what this was even all
23   about, yeah, and why I was being summoned.
24        Q.    Okay.
25        A.    What action to take.

1       Q.    Okay.  Do -- have you -- have you
2    received a summons for the trial beyond the
3    notice of this deposition?
4       A.    I think the only summons I've had is
5    from you, but -- or your office to do this
6    deposition.
7       Q.    Okay.  Okay.  So directing your
8    attention, again, to docket -- excuse me,
9    Exhibit 45, which is still in front of you
10   there.  Do you see how your attorney has that
11   highlighted?
12               I'm going to ask, Jim, your
13   attorney, just to highlight that -- that top
14   paragraph again.  And see where it says --
15               MR. WILKSON:  We're -- we're an
16   hour into this thing now, and we're still on
17   one paragraph of one exhibit.
18               MS. WALKER:  Yeah, thank you for
19   your help there.  If you wouldn't mind just
20   highlighting it.  See where it says:  Providers
21   of Alaska Urology?  Thank you so much, Jim.
22      Q.   (BY MS. WALKER)  Dr. Simerville, where
23   you -- do you see where it says:  They are
24   hybrid witnesses who may be called to provide
25   testimony?

1      A.    I do see that.
2      Q.    Yeah.   Is it news to you that that's
3    referring to a trial?
4      A.    I don't know what it's doing.   I
5    already told you before, I don't even know what
6    a hybrid witness is.   So --
7      Q.    Okay.   Do you --
8      A.    -- can you move on?
9      Q.    Yeah, I -- I -- I really appreciate
10   it, and I'm getting through as quickly as I
11   can.
12             It's just I got to ask the -- I
13   appreciate your -- your -- your view.
14             Do you -- and it's fair to say
15   that when it says, you know, who may be called,
16   you -- you don't know who might be calling you,
17   right?
18      A.    Nope.
19      Q.    Okay.   Is there anything -- did -- did
20   I speak over you a moment ago when you were
21   answering a question?   I apologize if I was.
22      A.    I told you I didn't -- well, no -- no,
23   just keep going, please.
24      Q.    Okay.   Fair enough.
25             So did the lawyers for the

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-2     Filed 03/28/25     Page 48 of 84   Exhibit 2
Page 48 of 84

1    Defendants ever tell you why they might be
2    calling you to testify at a trial?
3         A.    No.
4         Q.    Okay.  I'm not talking about your
5    lawyer.  Okay.  I'm only talking about the
6    lawyers for the Defendants or the lawyers
7    for -- okay.
8              MR. WILKSON:  You -- you -- you
9    asked the question, and he answered it.
10             MS. WALKER:  Okay.  Got it.
11        Q.    (BY MS. WALKER)  So -- so you are
12   planning to give expert testimony?
13        A.    I was not.  I said, no.  You need to
14   listen to my answers.
15        Q.    No, I -- I apologize, Dr. Simerville.
16   I appreciate you being direct with the answer.
17             Okay.  Give me one moment.
18             And you've talked about the --
19   you're not a specialist or expert in gender
20   dysphoria.  How long overall have you been
21   practicing urology?
22        A.    Twenty years.
23        Q.    Okay.  And earlier I asked about
24   communications with Mr. Gross or
25   Ms. Michaletz -- or I asked about

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 49 of 84
Exhibit 2
Page 49 of 84

1      conversations, and I want to just make sure the
2      record is clear.
3                     Have you ever had any -- any
4      communications with Mr. Gross or Ms. Michaletz
5      about the case at all, whether that's text,
6      e-mail, phone call, in-person communication --
7           A.    I told you --
8                     MR. WILKSON:  Asked and answered.
9           A.    Yeah, I told you this already.
10          Q.    (BY MS. WALKER)  Okay.  And that's --
11     that's a no.  I -- well, I asked about
12     conversations.  That's why I'm going back and
13     making sure the record is clear as to other
14     forms of communication.
15                    Okay.  I'm understanding,
16     Dr. Simerville, your quest- -- your answer to
17     be that you have not communicated in any way
18     with those two people, and I'll just ask you to
19     correct me if I'm wrong?
20          A.    Just -- I would just refer back to the
21     notes.
22          Q.    I -- I don't follow, refer back to the
23     notes.
24          A.    Well, I answered the question.
25          Q.    Okay.  And so you would have

1       graduated -- you said 20 years ago.  So you
2       would have graduated from med school in
3       about -- help me out with the math, please.
4            A.    I graduated med school in 1997.
5            Q.    So back in 1997, there would be no --
6       no training in gender dysphoria for you or your
7       classmates, right?
8            A.    No.  But I'm not an expert in that.
9            Q.    So I've heard.
10                  Just give me one quick second
11      here.
12                  Okay.  And fair -- and -- oh,
13      yes.  This will -- this will go very quickly,
14      but I -- I do appreciate you -- you test- --
15      you testified earlier that you looked at your
16      records.  And I'm not going to ask you to go
17      through those line by line because I know
18      you're in a bit of hurry.
19                  But I will ask really quickly,
20      it's fair to say that you only saw this
21      patient, Emalee Wagoner, at the earliest in
22      August of 2016 and in the latest,
23      February 2018, correct?
24           A.    I'm sure there's a date on the medical
25      record, which is the only time I've seen her.

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-2     Filed 03/28/25     Page 51 of 84 Exhibit 2
                                                                      Page 51 of 84

1      Q.   Okay.  So if I were to represent to

2    you that the medical record says that the last

3    time you saw her was 7 February 2018, is that

4    consistent with your memory?

5      A.   That is.

6      Q.   Okay.  And so, obviously, you haven't

7    seen her since.  You haven't even diagnosed her

8    since that time?

9      A.   That's correct.

10      Q.   Okay.  And I'll just represent to you

11    that -- and I can show you if you need.  I'm

12    happy to do that.  But I'm going to represent

13    to you that in your medical records, it

14    indicates that on 20 January 2017 -- so

15    that's -- I apologize, strike that.  Strike the

16    whole question.  I'll rephrase.

17            So, Dr. Simerville, if you need

18    to see your record, I'm happy to provide it.

19    But I'll -- I'll represent to you that you have

20    a medical note, a record that says that on

21    June 20th, 2017, you -- you used the expression

22    that, quote, from a urologic standpoint only.

23    And just -- I'm -- I'm asking you, it's true

24    that you wrote that because that is -- because

25    urology is your specialty, right?

Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 52 of 84    Exhibit 2
Page 52 of 84

1        A.      That is a true statement.

2        Q.      Okay.   Okay.   And -- and I think I

3    asked this and I'm sure I'll get an objection

4    if I have, but -- so in addition to not

5    communicating with Emalee Wagoner since 2018,

6    you also have not looked at any of her more

7    recent medical records since that date,

8    correct?

9        A.      Nope.

10       Q.      Okay.   So you are not in a position to

11   give an opinion as to what medical care Emalee

12   Wagoner should have going forward; is that

13   correct?

14       A.      No, I have not seen her in -- in

15   seven years.

16       Q.      Okay.   So that means you're not in a

17   position to give a medical opinion as to what

18   care she should have going forward, correct?

19       A.      I don't -- I -- I have not seen her in

20   seven years.

21       Q.      Okay.   Under- -- understanding that

22   you haven't seen her in seven years, the

23   implication of not seeing her in seven years is

24   that you are not in a position to provide an

25   opinion as to what medical care she should have

Case 3:18-cv-00211-MMS     Document 249-2     Filed 03/28/25     Page 53 of 84     Exhibit 2
Page 53 of 84

1    going forward?

2         A.    I think that's obvious, yes.

3         Q.    Fantastic, Dr. Simerville.  Thank you

4    so much.

5              MS. WALKER:  That concludes my

6    questions from me.  So I'm going to give David

7    an opportunity to ask you any questions, if

8    you'd like.

9                   EXAMINATION

10        Q.   (BY MR. GROSS)  Yeah, Doctor, I just

11   have -- I'm going to make it very quick.  I

12   just have questions about one entry.  And it's

13   from a record that looks like it's dated

14   April 3rd, 2019.  And it says this.  It says --

15   it's -- it's sort of -- it's a -- it's a note,

16   a progress note.

17              It says:  I discussed the

18   patient's current situation with Dr. Simerville

19   of urology regarding his dysphoria [sic], UTI,

20   and self-inflicted hypospadias.  It was his

21   opinion that the patient's current injury did

22   not predispose him to urinary tract infection

23   as he still had two intact sphincters above the

24   level of the lesion.  (Assuming no foreign body

25   was inserted).  He did not feel it likely that

1     repair of this lesion would relieve the

2     patient's symptoms either.  Furthermore, he

3     said this would be a complicated procedure with

4     a very high likelihood of complication and/or

5     complete failure.  He related that hypospadias

6     is -- in adults is a much more difficult

7     procedure than hypospadias repair in newborns.

8     He felt that this would require a

9     reconstructive specialist not available in

10    Alaska.

11                   So that was a lot.  Let me try to

12    break down just a couple -- a couple issues

13    there.

14                   Generally speaking, do you -- do

15    you -- if -- if -- if -- when you're looking at

16    the causation of a UTI, it's -- it talks about

17    the location of the leisure [sic] in relation

18    to the sphincters.

19                   Why would that be relevant?

20                   MS. WALKER:  Objection --

21    objection.  I'll pause the witness there for

22    one second.  David, we're objecting as to form.

23    There's no foundation for that question, and

24    it's well beyond the Court's order.

25                   If -- you're -- you're

1      certainly -- I -- I stated my objection, but I
2      do want to make sure that everyone understands
3      if -- if you're going to go into this field,
4      it's clearly beyond the order.  We -- we may
5      have to go into it, as well, but you --
6          Q.   (BY MR. GROSS)  Doctor, you can go
7      ahead and answer.
8          A.    Yeah, well, it -- it -- the reason I
9      mentioned sphincters was that indicates if a
10     patient has incontinence, you know.  So less
11     likely to have urine in the underwear,
12     resulting in an ascending urinary tract
13     infections, which results are protected by the
14     length of her urethra, which is why men don't
15     get UTIs very often.
16                So initially she presented, I
17     think, with -- or had had in her history a UTI.
18     So they were worried about what's the
19     contributing factor.
20         Q.    And did you -- did you -- you ruled
21     that out?
22         A.    I did.
23         Q.    Okay.  And you also say:  He did not
24     feel -- you did not feel that likely the repair
25     of this lesion would relieve the patient's

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 56 of 84    Exhibit 2
Page 56 of 84

1      other symptoms either.

2                    What other -- can you remember

3      what other symptoms they -- they were talking

4      about?

5                    MS. WALKER:  Same objections.

6         A.    I don't remember what the -- what --

7      I -- I can't recall what that was referring to.

8      I will tell you that hypospadias in adults is

9      oft- -- is very hard and often fails.

10        Q.   (BY MR. GROSS)  And what is that

11     procedure?

12                   MS. WALKER:  Same objections.

13        Q.   (BY MR. GROSS)  Go ahead.

14        A.    It's to -- so with a hypospadias, what

15     she has is a -- is a slit down the ventral side

16     of her urethra.  So it's like a cobra head

17     instead of just a normal urethral meatus.  So

18     it would be involved in re-tabularizing that

19     aspect of the urethra until she just had a

20     normal meatus at the tip of her penis.

21        Q.    Okay.  And those are very -- those are

22     difficult procedures that don't often succeed?

23        A.    They do not often succeed.  They often

24     fail.

25                   MR. GROSS:  Okay.  Those -- those

```
 1        are all the questions I have.
 2                    Thank you, Doctor.
 3                    THE WITNESS:  You're welcome.
 4                      FURTHER EXAMINATION
 5        Q.   (BY MS. WALKER)  Okay.  Dr. Simerville,
 6    don't go away.  Just a quick follow-up with
 7    that.
 8                    Is it fair to say that that
 9    procedure would cause pain, what you're talking
10    about?
11        A.    Any surgery can cause pain, yes.
12        Q.    Okay.  And the particular condition
13    you referred to, with the urethra being sort of
14    shaped in like a cobra head than a typical
15    urethra, would that be painful for a patient?
16        A.    Nope.
17        Q.    Why do you say that?
18        A.    Because lots of people have
19    hypospadias, and they don't have pain.
20        Q.    Okay.  Do some people have pain with
21    hypospadias?
22        A.    Not from the hypospadias.
23        Q.    Okay.  But from -- okay.  Fair enough.
24    I'll leave that.
25                    So going back to counsel --
```

1       counsel's question, he asked you a question
2       having to do -- he read a long medical note
3       that referred to sphincters.  And I'm going to
4       direct your attention back to that quote that
5       he read you.
6                       And I know, Dr. Simerville, I
7       can -- I can predict what you're going to say,
8       but I'm going to ask you -- I'm going to ask
9       you to bear with me and please just answer the
10      question, if you can.
11                      There is nothing about what
12      Mr. Gross, Mr. David Gross, read to you that
13      has anything to do with whether Emalee Wagoner
14      should have gender-affirming surgery now, does
15      it?
16          A.    That's a completely separate issue.
17          Q.    Yeah.   Okay.
18                      And -- right.  Because -- because
19      when -- when you're talking about this issue of
20      the -- the hypospadias, if I'm saying that
21      correctly, what you're referring to in your
22      notes there is -- is sort of contemplating or
23      getting ready for penile reconstruction as
24      opposed to a penectomy, right?
25                      MR. GROSS:  Objection, leading.

Veritext Legal Solutions
212-267-6868              www.veritext.com              516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 59 of 84    Exhibit 2
                                                                      Page 59 of 84

1                   MS. WALKER:  It -- it's a

2      cross-examination deposition.

3           Q.   (BY MS. WALKER)  So, Doctor, you can

4      answer, if you know the answer.

5           A.    We were not contemplating a penectomy.

6           Q.    Because that's -- that's not a service

7      you provide, right?

8           A.    Only for a patient with penis cancer.

9           Q.    Okay.  And Emily Wagoner did not have

10     penis cancer?

11          A.    She did not.

12          Q.    All right.  One second.

13                    Fantastic.

14                  MS. WALKER:  Dr. Simerville,

15     thank you so much.  We really appreciate you

16     taking time out your busy schedule.  And that

17     concludes the deposition questions for the

18     Plaintiffs.

19                  MR. GROSS:  No further questions.

20                  THE VIDEOGRAPHER:  This is the

21     videographer.  I will close out the record.

22     Please stand by.

23                  The time is 5:15 p.m.  This will

24     conclude today's testimony given by Dr. Jeff

25     Simerville.

1                  The total number of media units
2        is one and will be retained by Veritext.
3                        Deposition concluded.  Off the
4        record.
5                (Deposition adjourned at 5:15 p.m.)
6                    (Signature not requested.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 61 of 84
Exhibit 2
Page 61 of 84

1          CERTIFICATE OF DEPONENT

2

3          I have read the foregoing transcript of

4  my deposition and except for any corrections or

5  changes noted on the errata sheet, I hereby

6  subscribe to the transcript as an accurate record

7  of the statements made by me.

8

9

            _____

10                    JEFF SIMERVILLE, M.D.

11

12          SUBSCRIBED AND SWORN before and to me

13  this ____ day of _____, 20___.

14

15

16                    _____

17                    NOTARY PUBLIC

18

19

20  My Commission expires:

21

22

23

24

25

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 62 of 84
Exhibit 2
Page 62 of 84

1                    CERTIFICATE

2          I, SANDRA M. MIEROP, Certified Shorthand

3     Reporter, do hereby certify that the foregoing

4     proceedings were taken before me at the time and

5     place herein set forth; that the witness was sworn

6     to tell the truth; that the proceedings were

7     reported stenographically by me and later

8     transcribed by computer transcription; that the

9     foregoing is a true record of the proceedings

10    taken at that time; and that I am not a party to,

11    nor do I have any interest in, the outcome of the

12    action herein contained.

13         IN WITNESS WHEREOF, I have hereunto set

14    my hand on this the 28th day of March, 2025.

15

16

17

          SANDRA M. MIEROP

18        Notary Public, State of Alaska

          My commission expires:  9/18/28

19

20

21

22

23

24

25

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Wagoner, Emalee v. Dahlstrom, Nancy, Et Al.
DATE OF DEPOSITION: 3/27/2025
WITNESSES' NAME: Jeff Simerville , M.D.

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |

_____
Jeff Simerville , M.D.

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.


_____            _____
(NOTARY PUBLIC)                        MY COMMISSION EXPIRES:

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-2     Filed 03/28/25     Page 64 of 84
Exhibit 2
Page 64 of 84

| & | 3 | 9 | advice 25:5 |
|---|---|---|---|

**&**

**&** 2:12,19

**0**

**00211** 1:6 4:18
**09/18** 3:12

**1**

**1** 4:13 10:15
  12:9,18
**10005** 2:5
**120** 2:4
**1997** 51:4,5
**19th** 2:4

**2**

**20** 51:1 52:14
  62:13 64:22
**2016** 51:22
**2017** 37:7
  52:14,21
**2018** 51:23
  52:3 53:5
**2019** 54:14
**2025** 1:13 3:2
  4:3 63:14
**204** 9:13
**20th** 52:21
**2490** 1:17
**250** 2:19
**27** 1:13 3:2
**27th** 4:3
**28th** 63:14

**3**

**3/27/2025** 64:3
**307-7394** 2:7
**3:18** 1:6 4:18
**3rd** 54:14

**4**

**4** 13:25 14:3
**40** 38:2
**44** 3:11
**45** 3:12 9:18
  47:9
**46** 3:13
**4642** 63:16
**48** 30:21
**4:00** 1:14
**4:17** 4:3

**5**

**5** 3:4 13:21
**510** 2:13
**54** 3:5
**58** 3:6
**5:15** 60:23 61:5

**6**

**646** 2:7

**7**

**7** 52:3
**700** 2:13

**8**

**807** 2:19

**9**

**9/18/28** 63:18
**907-274-5100**
  2:22
**907-802-2998**
  2:15
**99501** 2:13,20
**99645** 1:17

**a**

**ability** 6:8 7:2
  20:13 21:17,25
  22:20
**able** 27:17,19
  38:20
**above** 54:23
**accommodate**
  34:3
**accurate** 35:17
  35:18 62:6
**acronym** 43:1
**act** 23:3
**action** 4:24
  5:10 46:25
  63:12
**actually** 23:3
  32:13
**adam** 13:15
**addition** 53:4
**address** 11:16
  14:4
**adjourned** 61:5
**adults** 55:6
  57:8

**advice** 25:5
  26:14,24 38:20
**affirming**
  41:16 44:7,10
  45:7 59:14
**aftercare** 20:14
  20:18 21:5,18
  21:25 22:20
**ago** 8:7 10:3
  26:10 27:4,21
  28:2 29:7
  35:17 40:21
  48:20 51:1
**agree** 4:11 6:11
  17:25 21:3
**ahead** 15:4
  30:7 32:1
  37:18 40:6
  56:7 57:13
**akdt** 4:3
**al** 1:7 4:16 64:2
**alaska** 1:2,14
  1:17 2:13,20
  3:13 4:18 13:2
  13:25 14:3
  15:2 17:15,18
  18:1 28:11
  29:1 31:4,4,22
  32:6,22 33:2
  33:10 34:14,19
  35:1,7,12,23
  36:20,25 37:4
  38:20,23 40:14
  47:21 55:10

63:18

**amended** 3:12
9:16

**anchorage** 2:13
2:20

**answer** 6:13,21
7:2 8:19 18:7
23:13,21,21,24
24:3,4,5,9,14
26:6 33:14
35:13 39:16
40:2 42:10
49:16 50:16
56:7 59:9 60:4
60:4

**answered**
29:13,23 49:9
50:8,24

**answering**
36:13 48:21

**answers** 49:14

**anymore** 29:9
41:13

**apologize** 28:24
48:21 49:15
52:15

**apply** 42:18

**appreciate**
20:23 23:9,11
24:10 36:13
37:17 38:9
43:23 48:9,13
49:16 51:14
60:15

**appropriate**
33:24 35:5
36:24

**appropriaten...**
32:20 33:8,12
33:21 34:12,22
36:10,18 38:11
38:16,18 39:10
40:15

**april** 54:14

**area** 19:13

**arielle** 2:24
4:19

**ascending**
56:12

**asked** 20:5
25:25 26:18
27:22 29:13
30:2,3 49:9,23
49:25 50:8,11
53:3 59:1

**asking** 8:11
21:10,24 27:7
28:1,6 38:7
45:4 52:23

**aspect** 29:24
57:19

**assess** 20:18

**association**
43:2

**assuming** 54:24

**attachments**
9:24

**attention** 13:21
16:15 32:14
47:8 59:4

**attorney** 5:9
8:12,17 10:2
14:15 21:13
32:15 45:19
47:10,13

**audible** 6:12

**audio** 4:10

**august** 51:22

**availability**
32:19 33:5
40:17

**available** 25:20
26:19,22 29:16
31:2,3,4,5 32:5
32:20 33:8,16
33:18 34:12,22
35:6 38:18
40:14 55:9

**aware** 31:11
32:2,7,10 36:2
36:4

**b**

**back** 26:10
29:25 32:13
43:21 50:12,20
50:22 51:5
58:25 59:4

**bear** 59:9

**beaten** 25:2

**believe** 16:14
25:17 28:1
40:8,13 41:4
42:20

**bell** 43:3

**bells** 14:17

**benefits** 44:18
44:21 45:7

**best** 6:7 10:13
14:12 34:3

**beyond** 24:21
47:2 55:24
56:4

**bhb.com** 2:15

**bi** 27:12

**big** 22:7

**bilateral** 27:12
27:14 28:6,9
28:13 29:5,8
29:17 31:14
44:18

**bilaterally**
28:23

**birch** 2:12

**bit** 12:20,22,23
12:23 42:11
43:21 51:18

**bittner** 2:12

**black** 9:15

**blood** 25:17

**body** 54:24

**bold** 9:15

**bottom** 9:13
25:18 26:18,22

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400
Case 3:18-cv-00211-MMS Document 249-2 Filed 03/28/25 Page 66 of 84 Exhibit 2
Page 66 of 84

[bottom - consistent]

Page 3

27:3,24 29:16
30:1,11,23
31:2 40:12
**break** 6:20,22
37:11,16,19,22
38:5 55:12
**breaks** 37:13
**brevity** 36:13
**brief** 5:24
**brooks** 13:15
**bunch** 13:2
**business** 17:14
**busy** 60:16

**c**

**c** 2:1
**call** 50:6
**called** 8:16 46:2
46:9,17,18
47:24 48:15
**calling** 46:12
46:15,16 48:16
49:2
**camera** 4:6
**cancel** 7:9
10:11
**cancer** 29:8
60:8,10
**capacity** 41:14
**caption** 9:14
**care** 20:19
41:16 42:14,15
43:12 53:11,18
53:25

**case** 1:5 4:18
45:20 50:5
64:2
**casual** 22:13
**causation**
55:16
**cause** 58:9,11
**cbc** 1:24
**cc** 11:10
**ccp** 1:24
**cert** 33:19
**certainly** 33:6
33:19,20 35:18
35:19 37:7
56:1
**certificate** 62:1
63:1
**certified** 63:2
**certify** 63:3
**change** 64:5
**changes** 62:5
**cherot** 2:12
**chief** 41:11
**circular** 44:13
**city** 2:5
**clarified** 29:24
**clarify** 21:11
29:14 39:21
46:14
**classmates** 51:7
**clause** 20:11
25:2,5
**clear** 29:1 30:5
31:13,21 35:11

36:12,14 37:9
40:19 46:8
50:2,13
**cleared** 41:4
**clearest** 18:7
**clearly** 56:4
**client** 8:17
10:22 11:10
**clinical** 42:17
**close** 60:21
**cobra** 57:16
58:14
**colleagues** 22:9
22:14
**collecting**
18:20
**colloquial**
30:19
**come** 25:16
26:9 29:24
**comes** 20:14
21:4,6 22:21
42:16
**comfortable**
10:22
**commission**
62:20 63:18
64:25
**communicated**
8:10 50:17
**communicating**
24:7 53:5
**communication**
50:6,14

**communicati...**
8:11,19 49:24
50:4
**community**
32:8 36:1
**complete** 55:5
**completely**
59:16
**complicated**
55:3
**complication**
55:4
**computer** 12:3
63:8
**con** 32:1
**concept** 36:10
36:18 38:11
**concerning**
7:17
**conclude** 60:24
**concluded** 61:3
**concludes** 54:5
60:17
**condition** 58:12
**conducted** 4:5
**confusion**
20:10
**connection** 4:7
**consent** 44:10
44:14,21 45:12
45:15
**consider** 32:3
**consistent** 6:8
43:12 52:4

212-267-6868

www.veritext.com

516-608-2400

Veritext Legal Solutions

Case 3:18-cv-00211-MMS     Document 249-2     Filed 03/28/25     Page 67 of 84

Exhibit 2
Page 67 of 84

**contained**
63:12
**contemplating**
59:22 60:5
**continue** 4:11
**contributing**
56:19
**controlling**
10:11
**convention**
22:8
**conversation**
22:14 45:19
**conversations**
45:22 50:1,12
**correct** 5:16
9:3 17:2,3,16
18:16,18,19
20:8 27:16
29:7,20 31:17
31:25 32:2
46:11 50:19
51:23 52:9
53:8,13,18
**correctional**
32:22 34:14
**corrections**
62:4
**correctly** 29:12
35:4 59:21
**costs** 45:7
**counsel** 5:1
10:11,20 11:9
23:23 24:11

45:24 58:25
**counsel's** 59:1
**couple** 55:12,12
**course** 11:10
24:21
**court** 1:1 4:17
4:20 5:21 13:1
33:11
**court's** 55:24
**covered** 19:16
**created** 15:13
**cross** 60:2
**crr** 1:24
**current** 54:18
54:21
**custody** 42:1,2
42:14,18,19
**cutting** 43:21
**cv** 1:6 4:18

**d**

**dahlstrom** 1:7
4:16 13:12
64:2
**date** 51:24 53:7
64:3
**dated** 54:13
**david** 2:14 38:6
38:9 54:6
55:22 59:12
**day** 62:13
63:14 64:22
**dead** 25:2

**deal** 22:16,17
**defendant's**
9:15 46:19
**defendants** 1:7
2:11 45:20
49:1,6
**defense** 2:4
45:24
**define** 30:3
**definitely** 7:25
34:3
**deign** 39:9
**depends** 4:6
26:16
**deponent** 62:1
**deposition** 1:10
3:11 4:4,14
5:18 27:10
46:6 47:3,6
60:2,17 61:3,5
62:4 64:3
**describe** 19:25
**described**
15:16,22
**description**
3:10
**desire** 34:2
**determined**
33:22
**dgross** 2:15
**diagnosed** 52:7
**diagnosing**
18:15

**different** 41:25
45:4
**difficult** 55:6
57:22
**dig** 36:9
**digging** 36:17
**direct** 13:20
32:14 34:4
49:16 59:4
**directing** 16:15
47:7
**directly** 10:21
11:3,9
**director** 41:9
**disagree** 23:19
23:20
**disclosure** 9:16
**discrete** 19:1
**discussed** 54:17
**distinction**
20:24
**district** 1:1,2
4:17,17 13:1,2
**doc** 9:18
**docket** 47:8
**doctor** 23:10
43:20 54:10
56:6 58:2 60:3
**doctors** 35:12
38:14
**document** 9:12
9:13,14,19
10:2,3 12:14
14:6,13 15:7

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400
Case 3:18-cv-00211-MMS Document 249-2 Filed 03/28/25 Page 68 of 84 Exhibit 2
Page 68 of 84

15:13 16:5,10
21:22 26:12
38:13
**documents**
7:17 9:2 14:9
44:1
**doing** 23:13
33:4 35:25
41:15 48:4
**door** 42:16
**dos** 8:22
**dr** 2:18,18 4:14
5:8 7:22 10:1,6
10:16 11:15
12:13 13:24
15:1 17:12
18:10 20:12
22:4,5,18
23:10 24:12
28:13,16,19
31:13 32:18
33:25 34:10
36:12,22 37:25
38:10 39:7
40:1 42:9 45:5
47:22 49:15
50:16 52:17
54:3,18 58:5
59:6 60:14,24
**drawing** 20:24
**duly** 5:5
**duper** 23:11
**dysphoria**
17:20 18:2,11

18:13,15,18,22
19:6,10,15,20
20:4,15,17
21:1,2,7,20
22:22 25:14
26:1,14,25
29:18 31:15,24
32:5,21 33:9
33:13 34:13,23
34:25 35:6,22
36:16,19,23
37:1 38:19
39:8,11 40:10
40:24 41:2,7
49:20 51:6
54:19

**e**

**e** 2:1,1 8:5 10:2
10:21,24 11:9
11:16,18,21,23
50:6
**earlier** 23:16
25:8 49:23
51:15
**earliest** 51:21
**education** 2:4
41:2
**eight** 27:21
**either** 39:3,6
55:2 57:1
**elaborate** 23:12
23:15 24:22
42:11

**emalee** 1:4 4:15
7:15 13:7 17:1
25:7,13,25
26:13,21,23
27:17 29:15
31:1 35:16
39:2 51:21
53:5,11 59:13
64:2
**emily** 60:9
**emmanuel** 7:9
**entire** 43:22
**entitled** 42:13
**entry** 54:12
**errata** 62:5
64:1
**essentially**
32:18
**established**
13:9 42:20
**et** 1:7 4:16 64:2
**evaluation**
25:15
**everybody** 9:9
42:15
**exactly** 19:25
26:17
**examination**
5:6 54:9 58:4
60:2
**example** 6:13
44:17
**excellent** 42:15

**except** 62:4
**excuse** 9:18
43:19 47:8
**exhibit** 3:9,11
3:12,13 9:18
10:12 13:21
47:9,17
**expedite** 12:3
**expeditiously**
6:24
**expert** 3:12
9:16 17:19
18:1,11,12,14
18:17,20 19:8
19:13,21 20:3
20:7,13 21:4
22:19,25 23:7
32:4 33:13
36:15 39:8
40:7,22 44:6,8
49:12,19 51:8
**expertise** 19:4
21:9
**expires** 62:20
63:18 64:25
**explain** 34:20
**expressed** 34:1
**expression**
52:21

**f**

**factor** 56:19
**fail** 57:24

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400
Case 3:18-cv-00211-MMS Document 249-2 Filed 03/28/25 Page 69 of 84
Exhibit 2
Page 69 of 84

**fails** 57:9
**failure** 55:5
**fair** 7:13,21 8:8
8:25 9:11 17:9
28:4 29:10
30:25 32:11
35:2 36:8
48:14,24 51:12
51:20 58:8,23
**false** 32:24,25
34:8,16
**familiar** 7:16
15:10 17:11
**fantastic** 5:13
5:23 19:23
54:3 60:13
**fapr** 1:24
**far** 31:20,25
32:2,9 39:3,5
**farley** 2:19
**farleygraves....**
2:21
**faster** 23:17
**february** 51:23
52:3
**federal** 33:11
**feel** 42:9 54:25
56:24,24
**fellow** 17:11
**felt** 55:8
**field** 17:19
45:10 56:3
**figure** 14:12
35:21

**figured** 6:17
**filed** 4:16
**financially** 4:24
**find** 46:21,22
**fine** 5:12 10:12
11:12 37:20
**first** 3:10 6:21
14:22 15:5
21:16 26:11
43:4 46:1
**five** 21:16
**floor** 2:4
**focus** 21:24
**follow** 20:13
21:17,25 22:20
50:22 58:6
**following** 21:5
**follows** 5:5
**foregoing** 62:3
63:3,9
**foreign** 54:24
**forgive** 29:12
**form** 55:22
**forms** 50:14
**forth** 16:18
63:5
**forward** 53:12
53:18 54:1
**foundation**
55:23
**free** 24:22
**friedman** 2:24
4:19

**front** 47:9
**full** 22:8
**fully** 7:3
**fund** 2:4
**further** 58:4
60:19
**furthermore**
55:2

**g**

**g** 2:19
**gender** 17:19
18:2,11,12,15
18:18,22 19:5
19:10,14,20
20:4,15,17
21:1,2,7,19
22:22 25:13
26:1,14,25
29:18 31:15,24
32:5,21 33:9
33:13 34:13,23
34:25 35:6,22
36:15,19,22,25
38:19 39:8,11
40:10,24 41:2
41:7,16 44:7
44:10 45:7
49:19 51:6
59:14
**general** 10:12
20:21,25 31:9
**generally** 45:11
55:14

**genitals** 30:20
**getting** 9:10
20:10,10 38:22
48:10 59:23
**give** 5:24 6:12
23:17 24:14,19
25:12,25 26:5
26:8,13,17,23
26:23 28:17
38:20 39:14
41:23 42:6
43:16 44:3,8
44:14,21 49:12
49:17 51:10
53:11,17 54:6
**given** 25:6 44:9
44:12 60:24
**giving** 24:14
**go** 4:12 12:8
15:4 30:7 32:1
32:13 34:9
37:18 38:21
40:6 45:6
51:13,16 56:3
56:5,6 57:13
58:6
**goal** 46:20
**going** 5:23 7:24
8:18 10:4
11:22 12:16
13:20,23 14:21
19:21,24 20:16
20:19 22:5
24:13 25:6

Veritext Legal Solutions
212-267-6868   www.veritext.com   516-608-2400
Case 3:18-cv-00211-MMS   Document 249-2   Filed 03/28/25   Page 70 of 84
Exhibit 2
Page 70 of 84

28:18 29:24
34:6,7 37:14
38:2 39:25
44:23 45:14
46:4,12,18
47:12 48:23
50:12 51:16
52:12 53:12,18
54:1,6,11 56:3
58:25 59:3,7,8
59:8
**good** 5:7 40:19
**graduated** 51:1
51:2,4
**graves** 2:19
**great** 10:9
11:14 12:7,11
25:1
**greg** 17:12
**gross** 2:14 3:5
16:23 23:19
24:1 38:1 45:1
45:19 49:24
50:4 54:10
56:6 57:10,13
57:25 59:12,12
59:25 60:19
**guidelines**
42:17 43:13,15

**h**

**hand** 63:14
**hang** 23:5

**happening** 11:7
36:3 46:13
**happy** 52:12,18
**hard** 57:9
**head** 6:14,16
43:22 57:16
58:14
**health** 18:21
43:3
**hear** 5:11,12
11:11 42:8
**heard** 4:8 13:12
33:5 43:5 51:9
**hearing** 11:8
43:4
**heck's** 46:18
**hello** 5:8
**help** 47:19 51:3
**hematuria**
16:23
**hereunto** 63:13
**hey** 22:15
36:22
**high** 55:4
**highlight** 47:13
**highlighted**
21:14,17 32:16
47:11
**highlighting**
47:20
**history** 18:21
56:17
**home** 20:20

**honest** 15:20
**hoping** 18:6
38:15
**horse** 25:2
**horton** 2:12
**hospital** 41:10
**hour** 47:16
**huh** 13:8,11
**hurry** 51:18
**hybrid** 15:10
15:16,22,23
47:24 48:6
**hypospadias**
54:20 55:5,7
57:8,14 58:19
58:21,22 59:20
**hypothetical**
22:7

**i**

**identifying**
18:17
**illness** 7:1
**imagine** 22:11
22:13
**implication**
53:23
**importance** 6:4
**important** 7:23
**improper** 24:2
**incarcerated**
41:19,22
**include** 16:17

**incontinence**
56:10
**index** 3:1,9
**indicates** 52:14
56:9
**infection** 54:22
**infections**
56:13
**inflicted** 19:6
19:10 54:20
**informally** 8:1
**information**
28:18
**informed** 25:19
44:10,14,21
45:12,14
**initially** 56:16
**injuries** 19:6,10
**injury** 54:21
**inserted** 54:25
**instructing**
23:24
**instruction**
23:20 24:2,7
24:13,23 39:21
40:2
**instructions**
20:14 21:5,18
21:25 22:21
**intact** 54:23
**interest** 63:11
**interested** 4:24
**interfere** 7:1

**internet** 4:7
**involved** 57:18
**involves** 41:22
**ipad** 43:20
**issue** 59:16,19
**issues** 55:12

**j**

**j** 11:23
**january** 52:14
**jeff** 1:11 3:2 5:4
   60:24 62:10
   64:3,21
**jeffrey** 4:14
**jim** 2:21 11:11
   12:19 13:22
   14:23 47:12,21
**jsimervill**
   11:17
**judge** 6:6
**june** 52:21
**jury** 6:5
**jwilkson** 2:21

**k**

**k** 2:14
**keep** 10:13
   37:13 38:7
   48:23
**kerr** 2:6
**kind** 5:24 6:14
   12:17 18:6
   20:21 22:10
   25:23

**know** 5:25 7:5
   7:10,20 9:4,9
   13:10,14,14,15
   13:16 15:5,12
   15:18,23 16:3
   16:20 17:7
   27:8,9 31:9,10
   31:10,18,19,21
   32:25 33:3
   34:1,1 38:12
   38:22 39:4,5
   39:24 40:20
   41:5 42:23
   43:14 44:12
   45:25 46:7
   48:4,5,15,16
   51:17 56:10
   59:6 60:4

**l**

**l** 2:13 11:19,23
   11:23
**lambda** 2:4
**lambdalegal....**
   2:6,8,10
**lately** 14:10
**latest** 51:22
**laura** 13:15
**lawrence** 13:16
**lawyer** 8:20
   37:23 46:10
   49:5
**lawyers** 13:18
   38:13 46:17

48:25 49:6,6
**leading** 59:25
**learn** 36:5,7
**leave** 58:24
**left** 13:3 27:15
**legal** 2:4 4:20
   4:21 6:4 9:14
   12:13
**leisure** 55:17
**length** 56:14
**lesion** 54:24
   55:1 56:25
**level** 54:24
**likelihood** 55:4
**likely** 36:2,4
   54:25 56:11,24
**line** 3:10 51:17
   51:17 64:5
**link** 11:2
**list** 3:12
**listen** 6:6 49:14
**little** 12:22,23
   12:23 42:11
   43:21
**llc** 64:1
**loaded** 22:24
**located** 20:20
**location** 55:17
**log** 10:24
**long** 14:14
   15:19 37:24
   49:20 59:2
**look** 10:14
   14:18 16:1

44:4
**looked** 51:15
   53:6
**looking** 55:15
**looks** 12:15
   54:13
**loop** 1:17
**lot** 8:5 14:9
   22:8 30:8
   33:17 41:23
   55:11
**lots** 58:18
**lower** 30:21
**ls** 11:20
**lund** 2:18 17:12
   28:13,19

**m**

**m** 1:24 11:23
   11:23,24,25
   63:2,17
**m.d.** 1:11 3:2
   5:4 62:10 64:3
   64:21
**made** 36:11,14
   62:7
**mail** 10:21
   11:16 50:6
**mailed** 10:2,24
**mailing** 11:9
**mails** 8:5
**make** 6:9 8:14
   8:22 19:1 20:9
   24:23,24 25:10

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Case 3:18-cv-00211-MMS     Document 249-2     Filed 03/28/25     Page 72 of 84
Exhibit 2
Page 72 of 84

29:11 39:25
44:19 50:1
54:11 56:2
**makes** 6:10
45:16
**making** 50:13
**mara** 2:16
45:23
**marathon** 6:19
**march** 1:13 3:2
4:3 63:14
**marked** 9:13
**mat** 41:10
**math** 51:3
**matter** 4:15
**matters** 40:16
**mean** 16:22
17:1 20:17
22:25 27:24
30:21 31:3,5
33:1 42:8
**meaningless**
40:16
**means** 8:17
27:14 37:4
41:5 53:16
**meatus** 57:17
57:20
**med** 51:2,4
**media** 4:13
61:1
**medical** 17:15
18:21 25:5
26:14,24 31:22

32:4,8,20 33:8
33:17 34:12,22
35:5 36:11,18
38:18 39:10
41:12 42:14
43:12,12,13,14
51:24 52:2,13
52:20 53:7,11
53:17,25 59:2
**medication** 7:1
**medicine** 20:22
20:25
**memory** 52:4
**men** 56:14
**mental** 18:21
**mention** 21:19
**mentioned** 56:9
**met** 5:14
**michaletz** 2:16
45:23,23 49:25
50:4
**middle** 12:17
**mierop** 1:24
4:21 63:2,17
**mind** 11:9
12:20 14:24
16:1 47:19
**minute** 26:10
27:4
**minutes** 10:3
38:2
**missing** 37:2
**mister** 14:25

**mms** 1:6
**moment** 10:18
14:11 37:11
43:16,19 44:4
48:20 49:17
**morgan** 2:8 5:9
**move** 6:23
23:18 25:3,4
48:8
**mwalker** 2:8

**n**

**n** 2:1
**name** 4:19 5:8
7:9,15 8:6 13:9
17:11 64:2,3
**named** 7:15
**names** 13:2,6
**nancy** 1:7 4:16
13:12 64:2
**need** 6:6,20,21
7:25 8:18
14:11,14,15
20:18,18 23:14
24:2 26:11
34:4 36:23,23
38:4,5 42:10
49:13 52:11,17
**needs** 11:5
**never** 5:14,19
5:20 41:6,15
43:10
**new** 2:5,5 64:1

**newborns** 55:7
**news** 48:2
**nod** 6:14
**nods** 6:16
**nope** 5:22 19:7
28:12,15 41:8
48:18 53:9
58:16
**normal** 57:17
57:20
**notary** 62:17
63:18 64:25
**note** 4:4 40:9
52:20 54:15,16
59:2
**noted** 62:5
**notes** 3:13
16:22 44:4
50:21,23 59:22
**notice** 3:11
47:3
**notion** 38:16
**number** 3:10
41:24 61:1

**o**

**oath** 6:1,3,8
**objecting** 55:22
**objection** 11:8
45:1 53:3
55:20,21 56:1
59:25
**objections** 57:5
57:12

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 73 of 84    Exhibit 2
Page 73 of 84

**objects** 11:6
**observations** 16:17
**obvious** 54:2
**obviously** 22:15,16 41:16 52:6
**office** 42:16 46:17,19 47:5
**oft** 57:9
**oh** 12:22 28:22 28:24 32:1 51:12
**okay** 5:7,11,17 5:23 6:11,19 7:5,8,11,13,18 7:21 8:8,21,24 8:25 9:4,7,25 10:5,9 11:8,14 11:22 12:6,6,8 12:10,12,16,24 13:5,13,17,20 14:11,18,21,24 15:8,9,12,21 16:1,11,15,20 16:25 17:9,9 17:25 18:5,14 18:25 19:8 20:1,11 21:12 21:16 22:4,9 23:1,9 24:10 25:1,4,12,21,22 26:7,9,21 27:2 27:6,17,23

28:4,4,9,13,16 28:24 29:4,10 29:21 30:10,15 30:18,25 31:12 31:20,20 32:3 32:11,13 33:7 33:25 34:6,9 34:20 35:2,10 36:8,11 37:3,6 37:9,17 38:13 38:14,16 39:7 39:18 40:6,19 41:1,5,5,9,14 41:18,25 42:17 42:21,23,25 43:6,10,16 44:16 45:17,17 45:22 46:8,20 46:24 47:1,7,7 48:7,19,24 49:4,5,7,10,17 49:23 50:10,15 50:25 51:12 52:1,6,10 53:2 53:2,10,16,21 56:23 57:21,25 58:5,12,20,23 58:23 59:17 60:9
**once** 18:6
**open** 11:2
**opine** 39:9
**opinion** 26:3,5 39:15 43:11

44:8 53:11,17 53:25 54:21
**opinions** 25:5 25:13 26:1,8
**opportunity** 54:7
**opposed** 59:24
**orchi** 27:24
**orchiectomies** 28:20,22 29:2
**orchiectomy** 27:12,18,25 28:7,9,14 29:5 29:6,9,17 30:4 30:9 31:15 44:18
**order** 55:24 56:4
**originating** 1:16
**outcome** 4:25 63:11
**outside** 32:22 34:14
**overall** 49:20
**oversaw** 41:15

**p**

**p** 2:1,1
**p.m.** 1:14 4:3 60:23 61:5
**page** 3:3,10 10:3,15 12:9 12:18 13:21

34:7 64:5
**paid** 9:10
**pain** 58:9,11,19 58:20
**painful** 58:15
**palmer** 1:17
**paragraph** 14:22 15:1,5 16:2,12 19:3 47:14,17
**part** 32:8 36:1
**participants** 4:7
**particular** 21:9 22:19 35:12 37:10 43:11 44:6,9 58:12
**parties** 4:11
**partner** 17:13 17:14,15
**parts** 32:24,25
**party** 4:23 63:10
**patience** 38:9
**patient** 7:8,14 18:22 35:21 36:21 37:8 40:22,25 44:9 51:21 56:10 58:15 60:8
**patient's** 22:20 54:18,21 55:2 56:25

**patients** 20:18
**pause** 39:20,25
  55:21
**paying** 9:7
**pdf** 11:6
**penectomy**
  59:24 60:5
**penile** 59:23
**penis** 57:20
  60:8,10
**people** 13:18
  38:3 41:15,19
  41:22 42:1,5,8
  42:13,14 50:18
  58:18,20
**percentage**
  41:21
**perform** 29:2
**performed**
  28:20,22 31:11
  41:6
**performs** 29:4
**person** 8:4 25:8
  25:9 42:8
  44:14,17 45:6
  45:9,11 50:6
**person's** 30:20
**phalloplasty**
  30:16 31:23
**phone** 50:6
**phrase** 26:16
**physical** 21:6
**picture** 16:8

**pinch** 10:7
**place** 4:11 63:5
**places** 38:4
**plaintiff** 1:4 2:3
  25:6,7
**plaintiffs** 5:10
  16:18 60:18
**planning** 49:12
**plastic** 31:10
**please** 4:4 6:20
  7:5 8:2,2 10:14
  11:16 12:9
  23:14,18 29:12
  42:6 43:17
  44:4 48:23
  51:3 59:9
  60:22
**point** 12:16
**popped** 35:15
**position** 19:2
  28:17 44:8,19
  53:10,17,24
**possible** 6:24
  20:1 34:2
**possibly** 18:7
**practice** 17:18
  18:1,4 33:20
  41:21
**practicing**
  49:21
**predict** 59:7
**predispose**
  54:22

**preparation**
  35:13
**presented**
  56:16
**privilege** 8:17
**problem** 44:2
**procedure** 21:6
  29:5 55:3,7
  57:11 58:9
**procedures**
  32:7 57:22
**proceed** 5:3
**proceedings**
  4:1 63:4,6,9
**professional**
  22:9 43:2
**progress** 54:16
**promise** 37:25
**prostate** 29:8
**protected**
  56:13
**provide** 28:10
  28:13 41:25
  47:24 52:18
  53:24 60:7
**providers** 15:2
  28:10 31:22
  33:17 35:5
  47:20
**providing** 31:8
  31:22
**psychiatrist**
  40:10

**public** 62:17
  63:18 64:25
**purpose** 31:15
**purposes** 31:23
**push** 43:20
**put** 11:21 19:22
  22:6 23:7 37:4

**q**

**qualified** 32:18
  33:10 34:11,21
  44:25
**quality** 4:5,6
**quest** 50:16
**question** 6:12
  6:21 7:6 21:2
  21:11,23 22:24
  23:21,22,25
  24:3,4,9 25:23
  25:24 26:6
  30:2 33:14
  34:5 35:13
  36:20 44:13
  45:4 48:21
  49:9 50:24
  52:16 55:23
  59:1,1,10
**questions** 5:25
  6:7 7:2,24 8:9
  8:18 19:25
  27:11 36:14
  38:7 54:6,7,12
  58:1 60:17,19

Veritext Legal Solutions
212-267-6868  www.veritext.com  516-608-2400
Case 3:18-cv-00211-MMS   Document 249-2   Filed 03/28/25   Page 75 of 84  Exhibit 2
Page 75 of 84

**quick** 25:22
  37:19 51:10
  54:11 58:6
**quickly** 20:1
  32:13 34:2
  38:8 48:10
  51:13,19
**quite** 15:20
**quote** 34:11
  52:22 59:4

**r**

**r** 2:1 11:23
**reached** 46:1
**read** 14:14,21
  15:4,4 16:2,9
  16:12,22 34:6
  43:25 59:2,5
  59:12 62:3
**ready** 15:6 16:3
  16:6 59:23
**really** 6:3,6
  21:1 32:12
  36:9,17 37:12
  38:15 40:16
  48:9 51:19
  60:15
**reason** 6:25
  45:6,8 56:8
  64:5
**recall** 27:20
  28:8 45:21
  57:7

**receive** 8:5
**received** 9:12
  47:2
**recent** 53:7
**recently** 9:2
**recognize** 7:14
  13:5
**recollection** 9:1
**reconstruction**
  59:23
**reconstructive**
  55:9
**record** 4:12 5:2
  37:18 50:2,13
  51:25 52:2,18
  52:20 54:13
  60:21 61:4
  62:6 63:9
**recorded** 4:9
  4:14
**recording** 4:6
  4:10
**records** 7:12
  8:6 21:22
  51:16 52:13
  53:7
**refer** 33:22
  40:23 50:20,22
**reference** 3:10
**referred** 25:8
  58:13 59:3
**referring** 9:17
  27:4 29:17
  30:19 31:14

  40:21 48:3
  57:7 59:21
**regarding**
  18:22 19:3,14
  20:3,4 22:19
  25:13 26:14,24
  32:4 54:19
**regional** 41:10
**related** 4:23
  55:5
**relation** 55:17
**relationship**
  19:5,9
**relevant** 55:19
**relieve** 55:1
  56:25
**remain** 37:18
**remember** 28:3
  28:5 31:18
  57:2,6
**remote** 4:14
**remotely** 8:13
**rendered** 43:10
**repair** 55:1,7
  56:24
**repeat** 18:8
**repeating**
  18:23
**rephrase** 52:16
**reported** 1:24
  19:14 20:3
  63:7
**reporter** 4:20
  63:3

**reporting** 64:1
**represent** 10:1
  25:6 38:12
  52:1,10,12,19
**representing**
  46:10
**requested** 61:6
**requesting**
  25:18
**require** 55:8
**research** 35:12
  35:20
**respond** 6:7
**resulting** 56:12
**results** 56:13
**retained** 61:2
**reviewed** 8:6
  9:1
**reviewing** 15:7
  16:5,10
**richard** 2:9
**rid** 16:9
**right** 5:15 11:4
  11:6 12:24
  14:7 17:6
  18:22 19:11,12
  19:15 20:2,4,7
  20:15 21:7,21
  22:1 25:4
  27:14,15 29:2
  31:16 32:12
  33:20 35:13,19
  35:23,25 36:6
  38:24,25 39:12

212-267-6868    Veritext Legal Solutions    516-608-2400
www.veritext.com
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 76 of 84    Exhibit 2
Page 76 of 84

39:15 40:24
41:3 43:8,13
44:11,21,25
45:10,13,15
48:17 51:7
52:25 59:18,24
60:7,12
**ring**  14:17 43:3
**risks**  44:17,20
  45:7
**robert**  13:16
**rsaenz**  2:10
**ruled**  56:20
**rules**  5:25 7:23
**rutherford**
  13:15

**s**

**s**  2:1 11:23 64:5
**saenz**  2:9
**sandra**  1:24
  4:21 63:2,17
**saw**  25:15
  35:16,20 37:8
  51:20 52:3
**saying**  22:1,3
  24:1 26:2 35:4
  46:2 59:20
**says**  13:1,25
  15:2 16:16
  22:15 32:17
  34:18 38:23
  47:14,20,23
  48:15 52:2,20

54:14,14,17
**scenario**  22:7
  22:11
**schedule**  60:16
**school**  51:2,4
**scope**  18:4
  35:22
**screen**  4:8 9:20
  10:5,14 12:2
**scroll**  13:23
  14:15
**scrolling**  12:20
  14:24
**second**  16:16
  16:16 25:22
  39:20 42:6
  51:10 55:22
  60:12
**see**  9:23,23
  10:5,6,8,17
  12:4,5,7,13,21
  12:25 13:4,25
  14:1,2 15:1,15
  15:21 19:19
  21:13,16 22:1
  22:3 32:17
  38:21 41:23
  47:10,14,20,23
  48:1 52:18
**seeing**  14:9
  22:1 39:2
  53:23
**seek**  36:5,7

**seen**  4:8 14:5,8
  14:13,19 51:25
  52:7 53:14,19
  53:22
**self**  19:6,10,14
  20:3 54:20
**send**  7:19 11:5
**sense**  6:9,10
  8:14,22 24:24
  25:10 45:16
**sent**  7:17,18,20
**sentence**  16:16
  19:22 32:15
**separate**  59:16
**service**  25:20
  26:4,19 28:10
  31:8 40:14
  60:6
**services**  32:4
  32:20 33:8
  34:12,22,24
  35:5 36:11,19
  36:24 38:18
  39:10
**set**  63:5,13
**setting**  32:22
  34:14
**seven**  8:7 10:3
  27:21 28:2
  35:15,17 40:20
  53:15,20,22,23
**shake**  6:14
**shaped**  58:14

**share**  9:21 10:5
  12:2
**sheet**  62:5 64:1
**shocked**  15:17
**shorthand**  63:2
**show**  52:11
**sic**  54:19 55:17
**side**  57:15
**signature**  61:6
  63:16
**significance**
  42:12
**simer**  20:12
  22:4
**simerville**  1:11
  2:18 3:2 4:15
  5:4,8 7:22 10:1
  10:6,16 11:15
  12:13 13:24
  15:1 18:10
  20:12 22:5,18
  23:10 24:12
  28:16 31:13
  32:18 33:25
  34:10 36:12,22
  37:25 38:10
  39:7 40:1 42:9
  45:5 47:22
  49:15 50:16
  52:17 54:3,18
  58:5 59:6
  60:14,25 62:10
  64:3,21

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Case 3:18-cv-00211-MMS     Document 249-2     Filed 03/28/25     Page 77 of 84     Exhibit 2
Page 77 of 84

sincerity 42:10
situation 10:10
  54:18
skerr 2:6
slit 57:15
solutions 4:22
somebody
  45:25 46:7,9
someone's
  44:12
sonja 2:6
soon 6:23
sooner 18:9
sorry 11:25
  16:6 23:23
  28:24 32:1
  37:15 46:14
sort 10:25
  20:15 54:15
  58:13 59:22
sorts 30:17
sounds 15:25
  26:1,2 29:12
  35:3 44:13
south 1:17
speak 7:25
  48:20
speaking 55:14
special 43:7
specialist 38:21
  39:1 40:24
  49:19 55:9
specialization
  41:18,20

specialized
  41:2
specializes
  45:10
specialty 52:25
specifically
  29:17
speculate 7:25
spend 35:24
sphincters
  54:23 55:18
  56:9 59:3
spoken 13:18
staff 41:12
stand 60:22
standing 43:1
standpoint
  52:22
start 25:22
state 63:18
stated 5:1 56:1
statement
  32:23,24 34:8
  34:9,10,16,17
  35:8 37:10
  38:23 53:1
statements
  20:4 62:7
states 1:1 4:17
stay 37:20
stenographic
  5:2
stenographic...
  63:7

street 2:4,13,19
strike 52:15,15
su 41:10
subscribe 62:6
subscribed
  62:12 64:22
succeed 57:22
  57:23
suite 2:13,19
summary 5:24
summoned
  46:23
summons 46:1
  47:2,4
super 23:11
suppose 30:14
sure 8:1,23
  12:15 19:1,17
  20:9,17,21
  22:12,25 29:11
  39:25 44:20
  50:1,13 51:24
  53:3 56:2
surgeon 31:9
  31:10 40:11
  45:9
surgeries 45:14
surgery 25:18
  26:19,22 27:3
  27:24 29:16
  30:2,12,24
  31:2 32:21
  33:1,9 34:13
  34:25 35:7,22

36:20,23,25
38:19 39:11
40:12 41:6,10
41:15 44:7,10
45:8,12 58:11
59:14
surprise 15:15
  17:21,23 28:21
surprised
  15:21 17:17
surprising
  15:25
survey 35:11
sworn 5:3,5
  62:12 63:5
  64:22
symptoms
  18:18 19:14
  20:3 55:2 57:1
  57:3

**t**

tabularizing
  57:18
take 4:11 6:22
  14:11,14 15:19
  20:19 25:21
  37:11,16,19,22
  37:24 40:11
  46:25
taken 1:16 5:17
  5:18 6:1 27:5
  63:4,10

Veritext Legal Solutions
212-267-6868   www.veritext.com   516-608-2400
Case 3:18-cv-00211-MMS   Document 249-2   Filed 03/28/25   Page 78 of 84   Exhibit 2
Page 78 of 84

**takes** 33:17
40:7,9,13
**talk** 8:11 15:6
16:4,7 30:10
30:11 37:23
38:15 46:6
**talked** 40:21
49:18
**talking** 14:6
16:21 17:3,4,5
25:9 30:20,22
30:23 38:17
39:23 49:4,5
57:3 58:9
59:19
**talks** 55:16
**team** 33:17,22
40:7,9,13
**teams** 46:12,15
**tell** 6:2 24:8
27:18 33:15,16
36:23 49:1
57:8 63:6
**telling** 26:21
**term** 15:10
27:6 30:1
**terms** 44:16
**terrific** 26:9
27:2
**test** 51:14
**testicles** 27:5
**testified** 5:5,21
51:15

**testify** 17:18
27:11 28:19
32:19 33:6,11
34:11,21 46:21
49:2
**testimony**
29:11 45:2
47:25 49:12
60:24
**text** 12:17
21:14 50:5
**thank** 43:23
47:18,21 54:3
58:2 60:15
**thanks** 13:23
**thing** 6:15,18
11:3 15:18
19:1 20:22,25
35:24 37:2
46:5 47:16
**things** 7:23
22:17 23:12
30:17
**think** 7:16,18
9:22 15:24
18:23 19:16,23
25:1 27:22
29:22 30:8,23
31:6 33:2,3,4
33:16,23 34:18
38:3 40:8
46:16,18 47:4
53:2 54:2
56:17

**throw** 20:16
**thursday** 4:3
**time** 1:14 4:2
9:8 14:6 16:24
19:20 25:19
35:24 39:2
43:4 51:25
52:3,8 60:16
60:23 63:4,10
**tip** 57:20
**today** 7:3 9:5,8
9:10
**today's** 60:24
**told** 26:18
29:15 31:1
33:12 39:16
42:25 48:5,22
50:7,9
**top** 10:14 12:8
12:10 43:22
47:13
**total** 61:1
**totally** 31:13,21
35:10 37:17
40:19
**touch** 29:25
**tract** 54:22
56:12
**training** 43:7
51:6
**transcribed**
63:8
**transcript** 62:3
62:6

**transcription**
63:8
**transgender**
43:2
**treat** 21:7 29:8
32:5,21 33:9
34:13,23,25
35:6 36:19,25
38:19 40:9,25
41:6
**treated** 7:8
**treating** 16:23
36:15 39:11
41:19,22
**treatment**
16:17 20:15
22:21 29:18
31:16 35:23
42:1
**trial** 6:4 33:11
47:2 48:3 49:2
**trouble** 10:21
**true** 32:23,24
34:8,16,18
35:8,9 52:23
53:1 63:9
**truth** 6:2,2,3
24:15,15,16,17
24:17,18,20,20
24:21 40:2,3,3
63:6
**truthfully** 7:3
**try** 19:24 46:5
46:21 55:11

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400
Case 3:18-cv-00211-MMS Document 249-2 Filed 03/28/25 Page 79 of 84 Exhibit 2
Page 79 of 84

| | | | |
|---|---|---|---|
| **trying** 10:19 | 58:15 | **video** 1:10 4:10 | 38:6,10 39:24 |
| 23:11 24:25 | **urethral** 57:17 | 4:14 | 44:3,5 45:3,5 |
| **tumors** 29:3 | **urinary** 54:22 | **videoconfere...** | 47:18,22 49:10 |
| **twenty** 49:22 | 56:12 | 1:10,16 | 49:11 50:10 |
| **two** 11:19,20 | **urine** 25:17 | **videographer** | 54:5 55:20 |
| 50:18 54:23 | 56:11 | 2:23 4:2,20 | 57:5,12 58:5 |
| **typical** 58:14 | **urologic** 52:22 | 43:18,19 44:2 | 60:1,3,14 |

| **u** |
|---|

| | | | |
|---|---|---|---|
| | **urologist** 22:16 | 60:20,21 | **wall** 2:4 |
| **u.s.** 13:1 | **urologists** 18:3 | **view** 48:13 | **want** 19:17 |
| **uh** 13:8,11 | 22:8,17 31:7,9 | **virtually** 4:5 | 20:9 22:6 |
| **unclear** 21:10 | **urology** 3:13 | **vocabulary** | 26:16 29:10,13 |
| **under** 53:21 | 13:25 14:3 | 27:19 | 31:18 36:9 |
| **underlined** | 15:2 17:15,19 | **vs** 1:6 | 37:12,13,16,22 |
| 9:15 | 18:1 28:11 | | 50:1 56:2 |
| **understand** | 29:1 31:4 | | **wanted** 27:5,18 |

| **w** |
|---|

| | | | |
|---|---|---|---|
| 6:22 7:6 19:23 | 47:21 49:21 | | 31:19 |
| 28:25 29:11 | 52:25 54:19 | **wagner** 26:22 | **wants** 23:21 |
| 35:3 40:1,5 | **use** 27:19 | **wagoner** 1:4 | 24:4,5 |
| 44:15,20 | **used** 29:7 30:1 | 4:15 7:15 13:7 | **warmth** 42:9 |
| **understanding** | 52:21 | 17:1 25:7,13 | **way** 16:8 22:15 |
| 19:5,9 44:17 | **uti** 54:19 55:16 | 25:25 26:13,24 | 26:11 27:9 |
| 50:15 53:21 | 56:17 | 27:17 29:15 | 30:19 46:21 |
| **understands** | **utis** 56:15 | 31:1 40:21 | 50:17 |

| **v** |
|---|

| | | | |
|---|---|---|---|
| 19:2 56:2 | | 51:21 53:5,12 | **we've** 9:17 |
| **underwear** | **v** 11:23 64:2 | 59:13 60:9 | 19:16 25:1,2 |
| 56:11 | **vaginoplasty** | 64:2 | 29:23 38:1,2 |
| **unit** 4:13 | 30:13 31:23 | **wait** 23:5,5,5 | 42:20 |
| **united** 1:1 4:17 | **ventral** 57:15 | **walker** 2:8 3:4 | **welcome** 14:16 |
| **units** 61:1 | **venture** 39:9 | 3:6 5:7,9 9:25 | 37:20 58:3 |
| **unquote** 34:15 | **veritext** 4:21 | 10:9,16,20 | **whereof** 63:13 |
| **unsure** 14:8 | 61:2 64:1 | 11:4,14,15 | **wilkson** 2:21 |
| **urethra** 56:14 | **versus** 4:16 | 12:6,12,19,21 | 9:20 10:4,18 |
| 57:16,19 58:13 | 20:25 42:18 | 12:22,25 13:22 | 10:23 11:12 |
| | | 13:24 14:23,25 | 12:1 39:22 |
| | | 23:23 24:10,12 | |

47:15 49:8
50:8
**witness** 4:8 5:2
6:16 9:16,22
10:7,11 11:1
12:5,7 15:10
15:16,22,23
23:24 43:25
48:6 55:21
58:3 63:5,13
**witnesses** 47:24
**witnesses'** 64:3
**woodworth**
1:17
**word** 40:15
**words** 21:16
34:7
**works** 27:10
**world** 43:1
**worried** 56:18
**wpath** 42:23
43:7,13,14
**written** 38:13
38:14
**wrong** 50:19
**wrote** 8:7 40:8
52:24

**y**

**yahoo.com**
11:23
**yahoo.con.**
11:18

**yeah** 8:16 10:8
11:1,12 14:3,5
15:25 17:13,23
21:12 24:25
25:11 33:19
38:6 40:18,25
44:24 46:23
47:18 48:2,9
50:9 54:10
56:8 59:17
**years** 8:7 27:21
28:2 29:7
35:15,17 40:20
49:22 51:1
53:15,20,22,23
**yep** 19:18
**york** 2:5,5 64:1

**z**

**zoom** 1:16

Veritext Legal Solutions
212-267-6868              www.veritext.com              516-608-2400
Case 3:18-cv-00211-MMS    Document 249-2    Filed 03/28/25    Page 81 of 84 Exhibit 2
Page 81 of 84

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.